# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BAZARIAN INTERNATIONAL<br>FINANCIAL ASSOCIATES, L.L.C.,<br><br>Plaintiff,<br><br>v.<br><br>DESARROLLOS AEROHOTELCO, C.A.,<br>WALTER LUCIANO STIPA, an individual,<br>DESARROLLOS NEWCO 22, C.A.,<br>DESARROLLOS HOTELCO<br>CORPORATION CURACAO HOLDING,<br>N.V., DESARROLLOS HOTELCO<br>CORPORATION ARUBA HOLDING, N.V.,<br>DESARROLLOS HOTELCO<br>CORPORATION DHC ARUBA, N.V. AND<br>DESARROLLOS HOTELCO<br>CORPORATION ARUBA HOLDING<br>CARACAS, S.A.,<br><br>Defendants. | Civil Action No. 13-1981 (BAH)<br><br>Judge Beryl A. Howell |

## MEMORANDUM OPINION

The plaintiff, Bazarian International Financial Associates, LLC ("plaintiff" or "BI"), filed this lawsuit against six foreign affiliated corporate defendants and Walter Stipa Sprecase, a Venezuelan citizen associated with all of the defendant companies. First Amended Complaint ("FAC") ¶¶ 3–9, ECF No. 13.[1] The plaintiff asserts two claims for breach of contract and quantum meruit stemming from the defendants' alleged breach of an Investment Banking Agreement between the plaintiff and Aerohotelco, pursuant to which the plaintiff assisted

---

[1] The defendant companies are Desarrollos Aerohotelco, C.A. ("Aerohotelco"), a Venezuelan corporation; Desarrollos Newco 22, C.A. ("Newco"), a Venezuelan corporation; Desarrollos Hotelco Corporation Curacao Holding, N.V. ("Curacao Holding"), a Curacaoan corporation; Desarrollos Hotelco Corporation Aruba Holding, N.V. ("Aruba Holding"), an Aruban corporation; Desarrollos Hotelco Corporation DHC Aruba, N.V. ("DHC"), an Aruban corporation; and Desarrollos Hotelco Corporation Aruba Holding Caracas, S.A. ("Caracas Holding"), a Venezuelan corporation. FAC ¶¶ 3–9.

Aerohotelco with the leasing of a tract of land and the financing for the development of a luxury hotel in Aruba. *Id.* ¶ 13. The plaintiff alleges that the defendants have failed to pay the plaintiff monies owed for its services under the Investment Banking Agreement. *Id.* ¶ 52. Pending before the Court is the defendants' Motion to Dismiss Plaintiff's First Amended Complaint for lack of personal jurisdiction, improper service and failure to state a claim, under Federal Rules of Civil Procedure 12(b)(2), (5), and (6). *See* Defs.' Mot. Dismiss ("Defs.' Mot."), ECF No. 25. For the reasons set forth below, the defendants' motion is granted in part and denied in part.

## I.      BACKGROUND

The factual allegations underlying this dispute have been generally summarized in this Court's Memorandum Opinion dismissing the plaintiff's prior lawsuit against Aerohotelco for a declaratory judgment that the plaintiff has the "right to certain investment banking fees under the parties' contract." *Bazarian Int'l. Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.*, 793 F. Supp. 2d 124, 125–27 (D.C. 2011) (BAH). The facts pertinent to resolving the instant motion are briefly summarized below.

### A.      Investment Banking Agreement

On February 5, 2007, Aerohotelco and the plaintiff executed an Investment Banking Agreement, pursuant to which the plaintiff agreed to assist Aerohotelco "with bidding for an option from the Government of Aruba to lease land in Palm Beach, Aruba ("the Palm Beach Option"), for the purpose of establishing and developing a luxury hotel resort ("the Project")." FAC ¶ 13. The plaintiff also agreed to "act as Aerohotelco's exclusive advisor and investment banker . . . to raise financing for the Project." *Id.* ¶ 14. The Agreement provided for payment to the plaintiff of a "Debt Fee" "'if the financing for the Project is concluded within thirty-six (36) months following the termination of this Agreement from sources introduced to the Project by

[the plaintiff].'"  *Id.* ¶ 16 (quoting FAC, Ex. A ("Investment Banking Agreement") ¶ 3, ECF No.

13-1) (alteration in the original).  The Agreement specified, in a forum selection clause, that

"District of Columbia courts will have jurisdiction over the Parties to adjudicate any and all

rights of the Parties under this Agreement."  Investment Banking Agreement ¶ 5.

     Shortly after consummation of the Investment Banking Agreement, the plaintiff

introduced the then-owner and president of Aerohotelco, defendant Stipa, to AIB Bank "to

discuss financing for the Project."  FAC ¶¶ 18–19.  The meetings culminated, on March 26,

2007, with AIB Bank sending to Aerohotelco and the plaintiff an "Indicative Term Sheet," *id.* ¶

21, which "provides an indication of the basic terms and conditions based on which the bank is

prepared to entertain a financing proposal," *id.*, Ex. B ("Indicative Term Sheet") at 4, ECF No.

13-2.  AIB Bank expressly stated that while Aerohotelco "may use [the Indicative Term Sheet]

as part of [its] proposal to the Government of Aruba" for the Palm Beach Option, it "does not

constitute any legally binding or enforceable obligation on the part of the bank to provide any

financing."  *Id.*  With the AIB Bank's Indicative Term Sheet in hand, Aerohotelco thereafter won

the Palm Beach Option to develop the Project in or around June 2008.  FAC ¶ 24.  The plaintiff

alleges, however, that even though Aerohotelco won the option to lease the land, a related

defendant company, DHC, actually leased the land from the Aruban government.  *Id.*

     In June 2009, twenty-eight months after the execution of the Investment Banking

Agreement, Aerohotelco notified the plaintiff that "it would not pay the Debt Fee for financing

coming from AIB Bank" because "[the plaintiff] had no role in facilitating its relationship with

AIB Bank[.]"  *Id.* ¶ 28.

### B.      Prior Lawsuit

On September 17, 2009, the plaintiff brought an action in this Court against Aerohotelco

seeking a declaratory judgment that the plaintiff was entitled to the Debt Fee "upon the

settlement of binding loan or guarantee commitments for the Project from AIB Bank." *Bazarian*,

793 F. Supp. 2d at 127; FAC ¶ 29.  The anticipated financing agreement ("Facility Agreement")

between AIB Bank and "Aerohotelco or one of the other corporate Defendants controlled by

Stipa" was entered on October 26, 2009, FAC ¶ 30, but, at the time of the prior action, the terms

remained "'subject to [] numerous contingencies and conditions,'" and "'there ha[d] not been

any draws made by the borrowers pending a final closing,'" *Bazarian*, 793 F. Supp. 2d at 130

(quoting Decl. of Pedro Vera ¶¶ 8–10).  On June 22, 2011, the action was dismissed due to lack

of subject matter jurisdiction because the settlement of a binding loan commitment was not yet

likely and, consequently, "the facts . . . do not present an actual controversy within the meaning

of the Declaratory Judgment Act and Article III of the U.S. Constitution."  *Id.* at 131.

### C.      Efforts to Serve Instant Lawsuit

On December 16, 2013, the plaintiff refiled the instant lawsuit against Aerohotelco, s*ee*

*generally* Compl., ECF No. 1, but because the plaintiff experienced difficulty serving

Aerohotelco in Venezuela, the complaint was never served, *see generally* Pl.'s Mot. Leave to

Effect Alternative Service ("Pl.'s Mot. Alt. Service") at 4–6, ECF No. 16; Response to Order to

Show Cause at 2–3, ECF No. 10; Status Report, ECF No. 11; Second Status Report, ECF No. 12.

Over a year later, on February 10, 2015, still unable to serve the original complaint, the plaintiff

filed the First Amended Complaint, the operative complaint for this motion, adding six

additional defendants: Stipa, Newco, Curacao Holding, Aruba Holding, DHC (collectively the

"Project Developers"), and Caracas Holding, a Venezuelan "holding company that holds some or

all of the equity interest in DHC."  FAC ¶¶ 3–9.  The plaintiff alleges that according to representations made in a Share Sale Agreement and Shareholders Agreement ("Share Sale Agreement") with another Venezuelan citizen, Newco, Curacao Holding, Aruba Holding, DHC, and Stipa became developers of the Project, *id.* ¶ 34, which was completed in November, 2013, *id.* ¶ 41.  Additionally, the plaintiff alleges that circumstances have now changed.  Specifically, "[u]pon information and belief, since January 26, 2011, Aerohotelco and/or Stipa, Newco, [Curacao Holding], Aruba Holding, DHC, and/or Caracas Holding . . . have drawn funds from AIB Bank to develop the Project."  *Id.* ¶ 33

On April 21, 2015, the plaintiff moved for leave to effect alternative service on the defendants pursuant to Fed. R. Civ. P. 4(f)(3) and 4(h)(2).  Pl.'s Mot. Alt. Service at 1.  As support, the plaintiff alleged that "[it] has thus far been stymied in its efforts" to serve the original complaint on Aerohotelco in Venezuela in accordance with the procedures set forth in the Hague Convention on Service Abroad of Judicial and Extrajudicial Documents (the "Hague Convention").  *Id.*  The plaintiff explained that, as required by the Hague Convention, a copy of the original complaint and summons translated into Spanish was "provided [] to the State Department's contracted international process server, Process Forwarding International, for forwarding to the Venezuelan Central Authority," but no response had been received for eight months.  *Id.* at 4.  The United States Embassy in Venezuela had advised the plaintiff that it was unable to obtain any additional information regarding the status of the Venezuelan Central Authority's efforts to serve Aerohotelco.  *Id.*

The plaintiff, in attempting to serve the First Amended Complaint on the defendants, alleged that "despite extensive efforts involving searches of international business databases and inquiries of the Aruban government, counsel for [the plaintiff] has been unable to identify

addresses . . . for Stipa, Newco, or Caracas Holding in either Venezuela or Aruba, or to confirm addresses for the remaining defendants." *Id.* at 6.[2]   Faced with these difficulties, the plaintiff moved for leave to serve the defendants by registered mail and e-mail to the defendants' U.S. counsel, who was located in Florida, and was "currently representing them in the Receiver Case in Connecticut, and thus are presumably in regular contact with Defendants."[3] *Id.* at 9–10.  This same U.S. Counsel had represented Aerohotelco in the first lawsuit brought by the plaintiff in 2009. *Id.* at 4.

On April 21, 2015, the plaintiff's Motion for Leave to Effect Alternative Service on the Defendants was granted, in light of the "unsuccessful attempts already made to serve the defendants" and "the fact that service on a party's attorney is 'not prohibited by international agreement.'"  Minute Order Granting the Plaintiff's Motion for Leave to Effect Alternative Service on Defendants, dated Apr. 21, 2015 (citing Fed. R. Civ. P. 4(f)(3); *Freedom Watch, Inc. v. OPEC*, 766 F.3d 74, 83 (D.C. Cir. 2014) and *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1016 (9th Cir. 2002)).  The defendants' motion to dismiss the plaintiff's First Amended Complaint is now ripe for resolution.

---

[2]     The difficulties confronted by the plaintiff in effecting service on the defendants lends support to the plaintiff's suspicion that these defendants have cloaked their whereabouts to dodge service.  Even now, the defendants are not entirely forthcoming with their addresses.  Only three of the defendants provided addresses for themselves, and two of them provided the identical address.  *See* Defs.' Mem., Ex. C ("Vera Decl.") ¶ 5, ECF No. 25-3; *id.*, Ex. E ("McKenzie Decl.") ¶ 3, ECF No. 25-5.

[3]     On June 25, 2014, the Project Developers were named as defendants along with Romeo Mikael Mouawad Mawad, the individual with whom the Project Developers entered into the Share Sale Agreement, and Mouawad's relatives, in a receivership action in the United States District Court for the District of Connecticut.  The complaint in that action alleges that the Project Developers received fraudulent transfers of $15 million, without providing any consideration in return, from two entities that were used to perpetrate a Ponzi scheme by a person who, as a result of an investigation by the Securities and Exchange Commission, has already pleaded guilty to criminal charges.  Compl. ¶¶ 37–38, 46, *Carney v. Stipa Sprecase*, No. 3:14-cv-00925-SRU (D. Conn. June 25, 2014) ("Receivership Compl."), ECF No. 1.  On November 30, 2015, after the parties reached a settlement agreement, the plaintiffs voluntarily dismissed the case pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i).  Notice of Voluntary Dismissal With Prejudice, *id.* (D. Conn. Nov. 30, 2015), ECF No. 92; Receiver's Seventh Consent Motion for Order Extending Briefing Schedule on Miguel Mouawad's Motion to Dismiss ¶ 13, *id.* (D. Conn. Oct. 29, 2015), ECF No. 90.

## II.    LEGAL STANDARDS

### A.    Federal Rule of Civil Procedure 12(b)(2)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), the

plaintiff bears the burden of "establishing a factual basis for the [Court's] exercise of personal

jurisdiction over the defendant." *Crane v. N.Y. Zoological Soc'y,* 894 F.2d 454, 456 (D.C. Cir.

1990) (citing *Reuber v. United States,* 750 F.2d 1039, 1052 (D.C. Cir. 1984), *overruled on other*

*grounds by Kauffman v. Anglo-Am. Sch. of Sofia,* 28 F.3d 1223, 1226 (D.C. Cir. 1994)); *Williams*

*v. Romarm, S.A.*, 756 F.3d 777, 785 (D.C. Cir. 2014).  The plaintiff need only make a prima facie

showing that the court has personal jurisdiction.  *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir.

2005) ("a court ordinarily demands only a prima facie showing of jurisdiction by the plaintiffs");

5B Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1351 (3d ed.

2014).  Similar to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure

to state a claim, "the uncontroverted allegations of the complaint must be taken as true, and the

court will draw all reasonable inferences in plaintiff's favor."  William W. Schwarzer *et al.*,

FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 3:412 (2013); *see Walden v. Fiore*, 134 S. Ct. 1115,

1119 n.2 (2014) (accepting jurisdictional allegations in complaint as true at motion to dismiss

stage).  At the same time, however, a plaintiff must provide sufficient factual allegations, apart

from mere conclusory assertions, to support the exercise of personal jurisdiction over the

defendant.  *See Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524

(D.C. Cir. 2001) (noting the "general rule that a plaintiff must make a *prima facie* showing of the

pertinent jurisdictional facts" (internal quotation marks and alterations omitted)); *First Chi. Int'l*

*v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988) ("Conclusory statements . . . do not

constitute the *prima facie* showing necessary to carry the burden of establishing personal

jurisdiction." (internal quotation marks and citation omitted)); *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 787 (D.C. Cir. 1983) (same); *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003) (stating plaintiff "cannot rely on conclusory allegations" to establish personal jurisdiction).

Unlike a motion to dismiss under Rule 12(b)(6), the court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharms., Inc. v. FDA,* 402 F.3d 1249, 1253 (D.C. Cir. 2005); *see also Mwani,* 417 F.3d at 7 (holding that plaintiffs "may rest their [jurisdictional] argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain"). Any "factual discrepancies appearing in the record must be resolved in favor of the plaintiff," however. *Crane,* 894 F.2d at 456 (citing *Reuber,* 750 F.2d at 1052).

### B.    Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is facially plausible when the plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability," but "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012). Although "detailed factual allegations" are not required to withstand a Rule 12(b)(6) motion, a complaint must offer "more than labels and conclusions" or "formulaic recitation of the elements of a cause of action" to provide "grounds" of "'entitle[ment] to relief,'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41,

47 (1957)) (alteration in original), and "nudge[ ] [the] claims across the line from conceivable to plausible," *id*. at 570.  Thus, "a complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (second alteration in the original).  In considering a motion to dismiss for failure to plead a claim on which relief can be granted, the court must consider the complaint in its entirety, accepting all factual allegations in the complaint as true, even if doubtful in fact.  *Twombly* at 555; *Harris v. D.C. Water and Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (in considering Rule 12(b)(6) motion, the "court must accept as true all of the allegations contained in a complaint" and "to draw the reasonable inference" therefrom "that the defendant is liable for the misconduct alleged," but that tenet "is inapplicable to legal conclusions," and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" (internal quotations and citations omitted)).

## III.   DISCUSSION

Defendants Aerohotelco and the Project Developers[4] moved to dismiss the plaintiff's First Amended Complaint, contending that (1) personal jurisdiction over the Project Developers is lacking because they were not parties to the Investment Banking Agreement providing, in a forum selection clause, that proper venue is in District of Columbia; (2) the defendants were not properly served under Federal Rule of Civil Procedure 4(f)(3); and (3) the plaintiff fails to state a claim as to all defendants.  Each of these arguments will be reviewed *seriatim* below.

---

[4]       Defendant Caracas Holding did not join in the defendants' motion to dismiss, *see* Defs.' Mot. at 1, and an entry of default was entered on July 14, 2015 as to this defendant, Clerk's Entry of Default as to Desarrollos Hotelco Corporation Aruba Holding Caracas, S.A., dated July 14, 2015, ECF No. 28.

### A.    Personal Jurisdiction

The plaintiff contends that personal jurisdiction may be exercised over all of the defendants based on a forum selection clause in the Investment Banking Agreement.  As noted *supra* in Part I.A, this clause states, in full, that "The Parties hereby agree that District of Columbia courts will have jurisdiction over the Parties to adjudicate any and all rights of the Parties under this Agreement."  Investment Banking Agreement ¶ 5.  Although, the Investment Banking Agreement was executed by the plaintiff and Aerohotelco, this Agreement also expressly states that it "binds Aerohotelco's 'successor companies or any related entities which intend to invest in and/or develop' the Aruban resort hotel project at issue," a scope that the plaintiff contends including the Project Developers.  FAC ¶ 11 (quoting the Investment Banking Agreement Preamble).

When this Court's subject matter jurisdiction is based on the diversity of the parties' citizenship, as in this case, personal jurisdiction over each defendants may be exercised "coextensive with that of a District of Columbia Court."  *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004) (citing *Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987)).  The D.C. Court of Appeals "has recognized the modern trend toward enforcing forum-selection clauses, noting that 'such clauses are [now] prima facie valid and [will] be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances.'"  *Yazdani v. Access ATM*, 941 A.2d 429, 431 (D.C. 2008) (quoting *Forrest v. Verizon Commc'ns, Inc.*, 805 A.2d 1008, 1010 (D.C. 2002)) (internal quotation marks omitted, alterations in the original).

The defendants do not argue that enforcement of the forum selection clause would be unreasonable and further, concede that personal jurisdiction may be exercised over defendant Aerohotelco since it is a party to, and executed, the Investment Banking Agreement.  Defs.'

Mem. Supp. Mot. Dismiss ("Defs.' Mem.") at 24 n.13, ECF No 25.  The defendants dispute

whether the five remaining defendants, four allegedly affiliated corporations and Stipa, are

subject to the personal jurisdiction of this Court.  They contend that "none of the [Project

Developers] are 'successor companies' or 'related entities,'" and that the forum selection clause

may only be enforced against Aerohotelco.  *Id.* at 23.  This threshold dispute boils down to the

sufficiency of the plaintiff's allegations regarding whether the five remaining defendants are

such successor or related entities to Aerohotelco. [5]

The plaintiff has plausibly alleged that the Project Developers are at least related entities

to Aerohotelco intended to develop the Project, FAC ¶ 33, and therefore fall within the scope of

the Investment Banking Agreement's forum selection clause.  One man, defendant Stipa, is a key

link among all of these defendant corporate entities.  Defendant Stipa was the owner and

president of Aerohotelco when it entered into the Investment Banking Agreement with the

plaintiff.  *See* Investment Banking Agreement at 5 (Signature Page).  He also allegedly "'directly

or indirectly fully owned'" the corporate Project Developers, FAC ¶ 34 (quoting the Share Sale

Agreement), with the authority to execute on their behalf a contract between the Project

Developers and a third-party individual, *id.* ¶ 37.

In addition to sharing defendant Stipa as an owner and authorized agent, the Project

Developers appear to have succeeded Aerohotelco's work in developing the Project.  For

---

[5]     The defendants make two additional arguments that are unavailing.  First, the defendants argued that the
Project Developers are not subject to personal jurisdiction because they are foreign citizens or entities, who "do not
transact any business in the District of Columbia, own any real or personal property in the District of Columbia,
have any offices, officers or agents present in the District of Columbia, or supply any services to any person or
entity within the District of Columbia."  Defs.' Mem. at 25.  Second, the defendants argue that the plaintiff has not
sufficiently alleged that any of the Project Developers can be considered "alter egos" of Aerohotelco, permitting
piercing of the corporate veil.  *Id.* at 28–29.  Neither argument addresses the plaintiff's averred basis of personal
jurisdiction, namely, the forum selection clause, which is dispositive here.  Furthermore, the defendants' contention
that the plaintiff has not adequately alleged that the Project Developers are "alter egos" of Aerohotelco is addressed
in more depth *infra* in Part III.C.1.

example, the plaintiff avers that while Aerohotelco was awarded the Palm Beach Option to lease land in Aruba, the option was actually exercised by DHC, one of the Project Developers, *id.* ¶ 24, and the Project Developers, rather than Aerohotelco, were identified as the "'Developers' of the hotel resort," *id.* ¶ 34.  The plaintiff explains that Aerohotelco's strange disappearing act was "customary," in order to facilitate the doing of business in Aruba: Aerohotelco is incorporated in Venezuela and the Project Developers are incorporated in Aruba, where the Project is located, or Curacao, a neighbor island country also part of the Kingdom of the Netherlands.  In short, the plaintiff alleges that the Project Developers were incorporated as a means of succeeding Aerohotelco in the development of the Project.

The defendants attempt to counter the plaintiff's factual allegations establishing a *prima facie* case of personal jurisdiction by relying on the declarations submitted by each of the Project Developers.  Defs.' Mem. at 26–27 (quoting declarations of defendant Stipa and the corporate representatives of DHC, Aruba Holding, Curacao Holding, and Newco).  These declarations make nearly identical statements denying that they are successor companies to, or related entities of, Aerohotelco.  *Compare* Defs.' Mem., Ex. C ("Vera Decl.") ¶ 10, ECF No. 25-3 *with* Defs.' Mem., Ex. D ("Stipa Decl.") ¶ 9, ECF No. 25-4 *with* Defs.' Mem., Ex. E ("McKenzie Decl.") ¶ 9, ECF No. 25-5.  These declarations, apart from being conclusory, actually show the deep interconnections of management personnel among the defendant corporate entities and thereby undermine the defendants' efforts to defeat personal jurisdiction.  For example, the Managing Director of both DHC and Aruba Holding declared that these defendants "do not share and/or have any common directors and/or shareholders and have no common business interests or holdings" with Aerohotelco.  Vera Decl. ¶ 10.  Yet, the Managing Director for both DHC and Aruba Holding, however, is the same person, who, in 2011, submitted to the Court, in the earlier

*Bazarian* action, a declaration testifying that he was, at that time at least, "an officer and attorney-in-fact for [Aerohotelco] and, in that capacity, [he was] familiar with the business affairs of [Aerohotelco]."  Def.'s Mot. Dismiss, Ex. B ¶ 3, *Bazarian*, 793 F. Supp. 2d 124 (No. 09-1764).

Similarly, defendant Stipa, who now serves as the President of Newco, submitted a declaration stating that "Newco and Aerohotelco are separate and distinct corporate entities which do not share or have any common directors and/or shareholders and have no common business interests or holdings," despite defendant Stipa's undisputed ownership of Aerohotelco at the time the Investment Banking Agreement was signed.  Stipa Decl. ¶ 9.

Lastly, the Managing Director of Curacao Holding declared that Curacao Holding and Aerohotelco "are separate and distinct corporate entities which do not share or have any common directors and/or shareholders and have no common business interests or holdings."  McKenzie Decl. ¶ 9.  Curacao Holding and Aerohotelco, however, do share one shareholder: defendant Stipa.  Both Newco, run by Stipa, and defendant Stipa, personally, own equity stakes in Curacao Holding.  *See* Pl.'s Opp'n Defs.' Mot. Dismiss ("Pl.'s Opp'n"), Ex. 1 ("Share Sale Agreement") at 16, ECF No. 30-1 ("Whereas Stipa and Newco . . . wish to sell part of their shares in [Curacao Holding] to THE COMPANY.").  Furthermore, defendant Stipa represented Curacao Holding, along with the rest of the corporate Project Developers, "as evidenced by the power of attorney granted to him," in the Shareholder Sale Agreement entered into by all of the Project Developers with another Venezuelan individual.  *Id.* at 15.  In other words, defendant Stipa represented himself and Newco, as its chairman, in addition to the three other corporate entities in this Share Sale Agreement.

The reappearance of defendant Stipa and Mr. Vera, who was the attorney-in-fact for Aerohotelco in 2011, at the helm of DHC, Aruba Holding, Newco and Curacao Holding, all of which developed the Project that Aerohotelco originally contracted with the plaintiff to assist in obtaining both the land and the financing, is entirely consistent with the plaintiff's allegation that these Project Developers are related entities to Aerohotelco that were incorporated to succeed Aerohotelco's interest in developing the Project.  The similarity in the names of all of the corporate defendants—all of which start with the word Desarrollos, and nearly all of which incorporate the word Hotelco—and their involvement in the same type of work—development of the luxury hotel on the same tract of land in Aruba—further corroborate that they are related to Aerohotelco.

Therefore, this Court finds that the plaintiff has alleged sufficient facts for the exercise of personal jurisdiction over the Project Developers, as related entities to Aerohotelco in the development of the Aruba project, based on the forum selection clause and other terms of the Investment Banking Agreement.[6]

---

[6]     The forum selection clause applies only to the "rights of the Parties under this Agreement," Investment Banking Agreement § 5, but the Court may nonetheless exercise personal jurisdiction over the defendants as to both of the plaintiff's breach of contract and quantum meruit claims.  *See* FAC Count I & II.  Quantum meruit only provides relief if no contract governs, which would fall outside the "rights of the Parties under [the Investment Banking] Agreement."  Investment Banking Agreement ¶ 5; *see Rosenthal v. Sonneschein Nath & Rosenthal, LLP*, 985 A.2d 443, 458 n.14 (D.C. 2009) (holding that the plaintiff may not recover under quantum meruit, a "non-contractual equitable doctrine[]," where the plaintiff executed an agreement that governed the action at issue). Pendant personal jurisdiction may be exercised over a defendant, however, "with respect to any of his claim that arose out of the same core of operative facts as those claims which clearly [fall] within the scope of" the Court's personal jurisdiction.  *Oetiker v. Jurid Werke, GmbH*, 556 F.2d 1, 4 (D.C. Cir. 1977).  Here, the plaintiff's breach of contract claim shares a common nucleus of operative facts with its quantum meruit claim, since both claims arise out of the plaintiff's efforts, and alleged success, in obtaining financing from AIB Bank for Aerohotelco and its successor companies for the development of the Project in Palm Beach, Aruba.  For this reason, the exercise of pendant personal jurisdiction over the plaintiff's quantum meruit case serves the interests of "'judicial economy, convenience and fairness to litigants'" so that the facts need only be litigated once.  *Id.* at 5 (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).  Consequently, the Court may exercise personal jurisdiction over the defendants as to both of the plaintiff's claims.

Accordingly, the defendants' motion to dismiss on the basis of lack of personal jurisdiction is denied.

### B.        Sufficiency of Service on Defendants

Even if the plaintiff has established a prima facie case of personal jurisdiction, the law is well settled that "[a] federal court may assert personal jurisdiction over a defendant only if 'the procedural requirements of effective service of process are satisfied.'" *Freedom Watch*, 766 F.3d at 78 (quoting *Mann v. Castiel*, 681 F. 3d 368, 372 (D.C. Cir. 2012) (internal citations omitted)). "Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999). This is because service is necessary, but not sufficient, to allow a court to exercise personal jurisdiction over a defendant. *See Mwani*, 417 F.3d at 8 (noting that "service of process does not alone establish personal jurisdiction"). Indeed, "[b]efore a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant . . . there also must be authorization for service of summons on the defendant and a constitutionally sufficient relationship between the defendant and the forum." *Id.* (internal quotation marks and citations omitted; alteration in original).

When sufficiency of service is challenged, the plaintiff bears the burden of demonstrating that service has been effected properly. *See Mann*, 681 F.3d at 372 (noting that, under Federal Rule of Civil Procedure 4, "the plaintiff has the burden to demonstrate that the procedure employed to deliver the papers satisfies the requirements" of proper service) (internal quotation marks omitted); 4A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1083 (3d ed. 2014) ("[T]he party on whose behalf service of process is made has the burden of establishing its validity . . . to do so, she must demonstrate that the procedure

employed to deliver the papers satisfied the requirements of the relevant portions of Rule 4 and any other applicable provision of law.").  Insufficient service of process on a defendant "warrant[s] the court's dismissing [the plaintiff's claims] without prejudice" under Federal Rule of Civil Procedure 12(b)(5).  *Simpkins v. District of Columbia Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997).

The plaintiff in this case, prior to serving the defendants, moved for leave to effect alternative service on the defendants.  *See* Pl.'s Mot. Alt. Service.  "[T]he decision whether to allow alternative methods of serving process under Rule 4(f)(3) is committed to the sound discretion of the district court."  *Freedom Watch*, 766 F.3d at 81 (citation omitted).  In light of the plaintiff's previous failed attempt to serve Aerohotelco in accordance with the Hague Convention, its failed efforts to "identify or confirm addresses for several of the Defendants," and its representation that the defendants have retained U.S. counsel to represent them in a separate case in Connecticut, "and thus are presumably in regular contact with Defendants," Pl.'s Mot. Alt. Serv. at 9, the Court granted the plaintiff's motion and, pursuant to Rule 4(f)(3), allowed the plaintiff to serve the foreign defendants via email and registered mail to the defendants' "'retained litigation counsel' in the unrelated U.S. District Court for the District of Connecticut matter."  Minute Order, Granting the Plaintiff's Motion for Leave to Effect Alternative Service on Defendants, dated April 21, 2015.  The defendants, who were served in accordance with the Court order, have moved to dismiss the complaint for improper service under Rule 4(f)(3), Defs.' Mem. at 11, which essentially amounts to reconsideration of the Court's order granting the plaintiff leave to effect alternate service.

In challenging the propriety of service in accordance with this Court's order, the defendants argue that: (1) "Rule 4(f)(3) may not be used as a means of serving a party *within* a

judicial district of the United States," Defs.' Mem. at 11 (emphasis in the original); (2) the

"[p]laintiff did not . . . demonstrate a minimum threshold effort to serve Defendants via Rule

4(f)(1) and the Hague Convention," *id.* at 16; and (3) "[t]he manner of service was not permitted

under the Hague and not designed to minimize offense to Aruba, Curacao and Venezuela," *id.* at

19.  None of these arguments has merit.

### 1.    *Federal Rule of Civil Procedure 4(f)(3)*

Under Rule 4(f) and (h), unless otherwise provided in federal law, an individual "may"

and a corporation "must" "be served at a place not within any judicial district or the United

States" by enumerated means, including broadly "by other means not prohibited by international

agreements, as the court orders."  Fed. R. Civ. P. 4(f)(3); *see also* Fed. R. Civ. P. 4(h)(2) ("[A] . .

. . foreign corporation . . . must be served . . . at a place not within any judicial district of the

United States, in any manner prescribed by Rule 4(f) for serving an individual, except personal

delivery under f(2)(C)(i).").  The defendants construe the prefatory language of Rules 4(f) and

(h) referring to when "an individual or business is to be 'served *at a **place** not within any judicial*

*district of the United States*,'" as barring the plaintiff from effecting service through the

defendants' counsel because he is in the United States.  Defs.' Mem. at 12–13 (quoting Fed. R.

Civ. P. 4(f) and 4(h)(2)) (emphasis in the original).

The defendants mainly rely on the non-binding opinion in *Freedom Watch, Inc. v.*

*Organization of the Petroleum Exporting Countries (OPEC)*, 107 F. Supp. 3d 134, 137–39

(D.D.C. June 4, 2015), in which another Judge on this Court declined to authorize alternate

service on a foreign defendant under Rule 4(f)(3) via its United States counsel because Rule 4(f)

"provides no authorization for service occurring within the United States," and because the

defendant in that case entered into an international agreement accepting service only through certain "diplomatic channels." *Id.* at 139.

As a preliminary matter, unlike in *OPEC*, no international agreement applicable to this case expressly prohibits service via the defendants' U.S. counsel through email and postal mail. Second, the reasoning in *OPEC* assumes, without explanation, that "service" is complete when the foreign defendant's United States counsel physically receives the summons. This holding was not mandated by the D.C. Circuit's opinion prior to remand. To the contrary, the D.C. Circuit suggested, without deciding, that "service on a foreign entity through its counsel in the United States" may be permissible under Rule 4(f)(3) because "the attorney functions as a *mechanism to transmit the service* to its intended recipient abroad." *Freedom Watch*, 766 F.3d at 84 (remanding back to the district court to consider, in the first instance, whether to exercise its discretion under Rule 4(f)(3) to authorize alternate service) (emphasis added). Thus, the D.C. Circuit viewed service on the domestic counsel as a means to "transmit the service," which service would be completed abroad upon transmittal to the intended party subject to the suit.

This Court disagrees with the defendants' cramped interpretation of Rule 4(f) and instead holds that permitting service of a foreign individual or corporation through retained United States counsel does not run afoul of the rule's application to individuals and corporations, located in foreign countries, where service will be completed. As another court concluded, "court orders generally crafted under Rule 4(f)(3) require transmission of service papers to a foreign defendant via a domestic conduit like a law firm or agent—ultimately, the foreign individual is served and thereby provided notice outside a United States judicial district, in accordance with Rule 4's plain language." *In re Cathode Ray Tube (CRT) Antitrust Litig*., 27 F. Supp. 3d 1002, 1009–1010 (N.D. Cal. 2014). Consequently, that court rejected the defendant's

interpretation of Rule 4(f) that an order permitting service in Washington D.C., was "facially deficient because Rule 4(f) empowers courts to authorize service of process 'at a place not within any judicial district of the United States.'" *Id* (quoting Fed. R. Civ. P. 4(f)).

Indeed, the D.C. Circuit observed approvingly that "[a] number of courts . . . have sanctioned service on United States counsel as an alternative means of service under Rule 4(f)(3) without requiring any specific authorization by the defendant for the recipient to accept service on its behalf." *Freedom Watch*, 766 F.3d at 83 (citing *U.S. Commodity Futures Trading Comm'n v. Aliaga*, 272 F.R.D. 617, 619–20 (S.D. Fla. 2011); *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 931–32 (N.D. Ill. 2009); *LG Elecs., Inc. v. ASKO Appliances, Inc.*, No. 08-828 (JAP), 2009 WL 1811098, at * 4 (D. Del. June 23, 2009); *RSM Prod. Corp. v. Fridman*, No. 06 CIV. 11512 (DLC), 2007 WL 2295907, at *1-6 (S.D.N.Y. Aug. 10, 2007); *Brookshire Bros. v. Chiquita Brands Int'l*, No. 05-CIV-21962, 2007 WL 1577771, at *2 (S.D. Fla. May 31, 2007)); *see also Rio Props.*, 284 F.3d at 1016–17 ("expressly agree[ing] with the district court's handling of this case and its use of Rule 4(f)(3) to ensure the smooth functioning of our courts of law" where service authorized on foreign entity by regular mail to its U.S. counsel and its international courier, and by email to its Internet address); *Richmond Techs., Inc. v. Aumtech Bus. Solutions*, 2011 U.S. Dist. LEXIS 71269, 44–46 (N.D. Cal. July 1, 2011) (authorizing service upon a foreign defendant's United States-based counsel under Rule 4(f), noting this "is a common form of service ordered under Rule 4(f)(3)"); *Knit With v. Knitting Fever, Inc.*, Nos. 08-4221, 08-4775, 2010 WL 4977944, at *4 (E.D. Pa. Dec. 7, 2010) ("Repeatedly, courts around the country have found that service upon a foreign defendant through counsel is appropriate to prevent further delays in litigation."); *Tracfone Wireless, Inc. v. AU Optronics Corp. (In re TFT-LCD (Flat Panel) Antitrust Litig.)*, 270 F.R.D. 535, 538 (N.D. Cal. 2010) (granting plaintiff's

motion to serve foreign defendant through its U.S. counsel); *Ehrenfeld v. Salim a Bin Mahfouz*, No. 04 Civ. 9641, 2005 WL 696769, at \*3 (S.D.N.Y. Mar. 23, 2005) (authorizing service on foreign defendant's United States counsel where counsel was "in communication with Defendant in relation to the pending legal proceedings in the United States . . . and will know how to locate Defendant"); *FMAC Loan Receivables v. Dagra*, 228 F.R.D. 531, 534 (E.D. Va. 2005) (authorizing service on foreign defendant's United States lawyer where defendant had been "in constant communications with his attorney").

Ultimately, Rule 4(f) is concerned with providing a method of service that is reasonably calculated to "'notif[y] a defendant of the commencement of an action against him.'" *Freedom Watch*, 766 F.3d at 78 (quoting *Mann v. Castiel*, 681 F.3d 368, 372 (D.C. Cir. 2012)). The defendants' argument focuses on an arcane notion of where service is physically made by the plaintiff and obscures this guiding principle. The defendants are not being haled, unexpectedly, into a foreign court. These defendants are sophisticated and worldly, doing business in one part of the world, while negotiating with a business partner in another, and, most significantly, choosing a forum selection clause outside their native countries. The District of Columbia is the defendants' deliberately negotiated chosen venue to litigate claims arising from the Investment Banking Agreement.

The defendants have also availed themselves of the U.S. legal system. Specifically, in a parallel civil action to the receivership action described *supra* in note 3, the Securities and Exchange Commission filed suit against the perpetrator of the Ponzi scheme and the corporate entities he allegedly controlled to recover fraudulently obtained funds. Complaint ¶¶ 1, 6, *SEC v. Illarramendi*, No. 03:11-cv-00078-JBA (hereinafter "*Illarramendi*") (D. Conn. Jan. 14, 2011), ECF No 1. The Project Developers, not named as defendants, entered special appearances,

through the same U.S. counsel used to effect service in the instant case, in order to seek

dissolution of an order requiring the placement into escrow of the $15 million the Project

Developers received, without consideration, from the investigated entities in an allegedly

fraudulent transfer.  *See* Mem. Supp. Mot. Dissolve Ex Parte Order Freezing Assets, Transferring

Assets to Bank Within Court's Jurisdiction, and Granting Limited Discovery ("Project

Developers' Mem. Supp. Mot. Dissolve Ex Parte Order Freezing Assets") at 2–3, *id.* (D. Conn.

Apr. 4, 2014), ECF No. 865-1; *see also* Compl. ¶¶ 37–38, 46, *Carney v. Stipa Sprecase*, No.

3:14-cv-00925-SRU (D. Conn. June 25, 2014), ECF No. 1.  In these circumstances, the plaintiff,

an American corporation, will not be deprived of the opportunity to vindicate its rights under the

agreement entered with the defendants in the venue to which all the parties agreed.

Accordingly, the Court's Minute Order, dated April 21, 2015, permitting the plaintiff to

serve the foreign defendants through their U.S. counsel was authorized under Rule 4(f)(3), and

service in accordance with that order properly effected service on the defendants.

### 2.      *Efforts to Effect Service Under Federal Rule of Civil Procedure 4(f)(1) and the Hague Convention*

The defendants next argue that they were improperly served because the plaintiff failed to

first demonstrate "a minimum threshold effort to serve Defendants via Rule 4(f)(1) and the

Hague Convention," before invoking Rule 4(f)(3).  Defs.' Mem. at 16–17.  The defendants'

reliance on non-binding district court cases from outside this Circuit is unavailing.  The Ninth

Circuit, in *Rio Properties*, 284 F.3d at 1015, persuasively reasoned that "court-directed service

under Rule 4(f)(3) is as favored as service available under Rule 4(f)(1) or Rule 4(f)(2)."  This

conclusion is based on the plain text of Rule 4(f).  The *Rio Properties* Court explained that "Rule

4(f)(3) is one of three separately numbered subsections in Rule 4(f), and each subsection is

separated from the one previous merely by the simple conjunction 'or.' . . . Moreover, no

language in rules 4(f)(1) or 4(f)(2) indicates their primacy, and certainly rule 4(f)(3) includes no qualifiers or limitations which indicate its availability only after attempting service of process by other means." *Id.*

Other courts, including this one, that have considered this issue have concurred with the Ninth Circuit. *See Angio Dynamics, Inc. v. Biolitec, AG*, 780 F.3d 420, 429 (1st Cir. 2015) ("By its plain terms, Rule 4(f)(3) does not require exhaustion of all possible methods of service before a court may authorize service by 'other means,' such as service through counsel and by email."); *Enovative Techs., LLC v. Leor*, 622 Fed. App'x. 212, 214 (4th Cir. 2015) ("Rule 4(f)(3) does not denote any hierarchy or preference for one method of service over another." (citing *Rio Props.*, 284 F.3d at 1015)); *U.S. ex rel. Barko v. Halliburton Co.*, 952 F. Supp. 2d 108, 116 (D.D.C. 2013) (holding Rule 4(f)(3) "is 'neither a last resort nor one of extraordinary means,' but is 'merely one means among several which enables service of process on an international defendants'" (citing *Rio Props.*, 284 F.3d at 1015)).

Thus, contrary to the premise of the defendants' argument, the plaintiff is not required to first demonstrate "a minimum threshold effort to serve Defendants via . . . the Hague Convention." Defs.' Mem. at 16.

Even if the plaintiff were obliged to attempt service under the Hague Convention, this burden would have been satisfied in this case. The plaintiff attempted to comply with the Hague Convention to serve the original complaint on Aerohotelco. Pl.'s Mot. Alt. Serv. at 4. The plaintiff translated the complaint and summons "into Spanish and then provided them to the State Department's contracted international process server . . . for forwarding to the Venezuelan Central Authority." *Id.* This effort was unsuccessful, however, because the address the plaintiff had for Aerohotelco was no longer valid, and the plaintiff had no other address. Pl.'s Opp'n at

18.  Despite the plaintiff's "thorough investigation utilizing all of the tools available . . . to check public records," including contacting the Aruban Department of Economic Affairs, Commerce, and Industry, it was unable to obtain valid addresses for any of the defendants named in the plaintiff's first amended complaint.  *Id.* at 18–19.  Consequently, the plaintiff sought an alternative method to serve the defendants with the First Amended Complaint, as Rule 4(f) permits.

### 3. *Service Effected in Accordance with the Hague Convention*

Lastly, the defendants argue that service through their U.S. Counsel, who was sent the summons and First Amended Complaint via email and postal mail, was improper because "the manner of service was not permitted under the Hague [Convention] and not designed to minimize offense to Aruba, Curacao, and Venezuela."  Defs.' Mem. at 19.  According to the defendants, this alternative service is improper because (1) "Venezuela, which, in this case, is the country of residence for three of the Defendants, specifically objects to 'the transmission of documents through postal channels," as laid out in Article 10 of the Hague Convention; and (2) "the local laws of Curacao and Aruba do not permit defendants to be served via email, or registered mail, on their counsel.'"  *Id.* at 20.  These arguments are unavailing.

First, as the plaintiff correctly points out, the defendants were properly served because "'service by email is not prohibited by the Hague Convention . . . . Email service has been approved even where, as here, the country objects to Article 10 of the Hague Convention.'"  Pl.'s Opp'n at 22 (quoting *Lexmark Int'l, Inc. v. Ink Techs. Printer Supplies, LLC*, 295 F.R.D. 259, 261–62 (S.D. Ohio 2013) (collecting cases)).  In other words, a country's objection to Article 10 does not constitute an express rejection of service by email.  *See AMTO, LLC v. Bedford Asset Mgmt., LLC*, No. 14-cv-9913, 2015 WL 3457452, at * 7 (S.D.N.Y. June 1, 2015)

("the Court concludes that, as a general matter, service via email for a defendant residing in Russia may qualify as an alternative means of service under Rule 4(f)(3)," even though Russia has objected to Article 10 of the Hague Convention because that is not tantamount to a rejection of service by electronic mail (collecting cases)); *WhosHere, Inc. v. Orun*, No. 1:13-cv-00526-AJT, 2014 WL 670817, at *3 (E.D. Va. Feb. 20, 2014) (permitting service by email on a defendant in Turkey, which objected to Article 10, because email is not a method of service explicitly listed in Article 10); *FTC v. PCCare247 Inc.*, No. 12-cv-7189, 2013 WL 841037, at *4 (S.D.N.Y. Mar. 7, 2013) (granting service by email and Facebook on a defendant in India, even though India has objected to Article 10 because "[s]ervice by email and Facebook are not among the means listed in Article 10"); *Henry F. Teichmann, Inc. v. Caspian Flat Glass OJSC*, 2:13-cv-458, 2013 WL 1644808, at *1 (W.D. Pa. Apr. 16, 2013) (allowing service of a foreign defendant by email even though the foreign country has objected to Article 10).  The reasoning in these cases is persuasive, and this Court similarly concludes that electronic service, used here to transmit the summons and the First Amended Complaint to the defendants' U.S. counsel, does not violate the terms of the Hague Convention.

Second, the defendants argue that even if the alternate service is not prohibited by the Hague Convention, it would not "minimize offense" to the law of Aruba and Curacao, the countries of residence for three of the defendants, because these two countries do not expressly permit service by postal mail or email.  Defs.' Mem. at 20–21.  At the outset, the D.C. Circuit recently reiterated that as long as not prohibited by an international agreement, "the district court retains discretion under Rule 4(f)(3) to authorize service even if the alternative means would contravene foreign law." *Freedom Watch*, 766 F.3d at 84 (citing *Rio Props.*, 284 F.3d at 1014). The district court need only make "'an earnest effort . . . to devise a method of communication

that is consistent with due process and *minimizes offense* to foreign law.'" *Id.* (quoting Fed. R.

Civ. P. 4 Notes of Advisory Comm. On Rules—1993 Amendments) (emphasis in the original).

In reaching this conclusion, the Circuit compared the 1993 Advisory Committee Notes for Rule

4(f)(2), which state that "[s]ervice by methods that would violate foreign law is not generally

authorized," with the Notes for Rule 4(f)(3), which more permissibly state that only "an earnest

effort should be made to devise a method of communication that is consistent with due process

and *minimizes offense* to foreign law." *Id.* (citation omitted) (emphasis in the original).  The

Circuit opined that "even if service cannot be effectuated . . . through United States counsel

without violating Austrian law, the district court could still authorize such service if it would

'minimize' offense to Austrian law." *Id.*  In short, compliance with foreign laws is not

absolutely necessary under the Rule 4(f)(3).

Despite this binding clarification of the applicable law from the D.C. Circuit, the

defendants cite to authorities from outside this Circuit, to argue that "authorizing Rule 4(f)(3)

service in a manner other than what is prescribed by the foreign state's law 'would constitute a

substantial affront' to foreign law." Defs.' Mem. at 21 (citing *Prewitt Enters., Inc. v. Org. of*

*Petroleum Exporting Countries*, 353 F.3d 916, 927–28 (11th Cir. 2011) and four district court

cases).  As support, the defendants submitted a letter from an attorney in Aruba summarizing the

requirements for service in Aruba and Curacao.  Based upon this letter, Aruba and Curacao

apparently do not explicitly forbid service via postal mail or email, but rather do not prescribe

these methods as acceptable modes of service.  In such circumstances, other courts to address

this issue have not hesitated to approve alternative service as presenting only a minimal offense

to the foreign country's laws.  *See Marks v. Alfa Grp.*, 615 F. Supp. 2d 375, 379 (E.D. Pa. 2009)

("[T]he law of the principality does not expressly prohibit service by registered mail.  As a result,

an order pursuant to Rule 4(f)(3) approving service by registered mail will not offend foreign law."); *Export-Import Bank of U.S. v. Asia Pulp & Paper Co.*, 03Civ.8554(LTS)(JCF), 2005 WL 1123755, at *5 (S.D.N.Y. May 11, 2005) (approving service via DHL international courier "[e]ven if it is technically in violation of Indonesian service requirements," because "any offense to that country's sovereignty is minimal").  Likewise, here, this Court finds that, absent an express prohibition, permitting alternate service via postal mail or email, when such service is calculated to notify the foreign defendants in a timely manner, would "minimize offense" to Aruban and Curacaoan law, even though such service does not technically comport with the specific terms of Aruban and Curacaoan law.

Accordingly, the defendants' motion to dismiss based on improper service is denied.

*       *       *

Having concluded that personal jurisdiction may be exercised over the defendants and that they were properly served pursuant to Rule 4(f)(3), the Court now turns to the defendants' motion to dismiss the First Amended Complaint for failure to state a claim.

## C.       Failure to State a Claim

As noted *supra*, the plaintiff asserts two claims against all the defendants: breach of contract and, in the alternative, quantum meruit arising from the defendants' refusal to pay the plaintiff the "Debt Fee," after the plaintiff assisted the defendants in obtaining financing for the Project from AIB Bank.  FAC ¶¶ 44–52; 57–59.  The defendants' arguments to dismiss, under Federal Rule of Civil Procedure 12(b)(6), are addressed below as to each claim.

### 1.       Breach of Contract

"To *prevail* on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty;

and (4) damages caused by breach." *Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015)

(quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009) (emphasis in the

original)).  The plaintiff alleges that the Investment Banking Agreement is a valid contract,

pursuant to which the "[d]efendants retained BI as their exclusive advisor and investment banker

. . . to raise financing for the Project."  FAC ¶ 43.  Specifically, the plaintiff alleges that the

Investment Banking Agreement obligates the defendants to pay the plaintiff, as a Debt Fee, "a

percentage of the financing committed to the Project as a result, directly or indirectly, of BI's

efforts," *id.* ¶ 44, "if the financing for the Project is concluded within thirty-six (36) months

following the termination of this Agreement from sources introduced to the Project by BI," *id.* ¶

45.  The plaintiff alleges that "BI . . . satisfied all of its material duties under the Agreement," *id.*

¶ 48, by introducing the defendants to AIB Bank, which resulted in an "Indicative Term Sheet"

in March 2007 and, subsequently in 2009, the Facility Agreement, which amounted to "a

definitive and enforceable financing agreement for the Project," *id.* ¶¶ 21, 30, 49.  Nonetheless,

the defendants refused to pay the plaintiff the agreed upon Debt Fee.  *Id.* ¶¶ 28, 52.

     The defendants raise two grounds for dismissal of the breach of contract claim.  First, the

defendants argue that Section 2.B of the Investment Banking Agreement requires the plaintiff to

secure binding financial commitments by April 2, 2007, eight weeks after the execution date of

the Investment Banking Agreement in order to be entitled to the Debt Fee—a requirement that

the defendants contend the plaintiff failed to meet.  Defs.' Mem. at 31 (quoting Investment

Banking Agreement § 2.B).  The plaintiff concedes that it did not secure a binding loan

commitment on behalf of the defendants until 2009.  After the plaintiff introduced the defendants

to AIB Bank, AIB Bank sent, on March 26, 2007, an "Indicative Term Sheet," which was "only

for discussion purposes and does not constitute any legally binding or enforceable obligation on

the part of the bank to provide any financing."  Indicative Term Sheet at 3; FAC ¶¶ 18–21.

Negotiations continued for another two years until 2009, when AIB Bank entered into a Facility

Agreement, with "Aerohotelco or one of the other corporate Defendants."  FAC ¶ 30.

Nonetheless, the plaintiff contend that it has fulfilled its obligation under Section 2.B, and the

other sections, of the Investment Banking Agreement, entitling it to the Debt Fee because

Section 2.B requires only the plaintiff to obtain "financial commitments" that is "something less

than fully 'binding'—such as a detailed proposal that could be submitted in support of

Aerohotelco's bid," and the Indicative Term Sheet satisfies that obligation.  Pl.'s Opp'n at 37.

This dispute turns on a question of interpretation of Section 2.B, cited by both parties.

"'The proper interpretation of a contract, including whether a contract is ambiguous, is a legal

question[.]"  *Abdelrhman v. Ackerman*, 76 A.3d 883, 887 (D.C. 2013) (citing *Tillery v. District

of Columbia Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006)).  Under D.C. law, "'the

written language embodying the terms of an agreement will govern the rights and liabilities of

the parties [regardless] of the intent of the parties at the time they entered in the contract, unless

the written language is not susceptible of a clear and definite undertaking.'"  *Id.* at 888 (quoting

*Dyer v. Bilaal*, 983 A.2d 349, 354–55 (D.C. 2009)).  The task of interpreting the terms of a

contract starts with the "plain meaning of the language on the face of a fully integrated contract."

*Id.* (citing *Tillery*, 912 A.2d at 1176).  A contract is not ambiguous if "'the court can determine

its meaning without any other guide than a knowledge of the simple facts on which, from the

nature of language in general, its meaning depends.'"  *Sahrapour v. LesRon, LLC*, 119 A.3d 704,

708 (D.C. 2015) (quoting *Joyner v. Estate of Johnson*, 36 A.3d 851, 856 (D.C. 2012)).  On the

other hand, "[a] contract . . . is ambiguous if 'it is, or the provisions in controversy are,

reasonably or fairly susceptible of different constructions or interpretations, or of two or more

28

different meanings . . . ." *Id.* (quoting *Joyner*, 36 A.3d at 856).  If the terms of the contract are ambiguous "'[e]xtrinsic or parol evidence which tends to contradict, vary, add to, or subtract from the terms of a written contract" may be considered.  *Abdelrhman*, 76 A.3d at 888 (quoting *Segal Wholesale v. United Drug Serv.*, 933 A.2d 780, 783 (D.C. 2007)).  "[C]onsideration of such extrinsic evidence is for the fact finder[.]"  *District of Columbia v. District of Columbia Pub. Serv. Com'n*, 963 A.2d 1144, 1156 (D.C. 2009).

The Investment Banking Agreement is not so clear as the defendants would suggest.  The entire Agreement consists of four pages, divided in seven paragraphs, some of which are further divided into "sections."  Paragraph 2 of the Agreement outlines the plaintiff's various duties along with the "remuneration and reimbursement" owed to the plaintiff.  Section 2.B, which provides the basis for the defendants' argument that the plaintiff was obligated to "secure binding 'financial commitments'" within eight weeks to be entitled to the Debt Fee, provides in relevant part:

> Bazarian International proposes to receive the financial commitments within eight weeks from date of this Agreement with cooperation of the Company.  For its time and effort in advising the company during the RFP process as well as in seeking and arranging the financing for the Project, Bazarian International will receive a monthly retainer . . . . If Bazarian International is successful in arranging financial commitments, the Company, at its sole discretion, may continue the retainer and secure Bazarian International's services until loan closing and/or disbursements.

Investment Banking Agreement § 2.B.  This section does not indicate any promise or guarantee by plaintiff "to receive the financial commitments within eight weeks," but much less firm language of only "proposes" to do so.  In any event, the Debt Fee, which the defendants link to the plaintiff's ability to secure "financial commitments within eight weeks" of the Agreement, is not mentioned at all in this section.  *Id.*  Instead, Section 2.B refers to the plaintiff's entitlement to a "monthly retainer," which is not at issue in this lawsuit.

The Debt Fee is discussed in Section 2.C as the remuneration the plaintiff is entitled to receive "[u]pon settlement of binding loan and/or guarantee commitments for the Project obtained directly or indirectly by Bazarian International." *Id.* § 2.C.  This paragraph puts no time constraint on the plaintiff's entitlement to the Debt Fee.  Instead, the following section of the Agreement clarifies that "[t]he investment banking fee(s) described in [Section] 2.C above are due and will become payable only upon the earlier of the first draw-down of funds and/or first infusion of equity capital." *Id.* § 2.D.  Moreover, if the defendants decided "not to proceed with the project or draw down the financing referred to herefor in Section 2.C after a fully executed commitment has been extended to the Project, Bazarian International will receive from the company a 'drop-dead' fee of .5%." *Id.* § 2.E.  Finally, in Paragraph 3, the Agreement expressly states that the plaintiff "will be entitled to the investment banking fees provided in [Section] 2.C. if the financing for the Project is concluded within thirty-six (36) months following the termination of this Agreement from sources introduced to the Project by Bazarian International." *Id.* ¶ 3.

This more comprehensive review of the Investment Banking Agreement reveals the ambiguity in the reference to "financial commitments" in Section 2.B.  While the defendants urge that the words "financial commitments" should be interpreted to mean final and binding obligations, this construction simply cannot be squared with the other provisions in the Agreement for two reasons.

First, Section 2.C provides that "[u]pon settlement of binding loan and/or guarantee commitments for the Project obtained directly or indirectly by Bazarian International, Bazarian International will be entitled to receive investment banking fees," Investment Banking Agreement § 2.C, which distinguishes the "binding" nature of the loan commitments triggering

the Debt Fee from the non-binding nature of the "financial commitments" that the plaintiff only "proposes to receive" in Section 2.B.  Second, Paragraph 3 provides for a full thirty-six months to "conclude" the financing, and, thus, clearly contemplates that the "financial commitments" the plaintiff "propose[d]" to obtain within the first eight weeks would be preliminary and not "conclude[d]" within that timeframe, contrary to the defendants' purported construction.  In short, the plain text of the contract highlights the ambiguity of the term "financial commitments." Therefore, the term "financial commitments" is "reasonably or fairly susceptible of different constructions or interpretations," *Sahrapour*, 119 A.3d at 708, including the plaintiff's interpretation that the "financial commitments" the plaintiff "proposes to receive . . . eight weeks from the date of the Agreement" is satisfied by the Indicative Term Sheet from AIB Bank, which, though not fully binding, was "a detailed proposal that could be submitted in support of Aerohotelco's bid" to win the Palm Beach Option from the Aruba government, Pl.'s Opp'n at 37.

The plaintiff's interpretation appears particularly reasonable in light of the context for the Investment Banking Agreement.  Aerohotelco sought the plaintiff's assistance in obtaining an option from the Government of Aruba "to obtain a leasehold interest" in a piece of land Aerohotelco wanted to develop into a luxury hotel.  Investment Banking Agreement § 1.B; FAC ¶ 13.  Aerohoteco were required to submit a bid to the government by March 30, 2007, which is exactly eight weeks after the date of the Agreement.  Pl.'s Opp'n at 37.  Aerohotelco would not know whether it won the bid until much later.[7]  FAC ¶ 24.  The Agreement's inclusion of the eight week deadline, falling on the same date that Aerohotelco's bid was due, for the plaintiff to find "financial commitments" is unlikely to be coincidental.  In this context, "financial commitments" can reasonably be interpreted to indicate, as the plaintiff suggests, "a detailed

---

[7]     The plaintiff alleges that Aerohotelco won the leasehold interest "[i]n or about June 2008," more than a year after the submission of the bid.  FAC ¶ 24.

proposal that could be submitted in support of Aerohotelco's bid," Pl.'s Opp'n at 37, and not a fully binding loan document, since a lender is unlikely to enter into any binding financial commitments for a project that has not yet materialized. Consequently, the contract language does not expressly preclude the plaintiff's claim for breach of contract.

Second, the defendants argue that, even if the plaintiff were entitled to the Debt Fee, the breach of contract claim may be asserted only against Aerohotelco because the other defendants were not party to the Agreement and had no obligation to pay the Debt Fee to the plaintiff. Defs.' Mem. at 37. As support, the defendants cite Section 2.C of the Agreement, which addresses the payment of the Debt Fee, and provides that the plaintiff "will be entitled to receive investment banking fees from the Company," which is defined as Aerohotelco. Investment Banking Agreement § 2.C; Defs.' Mem. at 37. The plaintiff did not address this contention in its opposition, and, thus, appears to have conceded the issue. *See generally* Pl.'s Opp'n at 39–41; Defs.' Reply at 24. This interpretation limiting the obligation to pay the Debt Fee to only Aerohotelco is consistent with D.C. law, which gives greater weight to "'specific terms and exact terms'" than to general language, such as that in the preamble. *Abdelhrman*, 76 A.3d at 891 (quoting *Washington Auto. Co. v. 1828 L St. Assocs.*, 90 A.2d 869, 880 (D.C. 2006) (internal quotations omitted)).

Notwithstanding the absence of a contractual obligation, the plaintiff alleges that Aerohotelco's duty to pay the plaintiff the Debt Fee may be imputed to the Project Developers because they are "alter egos" of Aerohotelco.[8] FAC ¶ 34. "Courts apply the 'alter ego' theory to 'cast aside the corporate shield.'" *Estate of Raleigh v. Mitchell*, 947 A.2d 464, 470 (D.C. 2008)

---

[8] The plaintiff also alleges, in the alternative, that the other co-defendants are "successors in interest" to Aerohotelco, and are subject to successor liability. This alternate ground for liability need not be addressed since the plaintiff has sufficiently alleged that the co-defendants are alter egos of Aerohotelco.

(quoting 1 WILLIAM MEADE FLETCHER, ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 41.35 (perm. ed., rev. 2006)).  In order to "pierce the corporate veil," and hold the Project Developers liable as the alter egos of Aerohotelco, the plaintiff must demonstrate "'(1) unity of ownership and interest, and (2) use of the corporate form to perpetrate fraud or wrong, or other considerations of justice and equity justify it.'"  *Id.* (quoting *Bingham v. Goldberg, Marchesano, Kohlman, Inc.*, 637 A.2d 81, 93 (D.C. 1994)).  "Although no single factor controls, courts generally inquire, *inter alia*, whether corporate formalities have been observed; whether there has been commingling of corporate and shareholder funds, staff and property; whether a single shareholder dominates the corporation; whether the corporation is adequately capitalized; and, especially, whether the corporate form has been used to effectuate a fraud."  *Lawlor v. District of Columbia*, 758 A.2d 964, 975 (D.C. 2000); *see also Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 355 (D.C. 2005).  Ultimately, "'the [alter ego] doctrine can be invoked only where equity requires the action to assist a third party.'"  *Estate of Raleigh*, 947 A.2d at 471 (quoting *McCarthy v. Azure*, 22 F.3d 351, 362–63 (1st Cir. 1994) (internal quotations omitted)) (alteration in the original).

Here, the plaintiff plausibly alleges a multitude of the factors courts consider when deciding whether to pierce the corporate veil, such as shared ownership, a single dominating shareholder, and use of the corporate form for fraud.  These factual allegations, which must be assumed to be true, along with the reasonable inferences that can be drawn from them, have "nudged . . . from conceivable to plausible" the plaintiff's assertion that the Project Developers are alter egos of Aerohotelco.[9]  *Twombly*, 550 U.S. at 555.

---

[9]     At trial, the plaintiff would have to prove, by a preponderance of evidence, that the Project Developers are alter egos of Aerohotelco, and not merely plausibly allege that fact, which is the standard by which a motion to dismiss for failure to state a claim is evaluated.

The plaintiff sufficiently alleges that Aerohotelco shares a unity of ownership and interest with the Project Developers.  FAC ¶¶ 3–8.  As discussed *supra* in Part III.A, the former owner and senior management of Aerohotelco now own and manage the other corporate defendants. Defendant Stipa, former owner and president of Aerohotelco, is now president and chairman of Newco.  Stipa Decl. ¶ 5; Share Sale Agreement at 15.  In addition, defendant Stipa is also at least a part-owner in Curacao Holding.  Share Sale Agreement at 16 ("Whereas Stipa and Newco 22 . . . wish to sell part of their shares in Hotelco Curacao . . . .").  The Managing Director of the two remaining corporate defendants, DHC and Aruba Holding, is the former attorney-in-fact for Aerohotelco.  Vera Decl. ¶ 3.  Moreover, the Project Developers, who are controlled by former Aerohotelco officers, not only continue to engage in the development of the luxury hotel in Aruba, the Project first espoused by Aerohotelco, they also deliberately chose to intermingle their financial liabilities by becoming joint guarantors of obligations assumed under the Share Sale Agreement, which provides additional financing for the Project.  Share Sale Agreement § 2.7 ("In order to guarantee fulfillment of the obligations under this Agreement . . . Stipa on his own behalf, as well as his capacity as representative of [Curacao Holding], [Aruba Holding] and [DHC], all become joint guarantors and main payers of the obligations assumed by Newco [] . . . .").

More significantly, defendant Stipa emerges as the dominating force behind all of the corporate defendants.  "'Under the alter ego theory, the court may ignore the existence of the corporate form whenever an individual so dominates an organization as in reality to negate its separate personality.'"  *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 897 (D.C. Cir. 2010) (quoting *Founding Church of Scientology of Wash., D.C., Inc. v. Webster*, 802 F.2d 1448, 1452 (D.C. Cir. 1986)).  Defendant Stipa represented Aerohotelco in

the Investment Banking Agreement at issue.  Investment Banking Agreement ¶ 1.  Defendant

Stipa also served as the authorized representative for all of the Project Developers in the Share

Sale Agreement, in which he expressly acknowledged that all of the Project Developers were

either "directly or indirectly fully owned or related to [him]," Share Sale Agreement at 15, and,

tellingly, entered the same address for all of the Project Developers, including defendant Stipa in

his personal capacity, *id.* at 22.[10]

Lastly, the plaintiff draws the reasonable inference from Aerohotelco's transfer to the

Project Developers of valuable assets in an alleged effort to avoid paying the plaintiff the Debt

Fee.  Pl.'s Opp'n at 40.  The defendants do not dispute that even though Aerohotelco was

awarded the Palm Beach Option to lease the land, the lease was actually executed by DHC,

evidencing a transfer of the Palm Beach Option, FAC ¶ 24, and, further, that the other Project

Developers subsequently joined as developers of the Project, to the exclusion of Aerohotelco, *id.*

¶ 34, from which the plaintiff draws the reasonable inference that they lack "any independent

business purpose other than that contemplated for Aerohotelco," Pl.'s Opp'n at 41 n.19.  The

defendants also do not dispute the plaintiff's allegation, based upon information contained in the

affidavits submitted by the managing directors of the corporate defendants, that the Project

Developers were incorporated shortly after Aerohotelco first informed the plaintiff that it would

not pay the Debt Fee.  Pl.'s Opp'n at 40; FAC ¶ 28.  Moreover, the defendants do not refute the

plaintiff's allegation that defendant Stipa apparently created complex ownership relationships

between the corporate defendants, suggesting an effort to hide ownership, *see* Share Sale

---

[10]     Notably, defendant Stipa entered a special appearance in *Illarramendi* to move the court to dissolve an order requiring transfer of allegedly fraudulently obtained assets, even though the order was directed to the corporate Project Developers only and not to defendant Stipa personally.  Project Developers' Mem. Supp. Mot. Dissolve Ex Parte Order Freezing Assets at 1 n.1.  Defendant Stipa's financial interests are evidently intimately intertwined with those of the corporate Project Developers.

Agreement at 16 ("Whereas Newco [] will sell 70% of its equity stake in [Curacao Holding] to [Caracas Holding], a Venezuelan company to be fully owned by Stipa . . . .").  All of the above described allegations, taken together, nudge the plaintiff's claim from conceivable to plausible that all of the defendants are but alter egos for each other.[11]

Accordingly, the plaintiff's breach of contract claim survives the defendants' motion to dismiss.

### 2.       Quantum Meruit

The defendants move to dismiss the plaintiff's quantum meruit claim against all defendants because "'a party cannot recover on a claim of unjust enrichment for activities that are covered by an express contract between the parties.'"  Defs.' Mem. at 38 (quoting *CapitalKeys, LLC v. Cyber, Inc.*, 875 F. Supp. 2d 59, 65 (D.D.C. 2012)).  The Court agrees.

"The District of Columbia recognizes unjust enrichment as a species of quasi contract that imposes 'in the absence of an actual contract,' 'a duty . . . upon one party to requite another in order to avoid the former's unjust enrichment[,] . . . to permit recovery by contractual remedy in cases where, in fact, there is no contract."  *Vila v. Inter-Am. Inv., Corp.*, 570 F.3d 274, 279–80 (D.C. Cir. 2009) (quoting *4934, Inc. v. D.C. Dep't of Empt. Servs.*, 605 A.2d 50, 55 (D.C. 1992)).  Here, the parties do not dispute that the Investment Banking Agreement is a valid contract entered into by the plaintiff, Aerohotelco, "and/or its successor companies or any related entities which intend to invest in and/or develop the Project," Investment Banking Agreement (Preamble), which the plaintiff alleges includes the other co-defendants, Pl.'s Opp'n at 26–28;

---

[11]        The plaintiff also alleges that "[t]here is [] a strong suggestion that, at least at one point, the non-Aerohotelco Defendants were under-capitalized."  Pl.'s Opp'n at 41 n.19.  While this allegation would be relevant, *see generally Anderson v. Abbott*, 321 U.S. 349 (1944), this allegation cannot be considered because it does not appear in the plaintiff's first amended complaint, *see McGinnis v. District of Columbia*, 65 F. Supp. 3d 203, 211 n.1 (D.D.C. 2014) ("'[I]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.'" (quoting *Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003))).

*see also supra* Part II.A (finding personal jurisdiction over all defendants because the forum selection clause in the Investment Banking Agreement binds all defendants as "successor companies or . . . related entities which intend to invest in and/or develop the project").  The Court's finding that the Investment Banking Agreement requires only Aerohotelco to pay the Debt Fee does not negate the binding force of the preamble as covering the remaining successors or related defendants.  Consequently, the plaintiff's quantum meruit claim is foreclosed by the Investment Banking Agreement, which expressly covers the plaintiff's activities that form the core of its quantum meruit claim.

Accordingly, the defendants' motion to dismiss Count II is granted.

## IV.   Conclusion

For the reasons stated above, the defendants' motion to dismiss is granted in part and denied in part.  The defendants' motion to dismiss based on lack of personal jurisdiction, improper service and failure to state a claim as to Count I is denied.  The defendants' motion to dismiss Count II for failure to state a claim is granted.

An Order consistent with this Memorandum Opinion will issue contemporaneously.

**DATE:** February 7, 2016

_____
BERYL A. HOWELL
United States District Judge