BAZARIAN INTERNATIONAL
FINANCIAL ASSOCIATES, LLC,

           Plaintiff,

           v.

DESARROLLOS AEROHOTELCO, C.A., *et al.*,

           Defendants.

Civil Action No. 13-1981 (BAH)

Chief Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

Pending before the Court is the defendants' *Daubert* Motion *in Limine* to Exclude the Testimony & Reports of Williston H. Clover ("Defs.' Mot."), ECF No. 65. The plaintiff originally offered Clover as an expert to opine on what appears to be eleven distinct topics, for which the plaintiff asserted expert testimony would be relevant and aid the jury in resolving disputed issues between the parties. *See generally* Pl.'s Opp'n Defs.' *Daubert* Mot. Lim. Exclude Test. & Report Williston H. Clover ("Pl.'s Opp'n"), ECF No. 69. At the pre-trial conference, as clarified in a subsequent notice, the plaintiff withdrew three of those topics. Pl.'s Notice of Withdrawal of Portions of the Expert Report & Rebuttal Expert Report of Williston H. Clover ("Pl.'s Not."), at 1–2, ECF No. 95. The defendants assert that Clover is unqualified to offer expert testimony and failed to submit a report that complies with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, and, in any event, that Clover's opinions are irrelevant, go to matters of common understanding, rest on unreliable data and methods, and are unduly prejudicial in light of their probative value. *See* Defs.' Mot. For the reasons that follow, the defendants' motion is granted in part and denied in part.

## I.      FACTUAL BACKGROUND

The Court's prior Memorandum Opinion denying the defendants' motion to dismiss the plaintiff's breach of contract claim, *see Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A.*, 168 F. Supp. 3d 1, 24 (D.D.C. 2016), as well as the Court's Memorandum Opinion dismissing the plaintiff's prior lawsuit against the defendants' alleged predecessor entity, *Bazarian Int'l. Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A.*, 793 F. Supp. 2d 124, 125–27 (D.D.C. 2011), lay out in detail the present dispute's factual background and, thus, will not be recounted again here. In summary form, the plaintiff alleges that the defendants have breached a written Agreement requiring payment of a fee to the plaintiff for facilitating the financing for construction and operation of the Ritz-Carlton Hotel in Aruba. Under the Agreement, the plaintiff was to "perform exclusive investment banking services," requiring the plaintiff to, among other things, (1) "structure the financial package for the Project and prepare [a] self-contained Information Memorandum, including total project costs, proper debt/equity ratios, and projected investor returns," and (2) "conduct negotiations with" various institutional lenders "to secure, on a best efforts basis, financing for the project." Amend. Compl., Ex. A, Agreement §§ 1.C, 1.D, ECF No. 13-1; *see also id.* § 1.D (providing that the plaintiff "will act as the Company's exclusive advisor and investment banker in working with financial institutions, investors, and funding sources to raise the debt financing for the Company.").

In consideration for these services, the Agreement provided that the plaintiff would receive a "debt fee" to be "based on a flat two percent (2%) of the gross amount of the debt financing provided to the Project, net of" certain amounts not at issue here. *Id.* § 2.C. Such fees "are due and will become payable only upon the earlier of the first draw-down of funds and/or the first infusion of equity capital, provided that financing has been committed to the Project as a result of the efforts of Bazarian International." *Id.* § 2.D. "Bazarian International will still be

entitled to the . . . fee[],” pursuant to the Agreement, “if the financing for the Project is concluded within thirty-six (36) months following the termination of this Agreement from sources introduced to the Project by Bazarian International.” *Id.* § 3. Finally, the Agreement directed that “[t]he Agreement will immediately become part of the relevant loan documents, management agreements, joint-venture agreements, guaranty agreements, bridge loan facilities and Memorandum of Association for this Project amongst and between the equity shareholders and lenders.” *Id.*

The defendants timely filed the pending motion *in limine*, *see* Scheduling Order, dated Nov. 14, 2017, and, following oral argument at the final Pre-Trial Conference on April 20, 2018, this motion is now ripe for consideration before the trial scheduled to begin with jury selection, on May 7, 2018.[1]

## II.    DISCUSSION

The defendants challenge the admissibility of Clover’s testimony on four grounds. First, the defendants argue that Clover is unqualified to provide his proposed expert testimony and relies on unsound methodology. Second, the defendants argue that Clover failed to submit a report compliant with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, requiring his testimony’s exclusion. Third, the defendants argue that the testimony Clover proposes to provide goes to matters that do not call for expert opinion and thus is not relevant. Finally, the defendants argue that Clover’s proposed testimony is unduly prejudicial in light of its probative value and thus merits exclusion. Each of these arguments is addressed in turn.

### A.  CLOVER’S QUALIFICATIONS AND RELIABILITY OF HIS METHODOLOGY

---

[1]      The defendants also timely filed a Motion *in Limine* to Exclude Testimony Regarding Defendants’ Foreign Status, ECF No. 67, but the parties “have resolved this Motion,” *see* Joint Pre-Trial Statement (“JPTS”) at 6, ECF No. 71, and the Court has entered an order memorializing the parties’ resolution of the issue, *see* Order, ECF No. 96.

The defendants challenge Clover's credentials and methodology as a basis for excluding his proposed expert testimony. For the reasons that follow, Clover's qualifications are sufficient to satisfy the requirements of Rules 702 and 703.

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" only if four conditions are met: (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (2) "the testimony is based on sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) "the expert has reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court articulated a "two-prong analysis" under Rule 702 "that centers on evidentiary reliability and relevancy: the district court must determine first whether the expert's testimony is based on 'scientific knowledge;' and second, whether the testimony 'will assist the trier of fact to understand or determine a fact in issue.'" *Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996) (quoting *Daubert*, 509 U.S. at 592)).

Certainly, a critical aspect of the reliability of a proffered expert's opinion stems from that witness's qualifications. In this regard, "experience" alone can constitute a basis of "reliable principles and methods." FED. R. EVID. 702(C); *see also id.* advisory committee's note to 2000 amendment ("[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience."); *Cedar Hill Hardware & Constr. Supply, Inc. v. Ins. Corp. of Hannover*, 563 F.3d 329, 343 (8th Cir. 2009) (holding that an expert's proposed testimony was admissible under *Daubert* due to the expert's "exhaustive experience in the insurance industry"); *First Marblehead Corp. v. House*, 541 F.3d 36, 41 (1st Cir. 2008) (determining an expert to be

qualified based on "nearly two decades of experience as a consultant in economics, finance, and strategy consulting"); *Shaw Grp., Inc. v. Marcum*, 516 F.3d 1061, 1068 (8th Cir. 2008) (finding a witness qualified as an expert "based on his experience working with military contracts similar to the" contract at issue); *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016, 1018 (9th Cir. 2004) (recognizing that non-scientific or technical testimony need not be "contingent upon a particular methodology or technical framework," so long as an expert's testimony is "reliable based on his knowledge and experience," and determining an expert to be qualified based on "twenty-five years' experience working for insurance companies and as an independent consultant"); *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 611-12 (5th Cir. 2000) (recognizing "that a trial court's reliance on individuals experienced in a particular field for the purposes of obtaining explanation of the technical meaning of terms used in the industry is prudent." (internal quotations and citation omitted)); *Lauria v. Nat'l R.R. Passenger Corp.*, 145 F.3d 593, 599 (3d Cir. 1998) (recognizing that an expert's knowledge "need not be based on testing or experiments beyond common understanding" so long as the expert's "testimony would be reliable or trustworthy in light of [the expert's] practical background and training"); *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1270 n.3 (9th Cir. 1994) ("[N]on-scientific testimony need only be linked to some body of specialized knowledge or skills" rather than "to the scientific method.").  At the same time, however, an expert witness who "is relying solely or primarily on experience . . . must explain how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts," rather than expect a court to "simply 'tak[e] the expert's word for it.'"  *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005) (internal quotation marks omitted) (quoting FED. R. EVID. 702 advisory committee's note to 2000 amendment)).

### *1. Clover's Qualifications*

At the outset, the defendants' critical assessment of Clover's background falls short of showing that he is unqualified to serve as an expert. The defendants point out that "Clover did not graduate from college and has never held any real estate or investment banking licenses," and "has absolutely no background in investment banking." Defs.' Mot. at 21. This view of Clover's lack of qualifications is bolstered by the fact that "Clover in his reports frequently interchanges the terms investment 'banker' and 'broker,'" which the defendants assert "are distinct professions and subject to different standards, licensing requirements, etc." *Id.* "This conflation of such a basic principle," the defendants argue, "highlights Clover's inadequacies when it comes to investment banking." *Id.* Indeed, the defendants complain that Clover identified his industry in his deposition as "[f]inance, development, consulting, marketing," rather than investment banking services. *Id.* at 21 (quoting Williston H. Clover Dep. ("Clover Dep.") at 5:22–25, ECF No. 66-1).

The defendants' criticism misses the mark because Clover does not hold himself out as an investment banker. Instead, Clover's Report states that he "ha[s] owned or been a board member of companies involved in United States and international real estate development, finance, consulting, and marketing for more than 50 years," and "ha[s] extensive firsthand experience in virtually every aspect of the industry, including finance, brokerage, consulting, development, and property ownership." Defs.' Mot, Ex. A, Expert Report Williston H. Clover ("Clover's Rpt.") ¶ 1.1, ECF No. 65-1. His experience appears to be directly related to "[t]he agreement at issue in this case," which "relates to securing financing (i.e. investment) from a bank for construction of a hotel." Pl.'s Opp'n at 18. Thus, Clover is qualified to opine on this subject regardless of the specific terminology used, and his testimony is not excludable merely because the defendants

may prefer "a different characterization of his specialization." *Id.* Any of the defendants' challenges to Clover's qualifications go to the weight rather than admissibility of Clover's testimony and can be addressed through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

### 2. Reliability of Clover's Methodology

The defendants contend that Clover's proffered expert opinions "fail[] to satisfy the reliability requirement" because Clover "failed to employ *any* methodology, let alone one that was valid and consistent." Defs.' Mot. at 16. In this regard, the defendants assert, "Clover merely referred to what he claimed is 'custom in the industry' or industry standard, but failed to explain how he complied with each to come to his opinions." *Id.* Clover's reliance on his extensive experience in the industry is sufficient to support the opinions proffered in his Report.

A particular example is instructive on this point. In *United States v. Vesey*, the Eighth Circuit determined that the district court abused its discretion in excluding the testimony of the government's expert witness, "a convicted drug trafficker and a confidential informant for law enforcement" who "sought to present evidence of how illegal drug operations are normally conducted and to counter the testimony of the government's expert witness." 338 F.3d 913, 916 (8th Cir. 2003). The expert witness had "testified that he had extensive knowledge of the sale, use, and distribution of narcotics as a result of his experience as a drug trafficker and as an informant," "used his knowledge to formulate general rules of drug trafficking behavior and to explain the logic and reasoning behind that behavior from the point of view of drug dealers," and "then applied both the rules and the reasoning behind them to the behavior of the actors in this case." *Id.* at 917–18. *Vesey* concluded that the expert witness had provided sufficient evidence that such testimony constituted "appl[ication of] principles and methods." *Id.* at 918.

Clover, as in *Vesey*, has "testified that he had extensive knowledge of," *id.* at 917, "international real estate development, finance, consulting, and marketing," Clover's Rpt. ¶ 1.1, "as a result of his experience," *Vesey*, 338 F.3d at 917, "in virtually every aspect of the industry, including finance, brokerage, consulting, development, and property ownership," Clover's Rpt. ¶ 1.1. Clover also states that he has "used his knowledge to," *Vesey*, 338 F.3d at 917, formulate his opinions, Clover's Rpt. ¶¶ 4.1–4.11, and that he has "applied both the rules and the reasoning behind them to the behavior of the actors in this case," *Vesey*, 338 F.3d at 918. Specifically, Clover opined, among other things, that (1) the lease proposal that the plaintiff prepared and submitted to the Government of Aruba contained all the components of a typical Information Memorandum, including "total project costs," "proper debt/equity ratios," and "projected investor returns," Clover's Rpt. ¶ 4.4; (2) "Bazarian satisfied the requirement for financial structuring" as that term is understood in the industry, *id.* ¶¶ 4.5–4.5.2; and (3) "[t]he term 'commitment' has various potential applications in the industry, and there are both binding commitments and other, lesser types of commitments, including conditional commitments and indicative term sheets," with the commitments referred to in Section 2.B of the Agreement being of the latter, non-binding type, *id.* ¶ 4.8. Clover's proposed testimony thus satisfies *Daubert*'s reliability requirement. To require Clover to go into more painstakingly and minute detail as to how exactly he formulated his understandings of what the terms "Information Memorandum," "structuring," and "commitments" mean and how precisely he "applied" those terms here would be pedantic and set an impossibly high standard for expert witnesses to satisfy. *See, e.g.*, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("*Daubert*'s gatekeeping requirement [merely] . . . make[s] certain that an expert, whether basing testimony upon professional studies or

personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

The defendants next argue that "Clover constructed his opinions specifically and solely for use in this litigation and based predominantly on information supplied by Plaintiff, factors that weigh in favor of excluding the proffered testimony."  Defs.' Mot. at 17 (footnote omitted).  As the plaintiff correctly notes, however, "every expert is asked to opine on factual information supplied to them by a party and, . . . if Defendants contend[] that he failed to adequately consider other facts, such is a basis for cross examination, not exclusion of his opinions altogether."  Pl.'s Opp'n at 24.  Indeed, *Daubert* stated that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  509 U.S. at 596.

In a similar vein, the defendants assert that "Clover makes multiple factual errors and wrongful assumptions in coming to his opinions, including his narrative regarding the relationship between Plaintiff and AIB Bank and the introduction of AIB to Defendants and the Project."  Defs.' Mot. at 19.  The crux of the defendants' argument is that Clover's opinions disregard other witnesses' testimony, which the defendants argue is correct.  *See id.* at 19–20.  This does not constitute a factual error or wrongful assumption, but a dispute of fact properly left to the jury.  Furthermore, even if Clover made factual errors or incorrect assumptions, these go only to the weight, not admissibility, of Clover's testimony.  *See, e.g.*, *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) ("[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir.2002)); *United States v. Jakobetz*, 955 F.2d 786, 800 (2d Cir. 1992) ("[W]hether

accepted protocol was adequately followed in a specific case . . . go[es] more to the weight than to the admissibility of the evidence."); *Chefs Diet Acquisition Corp. v. Lean Chefs, LLC*, Civ. No. 14-8467, 2016 WL 5416498, at *10 (S.D.N.Y. Sept. 28, 2016) ("[C]ontentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." (internal quotation marks omitted)).

Accordingly, the defendants' objections to Clover's qualifications to serve as an expert are overruled.

### B. CLOVER'S REPORT SATISFIES RULE 26(a)(2)(B).

The defendants next contend that Clover's Report fails to satisfy Federal Rule of Civil Procedure Rule 26(a)(2)(B) and thus should be excluded under Rule 37(c). Defs.' Mot. at 7–11. With one exception, Clover's Report satisfies each of Rule 26(a)(2)(B)'s requirements, as the Rule does not require the granularity of detail upon which the defendants insist. Although Clover fails to provide a complete list of all publications authored over the last 10 years, as Rule 26(a)(2)(B)(iii) requires, such error is harmless under Rule 37(c) in light of Clover's offer to provide such a list upon request**.** Thus, neither Clover's Report nor testimony merit exclusion on this basis.

#### 1. *The Requirements of Fed. R. Civ. P. 26(a)(2)(B)*

Rule 26(a)(2)(B) requires that an expert witness disclosure must be accompanied by a written report containing: (1) "a complete statement of all opinions the witness will express and the basis and reasons for them;" (2) "the facts or data considered by the witness in forming them;" (3) "any exhibits that will be used to summarize or support them;" (4) "the witness's qualifications, including a list of all publications authored in the previous 10 years;" (5) "a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or

by deposition;" and (6) "a statement of the compensation to be paid for the study and testimony in the case." FED. R. CIV. P. 26(a)(2)(B).

"The purpose of [Rule 26(a)(2)(B)] is to avoid unfair surprise to the opposing party." *Heller v. District of Columbia*, 801 F.3d 264, 270 (D.C. Cir. 2015) (internal quotation marks omitted). Rule 26(a)(2)(B), however, "does not limit an expert's testimony simply to reading his report," but rather "contemplates that the expert will supplement, elaborate upon, and explain his report in his oral testimony." *Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 167 (D.C. Cir. 2007) (internal alterations and quotation marks omitted). A report that "recounts in detail the expert's relevant experience" and "contain[s] an explicit statement as to the basis for that witness's opinion"—namely, that the "report was based 'on my experience, my review of numerous studies and books, [relevant] laws and regulations, and discovery materials from this case made available to me'—satisfies Rule 26(a)(2)(B). *Heller*, 801 F.3d at 271.

Rule 37(c)(1), meanwhile, provides that a party who fails to comply with Rule 26(a)(2)(B) "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). "In addition to or instead of this sanction," however, "the court, on motion and after giving an opportunity to be heard," may (1) "order payment of the reasonable expenses, including attorney's fees, caused by the failure;" (2) "inform the jury of the party's failure;" and (3) "impose other appropriate sanctions." *Id.*

### 2. *Analysis*

The defendants challenge the sufficiency of Clover's Report on three grounds. First, the defendants argue that "Clover's Report is incomplete, as it fails to provide the basis and reasoning behind each of his purported opinions." Defs.' Mot. at 9. This is incorrect, as

Clover's Report, like the reports admitted in *Heller*, identifies Clover's relevant experience and the documents Clover considered in formulating his opinions. Clover's Rpt. ¶¶ 1.1–1.8, 3.1–3.1.17; *see Heller*, 801 F.3d at 271.

Second, the defendants argue that "Clover's Report, apart from listing 'Documents and Source Material Considered,' fails to set forth the specific facts or data considered by Clover in forming his opinions and fails to attach even one exhibit supporting these opinions." Defs.' Mot. at 9. Rule 26(a)(2)(B) does not, however, require an expert to identify the facts or data they considered in such granular detail; to the contrary, *Heller* held that a district court did not abuse its discretion in admitting expert reports that stated merely that the experts had based their conclusions on their experience, review of books and article, review of relevant legal authority, and discovery materials. 801 F.3d at 271; *see also Chefs Diet Acquisition Corp.*, 2016 WL 5416498, at *10 n.6 (S.D.N.Y. Sept. 28, 2016) (holding that an expert properly identified the materials on which he had relied in formulating his opinions by "provid[ing] an Attachment listing the materials, all of which were apparently produced to Defendants as part of discovery"). Furthermore, Rule 26(a)(2)(B) does not require an expert to rely on exhibits, only that an expert must attach any exhibits used to summarize or support the expert's opinions. *See* FED. R. CIV. P. 26(a)(2)(B)(iii) (requiring an expert's report to contain "*any* exhibits that will be used to summarize or support [the expert's opinions]" (emphasis added)). The plaintiff explains that "Clover did not include any exhibits as part of his Report because he does not intend to use exhibits to summarize or support his opinions." Pl.'s Opp'n at 11; *see also Malibu Media, LLC v. Harrison*, Civ. No. 1:12-CV-01117-WTL, 2014 WL 5598582, at *5 n.2 (S.D. Ind. Nov. 3, 2014) (holding that a plaintiff did not improperly fail to attach exhibits to an expert report where

"neither Plaintiff nor [the expert] will use any exhibits to summarize or support [the expert's] report" (internal alterations and quotation marks omitted)).

Third, the defendants assert that "Clover's Report fails to sufficiently provide Clover's qualifications," as the "[p]laintiff did not include in its disclosure materials a *curricul[um] vitae* or other statement of qualifications identifying Clover's credentials, educational background, licensures (if any), etc." Defs.' Mot. at 9. Instead, "some of the 'qualifications' listed by Clover in his report are referencing his company's qualifications and experience rather than his own." *Id.* at 9–10 (footnote omitted). The defendants take issue with Clover's reliance on "his experience in the industry" as a basis for his asserted expertise, asserting that Clover fails "to sufficiently identify an applicable 'industry.'" *Id.* at 10. In this regard, the defendants contend that Clover identifies his industry too broadly or vaguely and that Clover fails to explain adequately the reasoning, but defendants identify no legal authority requiring Clover to explain his expertise or reasoning with greater granularity. *Id.*

The very first sentence of Clover's Report states that Clover is experienced in "international real estate development, finance, consulting, and marketing." Clover's Rpt. ¶ 1.1. Clover then details his experience and qualifications over eight paragraphs, including his employers, job titles, length of experience, responsibilities, speaking engagements, and examples of projects on which he has worked. *Id.* ¶¶ 1.1–1.8. Rule 26(a)(2)(B) does not require an expert to provide a *curriculum vitae*—only "the witness's qualifications, including a list of all publications authored in the previous 10 years." FED. R. CIV. P. 26(a)(2)(B). Although Clover does not provide a complete list of publications, as Rule 26(a)(2)(B) requires, he states that he has "published several articles on development, finance, and leadership in Overseas Property Professional (UK)," and, more importantly, that he "would be happy to provide copies of them

upon request."  Clover's Rpt. ¶ 2.2.  In light of this offer, any failure to provide a complete list of

Clover's publications is harmless.  *See* FED. R. CIV. P. 37(c)(1) (allowing an expert to testify

where a failure to comply with Rule 26(a) is "harmless").  Finally, references to the

qualifications of "the company that Clover personally owns and operates" are merely

"background information to Clover's qualifications."  Pl.'s Opp'n at 12.  Rule 26(a)(2)(B)

requires an expert report to provide information sufficient to "avoid unfair surprise to the

opposing party."  *Heller*, 801 F.3d at 270 (internal quotation marks omitted).  Clover's Report

satisfies this standard, even if it does not provide all the information the defendants would like.

For these reasons, Clover's Report does not violate Rule 26(a)(2)(B) except as to Clover's failure

to provide a complete list of publications, which is harmless.

### C.  The Relevance of Clover's Proposed Testimony

The plaintiff originally proposed to offer Clover's expert opinions and conclusions

seemingly on eleven issues, *see* Clover's Rpt. ¶¶ 4.1–4.11, but as detailed below, withdrew three

of his proffered opinions at the pretrial conference and in a subsequent notice, *see* Pl.'s Not. at 1–

2.  The defendants challenge Clover's testimony as irrelevant, contending that the proffered

testimony would not assist a trier of fact in resolving any factual dispute between the parties.

Defs.' Mot. at 11–15.  The relevant legal principles governing contractual interpretation and the

admission of expert testimony are set out below, and addressed in application to the remaining

parts of Clover's proposed testimony.

#### 1. Overview: Use of Expert Testimony in Contract Interpretation

"The proper interpretation of a contract, including whether a contract is ambiguous, is a

legal question." *Abdelrhman v. Ackerman*, 76 A.3d 883, 887 (D.C. 2013) (internal quotation

marks omitted) (citing *Tillery v. D.C. Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006)).

Under D.C. law, "the written language embodying the terms of an agreement will govern the

rights and liabilities of the parties [regardless] of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking." *Id.* at 888 (internal quotation marks omitted) (quoting *Dyer v. Bilaal*, 983 A.2d 349, 354–55 (D.C. 2009)). The task of interpreting the terms of a contract starts with the "plain meaning of the language on the face of a fully integrated contract." *Id.* (citing *Tillery*, 912 A.2d at 1176). A contract is not ambiguous if "the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends." *Sahrapour v. LesRon, LLC*, 119 A.3d 704, 708 (D.C. 2015) (internal quotation marks omitted) (quoting *Joyner v. Estate of Johnson*, 36 A.3d 851, 856 (D.C. 2012)). Conversely, "[a] contract . . . is ambiguous if 'it is, or the provisions in controversy are, reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings." *Id.* (quoting *Joyner*, 36 A.3d at 856). If the contract's terms are ambiguous "[e]xtrinsic or parol evidence which tends to contradict, vary, add to, or subtract from the terms of a written contract" may be considered. *Abdelrhman*, 76 A.3d at 888 (internal quotation marks omitted) (quoting *Segal Wholesale v. United Drug Serv.*, 933 A.2d 780, 783 (D.C. 2007)); *see also M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 935 (2015) ("[A] court may look to known customs or usages in a particular industry to determine the meaning of [the] contract."); *id.* at 937–38 (Ginsburg, J., concurring) ("[A] court must examine the entire agreement in light of relevant industry-specific 'customs, practices, usages, and terminology.'" (quoting 11 Richard A. Lord, Williston on Contracts § 30:4, at 55–58 (4th ed. 2012)); *Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 497 (D.C. Cir. 1995) ("The admissibility of extrinsic evidence" under D.C. law "depend[s] upon the existence of an ambiguity in the contract.").

In determining the admissibility of expert testimony, including testimony intended to aid the jury to understand the meaning of an ambiguous, disputed contractual term, a district court must "determine whether the proffered expert testimony 'is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Ambrosini*, 101 F.3d at 134 (quoting *Daubert*, 509 U.S. at 591). The relevance of proposed expert testimony does not depend on whether the testimony "satisfies the plaintiff's burden on the ultimate issue at trial," but whether the testimony "could aid the jury's resolution of the [parties'] claims." *Id.* at 135–36. Expert testimony that provides "specialized, technical matter concerning which a lay jury may benefit from a qualified expert's tutelage" is relevant. *U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 895 (internal quotation marks omitted) (D.C. Cir. 2010); *see also* FED. R. EVID. 702 advisory committee's note to 2000 amendment (explaining that expert testimony that seeks "to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case," is relevant if "the testimony 'fit' the facts of the case.").

"Expert testimony which does not relate to any issue in the case," however, "is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal quotation marks omitted). "Rule 702's 'helpfulness' standard requires" at a minimum "a valid . . . connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92. "[W]here the jury is just as competent to consider and weigh the evidence as is an expert witness and just as well qualified to draw the necessary conclusions therefrom, it is improper to use [expert] evidence for the purpose." *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 973 (D.C. Cir. 2016) (quoting *Henkel v. Varner*, 138 F.2d 934, 935 (D.C. Cir. 1943)); *see also Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962) ("[E]xpert testimony not only is unnecessary but indeed may

properly be excluded in the discretion of the trial judge 'if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation.'" (quoting *U.S. Smelting Co. v. Parry*, 166 F. 407, 411, 415 (10th Cir. 1909)); *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998) ("[A]n expert . . . must testify to something more than what is obvious to the layperson in order to be of any particular assistance to the jury." (internal quotation marks omitted)); *Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen Ret. Sys. of City of Detroit*, 50 F.3d 908, 917 (11th Cir. 1995) ("Expert testimony is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves.").

"Recognizing th[e] fact" that "some expert opinions are more helpful or more valid than others," *Bill Harbert Int'l Constr., Inc.*, 608 F.3d at 894, "the Rules of Evidence—especially Rule 702—assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. District judges thus play "a gatekeeping role" in determining whether proffered expert testimony will aid "the particularized resolution of legal disputes." *Id.* This "'gatekeeping' obligation," moreover, "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co.*, 526 U.S. at 141. "[A] district court has broad discretion regarding the admission or exclusion of expert testimony." *United States v. Day*, 524 F.3d 1361, 1367 (D.C. Cir. 2008) (quoting *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 567 (D.C. Cir. 1993)); *see also SeaWorld of Fla., LLC v. Perez*, 748 F.3d 1202, 1214 (D.C. Cir. 2014) ("Finders of fact are normally accorded wide latitude in determining

whether proffered expert testimony would be helpful." (internal alterations and quotation marks

omitted)). "The proponent of the expert testimony bears the burden to establish the admissibility

of the testimony and the qualifications of the expert." *United States v. McGill*, 815 F.3d 846,

903 (D.C. Cir. 2016).

Clover's Report enumerates eleven supposedly distinct categories of testimony that

Clover proposes to offer to the jury. Each category of proposed testimony is set off in a separate

paragraph or paragraphs of Clover's Report. *See* Clover's Rpt. ¶¶ 4.1–4.11. The admissibility of

each category of proposed testimony is addressed in turn.

### 2. Whether a Two-Percent Debt Fee is the Industry Standard

The first matter on which Clover proposes to opine is "whether a 2% debt fee, like that

found in the Agreement at issue in this case, is standard in the industry for investment banking

contracts like the one at issue in this case." Clover's Rpt. ¶ 4.1. The Agreement entitles the

plaintiff, "[u]pon settlement of binding loan and/or guarantee commitments for the Project

obtained directly or indirectly by Bazarian International," to a "debt fee will be based on a flat

two-percent (2%) of the gross amount of the debt financing provided to the Project," net of

certain amounts not at issue here. Agreement § 2.C. Clover asserts that "a 2% fee is lower than

the industry standard internationally, especially if it includes structuring and the creative funding

process," and that he, if "asked to undertake such an assignment," would require a fee of "3% of

the actual amounts funded," as well as "a retainer, and an agreement stating that all fees due

would be paid from closing proceeds at closing by the closing attorney." Clover's Rpt. ¶ 4.1.

Clover concludes that "[t]he fee for this transaction is certainly not excessive in this business"

and "if anything, somewhat lower than the industry standard." *Id.* Clover elaborates on this

testimony in his rebuttal report. *See, e.g.*, Defs.' Mot., Ex. B, Rebuttal Expert Report of

Williston H. Clover ("Clover's Rebuttal Rpt.") ¶ 2.3, ECF No. 65-2 ("My firm typically charges a 3% fee for placing debt and a 5% fee for placing equity."); *see also id.* ¶¶ 2.1–2.4.

The plaintiff fails entirely to explain how the reasonableness of the fee amount to which the plaintiff claims entitlement is relevant to whether the plaintiff is in fact due such fee. The issue here is not whether the fee amount is reasonable but rather whether the plaintiff satisfied the contract's terms so as to be entitled to the fee. The contract at issue is the product of negotiation between the parties and clearly provides that the debt fee is to "be based on a flat two-percent (2%) of the gross amount of the debt financing to the Project." Agreement § 2.C. Any testimony as to what fee amount is industry standard thus is irrelevant. *See, e.g.*, *Radiologix, Inc. v. Radiology & Nuclear Med., LLC*, No. 15-4927-DDC-KGS, 2018 U.S. Dist. LEXIS 29934, at *21 (D. Kan. Feb. 26, 2018) (excluding proposed expert testimony "about the Agreement's Service Fee—*i.e.*, it was higher than the fees usually established in practice management agreements," as "not relevant to defendant's damages claim" and as "irrelevant to the issues that the trier of fact must decide here—*i.e.*, whether the parties satisfied their obligations that they specifically agreed to perform when they entered the Agreement.").

The plaintiff's vague and conclusory assertion that Clover's testimony "regarding common understandings and practices in the industry" would "provid[e] necessary background to help the jury understand the issues in this case and the testimony of fact witnesses," Pl.'s Opp'n at 20, does not adequately explain how testimony on the reasonableness of the fee to which the parties agreed "relate[s] to any issue in the case" or has a "a valid . . . connection to the pertinent inquiry," which is "a precondition to admissibility." *Daubert*, 509 U.S. at 591–92. The plaintiff also asserted, at the Pre-Trial Conference, that the reasonableness of a two-percent fee would be relevant to a *quantum meruit* claim, *see* Hr'g Tr., but this claim has been dismissed, *see*

*Bazarian*, 168 F. Supp. 3d at 24–25, and the plaintiff failed to move timely for reconsideration.[2]

The testimony Clover proposes to offer in Paragraph 4.1 of his report and the associated portions

of his rebuttal report thus are inadmissible as irrelevant.[3]

### 3. *Whether a Debt Commission Typically is Calculated Based on the Full Amount Loaned or Only the Amount the Lead Arranger Lends*

The second matter on which Clover proposes to opine is "whether it is commonly

understood in the industry that a commission for arranging debt" such as the commission to

which the plaintiff claims he is entitled "is calculated based on the full amount lent by a lending

consortium or whether the fee is calculated based only on the amount actually lent by the lead

arranger for the consortium."  Clover's Rpt. ¶ 4.2.  The Agreement provides that the debt fee is

to be calculated "based on a flat two percent (2%) *of the gross amount of the debt financing*

*provided to the Project*."  Agreement § 2.C (emphasis added).  Clover asserts that "it is

commonly understood in the industry that the brokerage/consulting fee is charged to and paid by

the borrower based on the full amount of the loan syndicated and committed to by the

syndicating manager," that "the lead arranger/syndicator/manager" commonly "act[s] as

managing partner in the consortium, . . . spread[ing] risk and charges among participating

lenders, much like the insurance business," that "[t]he fee or commission is usually paid by the

borrower," and that "[t]he broker and borrower depend on the lender [the] submit[] the

transaction to, and often do[] not know of other participants as the commitment generally is

issued in the lead lender/syndicator/manager's name."  Clover's Rpt. ¶ 4.2.

---

[2]     All citations to the Pre-Trial Conference transcript refer to an unofficial version of the transcript available to the Court.  An official version of the transcript will be placed on the public docket in this case.
[3]     The plaintiff has informed the Court that it withdraws from paragraph 2.4 of Clover's Rebuttal Report the reference to the plaintiff's "well-earned reputation and track record of success in hotel financing placements in the Caribbean" and assertion that "Bazarian has had more successful placements for hotel and resort financing in the Caribbean than any other firm and Bazarian's resulting reputation was important to its efforts and success in this case."  *See* Pl.'s Not. at 2.

As with testimony regarding the industry standard fee amount, the plaintiff has failed to explain how the basis on which fees of the sort at issue here typically are calculated is relevant in any way to whether the plaintiff is entitled to the fee. The Agreement unambiguously specifies that the debt fee is to be calculated based on "the gross amount of the debt financing provided to the Project," Agreement § 2.C, not any particular lender's contribution to the project. Whether fees such as that at issue here typically are calculated based on the full amount that a lending consortium loans or only the amount that the consortium's lead arranger loans is irrelevant to the amount of the fee the plaintiff asserts it is due under the Agreement. Once again, to the extent this issue would be relevant to a *quantum meruit* claim, no *quantum meruit* claim remains in this case. The plaintiff thus has not met its burden to show that Clover's testimony "relate[s] to any issue in the case" or has a "a valid . . . connection to the pertinent inquiry." *Daubert*, 509 U.S. at 591–92. The testimony Clover proposes in Paragraph 4.2 thus is inadmissible.

### 4. Whether the Proposal Included All Information That an Industry-Standard Confidential Information Memorandum Would Contain

The third matter on which Clover proposes to opine is "whether the Proposal prepared by Bazarian and submitted to the Government of Aruba included all of the financial information that would typically be covered in an industry standard, self-contained Confidential Information Memorandum, including: (i) total project costs; (ii) proper debt/equity ratios; and (iii) projected investor returns." Clover's Rpt. ¶ 4.4. The "Confidential Information Memorandum" of which Clover speaks refers to Section 1.C of the Agreement, which required the plaintiff to, among other things, "prepare a[] self-contained Information Memorandum, including total project costs, proper debt/equity ratios, and projected investor returns." Agreement § 1.C. Defendant Desarrollos Aerohotelco, C.A.'s third affirmative defense to the plaintiff's breach of contract claim, titled "Failure of Condition Precedent – Structure Financial Package/Information Memo,"

is that the plaintiff "failed to adequately and timely" perform the requirements of Section 1.C. *See* Desarrollos Aerohotelco, C.A.'s Answer at 7. The other defendants adopt this affirmative defense as well. *See* Defs.' Answer at 8. Thus, whether the Proposal, though "not designated as" an Information Memorandum, nonetheless contained "all of the financial information that would typically be covered in" and "serve[d] the same purpose and function as a Confidential Information Memorandum for potential lenders," Clover's Rpt. ¶ 4.4, is relevant "to determine a fact in issue," *Daubert*, 509 U.S. at 591—namely, whether the plaintiff performed Section 1.C's requirements.

Clover asserts that "the Proposal did cover all of the components that would normally be seen in a Confidential Information Memorandum," and that "[w]hile the Proposal was not designated as such, it could thus serve the same purpose and function as a Confidential Information Memorandum for potential lenders (and appeared to do so with respect to AIB Bank's submission of its indicative term sheet)." Clover's Rpt. ¶ 4.4. "In practice," Clover says, "if the recipient of such information requires any additional information, they specifically request it; otherwise, the information received is deemed complete and satisfactory." *Id.*; *see also* Clover's Rebuttal Rpt. ¶ 4.3 ("[I]t is common not to dictate every element in order to give a lender flexibility in revising the structure of the transaction to meet their own internal guidelines."). Moreover, what an Information Memorandum typically contains and the function it serves are not "issues of common understanding which jurors" reasonably may be expected "to comprehend for themselves," *Hibiscus Assocs. Ltd.*, 50 F.3d at 917, but rather are "specialized, technical matter concerning which a lay jury may benefit from a qualified expert's tutelage." *Bill Harbert Int'l Constr., Inc.*, 608 F.3d at 895 (internal quotation marks omitted). The

testimony Clover proposes in Paragraph 4.4 to offer and related portions of Clover's rebuttal report thus are relevant and admissible.

### 5. *Whether the Plaintiff Satisfied the Requirement for Financial Structuring*

The fourth matter on which Clover proposes to opine is "what 'structuring' the financial package (as that term is used in section l.C. of the Agreement) means within the industry." Clover's Rpt. ¶ 4.5. The Agreement provided that "Bazarian International will structure the financial package for the Project." Agreement § 1.C. Defendant Desarrollos Aerohotelco, C.A.'s third affirmative defense to the plaintiff's breach of contract claim, entitled "Failure of Condition Precedent – Structure Financial Package/Information Memo," is that the plaintiff "failed to adequately and timely" perform the requirements of Section 1.C. *See* Desarrollos Aerohotelco, C.A.'s Answer at 7. The other defendants adopt this affirmative defense as well. *See* Defs.' Answer at 8.

What "'structuring' [a] financial package . . . means within the industry," as well as whether the plaintiff "satisfied the requirement for financial structuring," Clover's Rpt. ¶¶ 4.5–4.5.1, are not "issues of common understanding which jurors" reasonably may be expected "to comprehend for themselves," *Hibiscus Assocs. Ltd.*, 50 F.3d at 917, but rather are "specialized, technical matter concerning which a lay jury may benefit from a qualified expert's tutelage." *Bill Harbert Int'l Constr., Inc.*, 608 F.3d at 895 (internal quotation marks omitted).

Clover asserts that "[s]tructur[ing]" a financial package "requires a deep knowledge of the tools available to finance an effort," and that those "tools involve a common first mortgage, subordinated debt, mezzanine debt, a wraparound mortgage, third party guarantees, take out commitments, and some 22 different identified tools and sources that can be combined in order to accomplish the client's purpose," as well as "a deep knowledge of w[ha]t investors will

accept." Clover's Rpt. ¶ 4.5. Clover further asserts that structuring a financial package "call[s] into play" a broker's "creativity . . . so that the objectives of the borrower are met." *Id.* "The key to success in most financial placements," Clover says, "has to do with the structure of the loan and how it is offered structurally, together with the flexibility of the offeror under such a structure." *Id.*

Clover further opines that the plaintiff "satisfied the requirement for financial structuring and was creative in such structuring to the benefit of all concerned." *Id.* ¶ 4.5.1. The plaintiff did so, Clover opines, by "br[inging] AIB Bank to the table and emphasiz[ing] to Mr. Stipa that it would be advantageous for AIB Bank to serve not only as a participant in a lending syndicate, but as the lead arranger of senior debt." *Id.* Finally, Clover opines that "the custom in the industry and implicit understanding behind this type of agreement is that if a developer/borrower ultimately elects to do some or all of the negotiations"—even such negotiations "that the agreement states the investment banker or broker will undertake"—"the developer will pay the called-for fee in any event to the broker, as the introduction was made by the broker." *Id.* ¶ 4.5.2. Clover's proposed testimony goes to whether the plaintiff performed the requirements of Section 1.C, and thus is relevant "to determine a fact in issue." *Daubert,* 509 U.S. at 591. As such, Clover's proffered testimony in Paragraphs 4.5 through 4.5.2 is relevant and admissible.[4]

### 6. Whether Exclusion From a Transaction of an Investment Banker or Broker After an Introduction to a Financing Source is Made is Common in the Industry

The fifth opinion Clover proposes to offer is that although "[t]he value of the investment banker/broker is to stay in the process through the closing process to consult with both parties and act as an advisor, . . . there are borrowers who consider themselves capable of carrying the

---

[4] The plaintiff has informed the Court that it withdraws the language "and it would not be appropriate to hold this against Bazarian" in paragraph 4.5.1 of Clover's Report. *See* Not. Withdrawal at 1.

transaction forward through closing, but the impetus is to avoid paying fees that have been earned." Clover's Rpt. ¶ 4.6.  Typically, according to Clover, "[t]he broker earns his agreed upon commission at the time he exposes the borrower and the transaction to the valuable industry contacts that the broker has built up over years of providing a specialized service." *Id.* Clover also opines that "[t]he effort to establish confidence in the borrower with the lender is a part of the broker's role." *Id.*[5]

Clover also asserts that "[b]ased on my review of the evidence, it seems that Mr. Stipa and Desarrollos Hotelco relied on Mr. Bazarian's well-developed relationship with AIB Bank and Willem Broekaart to secure financing, as Mr. Bazarian had worked extensively with Mr. Broekaart on the projects for several years and was well known to AIB Bank because of previous projects in Aruba that they had worked on together." *Id.* ¶ 4.6.1.  "It is clear to me," Clover says, "that Bazarian was able to get AIB Bank as deeply involved as quickly as it did because of the reserve of goodwill from Bazarian's long established relationship with AIB Bank and Willem Broekaart." *Id.*  Finally, Clover asserts that "Desarrollos then cut Bazarian out of the financing process in July and August 2008" and that Stipa "never coordinated any further discussion with AlB Bank with Bazarian." *Id.* ¶ 4.6.2.

The defendants are correct that Clover's testimony amounts to a recitation of what occurred in the relationship among the plaintiff, Dessarollos and AIB Bank, as a factual matter, relying largely on the plaintiff's version of the facts, rather than offering much in the way of expert testimony about the function of banking relationships within the industry. Further, Clover

---

[5]     The plaintiff has informed the Court that it withdraws the following language from paragraph 4.6 of Clover's Report: "I have been asked to opine on whether it is common in the industry for a client to exclude from a transaction an investment banker or broker after a valuable introduction to a financing source has been made.  My opinion is that, while it is not common, I have over the years seen a few attempts to exclude an investment banker or broker from a relationship to avoid paying fees."  *See* Pl.'s Not. at 1.

appears to be offering speculative views about the motivation of Dessarollos "to avoid paying fees that have been earned." Clover's Rpt. ¶ 4.6. This proposed testimony essentially usurps, rather than aids, the jury's role in weighing the evidence and finding the facts. Clover's opinions go to matters that "can be accurately and intelligibly described to the jury," who, as persons "of common understanding, are" perfectly "capable of comprehending the primary facts and of drawing correct conclusions from them." *Salem*, 370 U.S. at 35. As such, the testimony Clover proffers in Paragraphs 4.6 through 4.6.2 is inadmissible.

### 7. Whether the Plaintiff "Introduced" AIB Bank to the Project and to the Defendants as that Term is Used in the Industry

The sixth matter on which Clover proposes to opine is "whether Bazarian made an 'introduction' of AIB Bank to the project and to Desarrollos Hotelco as that term is commonly understood in the industry." Clover's Rpt. ¶ 4.7. Section 3 of the Agreement entitles the plaintiff to fees "if the financing for the Project is concluded . . . from sources *introduced* to the Project by Bazarian International. Agreement § 3 (emphasis added). Clover opines that the plaintiff did make such an introduction, "as that term is commonly understood in the industry." Clover's Rpt. ¶ 4.7. The plaintiff did so, according to Clover, in four ways. First, Clover opines, the plaintiff "provided a copy of the indicative term sheet for mezzanine financing submitted by AIB Bank while Mr. Bazarian held the option to Mr. Stipa," thus "clearly indicat[ing] to Desarrollos Hotelco that AIB Bank was a lender interested in financing the project." *Id.* Second, Clover opines, the plaintiff "made AIB Bank and Mr. Broekaart aware of Walter Stipa's and Desarrollos Hotelco's potential involvement with the project." *Id.* Third, Clover opines, the plaintiff "arranged for and participated in the first face-to-face meeting between the AIB Bank executives and Walter Stipa." *Id.* Fourth, Clover opines, the plaintiff, and not the defendants, "provided AIB Bank the information that [the bank] needed and was requesting to [(1)] consider

[the bank's] participation in financing the project and [(2)] prepare the March 26, 2007 indicative

term sheet, including a financial model prepared by Bazarian." *Id.* Clover opines that "each of

the above points satisfies me that Bazarian created and facilitated the introduction of AIB Bank

to the project and to Desarrollos Hotelco within the usual and customary meaning of that term in

the industry," notwithstanding whether "AIB Bank and Desarrollos Hotelco previously had a

single telephone conference call or not." *Id.*

These four specific actions taken by the plaintiff, as described by Clover, constituted an

"introduction" of the bank and the defendants, Clover's Rpt. ¶ 4.7, but Clover does not opine

that any of these actions standing alone or only in some combination, are necessary to constitute

an "introduction" as that term is used in the industry. While Clover opines that the term

"introduction" has a "usual and customary meaning . . . in the industry," *id.*, he explains neither

what such meaning is nor whether or how that meaning diverges in any way from the term's

ordinary meaning. The plaintiff thus identifies no grounds to conclude that the term

"introduced," as used in Section 3 of the Agreement, is ambiguous. At most, Clover opines as to

*the manner in which* the plaintiff introduced the defendants to the bank, not that the specific

actions the plaintiff took were elements of an industry-standard introduction.

To testify merely that the plaintiff's conduct satisfied the definition of an "introduction,"

without explaining that term's meaning, would invade the trier of fact's province. *See, e.g.*, *Red

Rock Commodities v. Standard Chtd. Bank*, 140 F.3d 420, 423–24 (2d Cir. 1998) (affirming

exclusion of expert testimony designed "to put the agreement in a different perspective favorable

to [plaintiff] as a matter of banking practice" absent "any agreement ambiguity"); *Hogan

Logistics, Inc. v. Davis Transfer Co.*, No. 4:16-cv-1541 CAS, 2018 U.S. Dist. LEXIS 3600, at *8

(E.D. Mo. Jan. 9, 2018) (excluding proposed expert testimony regarding definitions of terms in

contested agreement as applied "to the facts of the case to interpret the meaning of the Agreement," as "opinions invade the province of the jury because they interpret the Agreement and offer precisely the conclusions [plaintiff] asks the jury to reach, essentially opining on the Agreement's legal effect."). The term "introduced" thus is unambiguous, making expert testimony unnecessary to elucidate the term's meaning. *See Segar*, 508 F.3d at 22. As such, the testimony Clover proffers in Paragraph 4.7 is inadmissible as irrelevant.

### 8. *Whether the Plaintiff Received a Financial "Commitment" as that Term is Used in the Industry*

The seventh matter on which Clover proposes to testify is whether the Agreement required the plaintiff to secure "final, binding [financial] commitment[s]" or "something other than" that. Clover's Rpt. ¶ 4.8. Section 2.B of the Agreement provided that "Bazarian International proposes to receive the financial commitments within eight weeks from date of this Agreement with cooperation of the Company." Agreement § 2.B. Clover opines that "this language—to the extent it is even legally binding . . . must have been referring to something other than a final, binding commitment." Clover's Rpt. ¶ 4.8. "'[C]ommitment' has various potential applications in the industry," Clover opines," including "both binding commitments and other, lesser types of commitments, including conditional commitments and indicative term sheets." *Id.* Clover asserts that "[h]ere, it seems clear . . . that the indicative term sheet provided by AIB Bank was the type of 'commitment' to which paragraph 2.B. was referring." *Id.* "[N]o lender would possibly issue a binding commitment or even a conditional commitment to the project when Desarrollos Hotelco had not yet been awarded the option," Clover says, "much less signed the long-term land lease with the Government of Aruba." *Id.*; *see also* Clover's Rebuttal Rpt. ¶ 5.2 ("In my experience, the first question that a lender asks is if the proposed borrower owns or controls the property in question, this being because the bank does not want to spend

great sums of money on its staff to analyze any transaction before they know the borrower is serious and has the land under control."); *id.* ¶ 5.3 ("In any event, I don't see how Bazarian could have possibly obtained credit committee approval in a period of eight weeks from the date of the Agreement in this situation.").

The Court already has concluded that the term "commitments" is ambiguous, and that the term's meaning is relevant to the parties' dispute. *See Bazarian*, 168 F. Supp. 3d at 20–22. This determination is the law of the case. *See TNA Merch. Projects, Inc. v. FERC*, 857 F.3d 354, 363 (D.C. Cir. 2017). What that terms means in the industry context, moreover, is not an "issue[] of common understanding which jurors" reasonably may be expected to understand for themselves, *Hibiscus Assocs. Ltd.*, 50 F.3d at 917, but rather is a "specialized, technical matter concerning which a lay jury may benefit from a qualified expert's tutelage." *Bill Harbert Int'l Constr., Inc.*, 608 F.3d at 895 (internal quotation marks omitted). The testimony Clover proposes to offer in Paragraph 4.8 and related portions of Clover's rebuttal report thus are admissible.

### 9. *Whether Investment Bankers Usually Require an Exclusive Agreement*

The eighth matter on which Clover proposes to testify is "whether and why investment bankers seek an 'exclusive' agreement to arrange for financing and whether the July 21, 2008 Syndicate Manager Agreement (Exhibit 28) between Desarrollos Hotelco and AIB Bank would violate what is commonly understood by an 'exclusive' investment banking relationship in the industry." Clover's Rpt. ¶ 4.9. Clover opines that the Syndicate Manager Agreement between Desarrollos and AIB Bank "contravenes the exclusive agreement that the parties entered into and

makes it clear that the parties were trying to exclude Bazarian from the transaction as his name was not even mentioned." *Id.* ¶ 4.9.2.[6]

The Agreement unambiguously provides that the plaintiff shall "perform exclusive investment banking services" in connection with the project. Agreement § 1; *see also id.* § 1.D ("Bazarian International will act as the Company's exclusive advisor and investment banker in working with financial institutions, investors, and funding sources to raise the debt financing for the Company."). Clover's proposed testimony is not the type from which a "lay jury may benefit from a qualified expert's tutelage," *Bill Harbert Int'l Constr., Inc.*, 608 F.3d at 895 (internal quotation marks omitted), because there is no dispute here either that (1) investment bankers typically seek exclusive agreements or, more significantly, that (2) the Agreement is an exclusive agreement, since the language makes this amply clear. Clover's testimony thus "relate[s] to [no] issue in the case" and has no "valid . . . connection to the pertinent inquiry." *Daubert*, 509 U.S. at 591–92. Moreover, Clover bases his assertion that "the parties were trying to exclude" the plaintiff solely on his observation that the plaintiff's "name was not even mentioned," Clover's Rpt. ¶ 4.9.2, evidence that "the jury is just as competent to consider and weigh . . . as is an expert witness and just as well qualified to draw the necessary conclusions therefrom." *Gilmore*, 843 F.3d at 973 (quoting *Henkel*, 138 F.3d at 935). The testimony Clover proposes to offer in Paragraphs 4.9 through 4.9.2, thus, is neither relevant nor admissible.

### 10. Proffered Testimony by Clover Withdrawn By the Plaintiff

As noted the plaintiff has withdrawn three opinions originally offered by Clover. For clarity of the record and for trial, these withdrawn opinions are described below.

---

[6] The plaintiff has informed the Court that Clover's proposed testimony as to the reasons investment bankers and brokers require an exclusive arrangement is withdrawn from paragraph 4.9.1 of Clover's Report. *See* Pl.'s Not. at 2.

### a. Whether An Industry-Standard Definition of the Term "Best Efforts Basis" Exists and, If So, What Such Language Requires

Clover proposed to opine "whether there is a commonly understood definition in the industry of language referring to securing financing on a 'best efforts basis,' such as that found in Section 1.D. of the Agreement and, if so, what that language requires." Clover's Rpt. ¶ 4.3 (citing Agreement § 1.D, which required the plaintiff to, among other things "conduct negotiations with" three categories of entities—"financial institutions, investors, and funding sources"—in order "to secure, on a best efforts basis, financing for the Project."). Clover posited that the term "best efforts basis" "is usually included in any brokerage agreement of this sort, and is designed to put the buyer on notice that the broker is not guaranteeing the placement of debt, but will use his 'best efforts' to place the debt." Clover's Rpt. ¶ 4.3; *see also* Clover's Rebuttal Rpt. ¶ 3.1 (opining that "best efforts" terms are typically included in financing placement contracts to make clear to the potential borrower that the intermediary is not guaranteeing placement of debt or equity financing and is not acting as a lender."); *id.* ¶¶ 3.1–3.6.[7]

The plaintiff wisely withdrew Clover's testimony as to the term "best efforts basis," Pl.'s Not. at 1, since the plaintiff has failed to show that testimony as to the term's meaning is "needed to clarify facts and issues," *Hibiscus Assocs. Ltd.*, 50 F.3d at 917, beyond "what is obvious to the layperson," *Ancho*, 157 F.3d at 519 (internal quotation marks omitted), making Clover's proposed testimony irrelevant. Indeed, Clover admitted that "any professional dictionary of

---

[7] The plaintiff has informed the Court that it withdraws from paragraph 3.1 of Clover's rebuttal report the following sentence: "In my report, I simply explained that 'best efforts' terms are typically included in financing placement contracts to make clear to the potential borrower that the intermediary is not guaranteeing placement of debt or equity financing and is not acting as a lender." *See* Pl.'s Not. at 2. The plaintiff has also informed the Court that it withdraws from paragraph 3.2 of Clover's rebuttal report the following sentence: "While I believe the ramifications of this are more of a legal question than one for me to opine on as an expert, it would strike me as grossly unfair that Mr. Stipa and Desarrollos Hotelco would be able to engage in this circumvention, prevent Bazarian from completing the task it was hired to do, and then defend themselves on the basis that Bazarian failed to complete the task." *Id.*

terms" would express the same meaning of the "best efforts basis" term, Clover's Rpt. ¶ 4.3,

rendering the jury "just as competent to consider and weigh" a dictionary definition as is Clover.

*Gilmore*, 843 F.3d at 973 (quoting *Henkel*, 138 F.3d at 935). Thus, the meaning of "best efforts

basis" does not require expert testimony for a reasonable jury to understand, and expert

testimony as proposed would thus invade the trier of fact's province by essentially testifying as

to the Agreement's legal effect and that the plaintiff satisfied the "best efforts" term's

requirements. *See, e.g.*, *Elorac, Inc. v. Sanofi-Aventis Can., Inc.*, No. 14 C 1859, 2017 U.S. Dist.

LEXIS 133449, at *78-80 (N.D. Ill. Aug. 21, 2017) (excluding proposed expert testimony on

meaning of contract term "commercially reasonable efforts" as used in disputed contract because

"proposed testimony cross[es] the line between helpful opinion testimony and testimony that

invades the province of the court by instructing the jury as to the meaning of a contract").

### b. Whether Including A Clause Incorporating By Reference All Lending Agreements and Documents is Standard Industry Practice and if so, Why

Clover also proposed to testify "whether it is standard practice in the industry to include a

clause such as that found in Section 3 of the Agreement requiring the Agreement to be

incorporated by reference in all lending agreements and documents and, if so, why this is the

case." Clover's Rpt. ¶ 4.10 (citing Agreement § 3, which provides: "The Agreement will

immediately become part of the relevant loan documents, management agreements, joint-venture

agreements, guaranty agreements, bridge loan facilities and Memorandum of Association for this

Project amongst and between the equity shareholders and lenders."). Clover opined that "[i]t is

common practice to agree that the agreement be included by reference or attachment to all

lending agreements and documents . . . in order to assure that the broker will not be eliminated

from such agreement during the exclusive period" and to "put[] any lender on notice that the fee

to a broker, in this case Bazarian, will be paid as agreed." Clover's Rpt. ¶ 4.10; *see also* Clover's

Rebuttal Rpt. ¶ 6.1.  The plaintiff wisely has withdrawn Clover's proposed testimony on this subject, *see* Pl.'s Not. at 2, since whether including an incorporation clause such as that found in Section 3 of the agreement is standard industry practice, the parties do not dispute that Section 3 itself contains such a clause or the meaning of such clause.  As such, the plaintiff failed to show the relevance of what other industry participants typically include in contracts, making Clover's testimony on this subject without any "valid . . . connection to the pertinent inquiry." *Daubert*, 509 U.S. at 591–92.

### c. Whether Forming Related or Successor Entities to Serve as a Mortgagor or Borrower is Common Industry Practice

Finally, Clover proposed to opine on "whether it is common in the industry for related or successor entities to be formed to serve as the mortgagor/borrower, especially where the client is a foreign entity and the local government for the project in question requires a local entity to be formed," that "common practice [is] to have separate entities or corporations formed to hold single assets," and that "[o]n occasion a country will insist that the ownership be through a corporation domiciled in the host country."  Clover's Rpt. ¶ 4.11.  Again, the plaintiff has withdrawn Clover's proposed testimony on this subject.  *See* Not. at 2.  This was a smart move.  Clover's proposed testimony is not the type from which a "lay jury may benefit from a qualified expert's tutelage," *Bill Harbert Int'l Constr., Inc.*, 608 F.3d at 895 (internal quotation marks omitted), because the parties simply do not dispute whether "hav[ing] separate entities or corporations formed to hold single assets" and/or "a corporation domiciled in the host country" own the assets in question are or are not common industry practices, Clover's Rpt. ¶ 4.11, meaning that Clover's testimony "does not relate to any issue in the case" or have "a valid . . . connection to the pertinent inquiry." *Daubert*, 509 U.S. at 591–92.

* * *

To summarize, Clover's testimony is relevant and helpful to the trier of fact only as to (1) whether the Proposal constituted an Information Memorandum, Clover's Rpt. ¶ 4.4; Clover's Rebuttal Rpt. ¶¶ 4.1–4.4, (2) the industry requirements of "financial structuring, Clover's Rpt. ¶ 4.5–4.5.2, and (3) the industry meaning of the term "commitments," *id*. ¶ 4.8 ; Clover's Rebuttal Rpt. ¶ 5.1–5.3.[8]

### D. Whether Clover's Report and Testimony are Unduly Prejudicial In Light of Their Probative Value.

The defendants argue that Clover's Report and proposed testimony are unduly prejudicial in light of their probative value under Rule 403 because "[m]uch of Clover's testimony . . . serve[s] more as a character witness for Plaintiff than any expert testimony." Defs.' Mot. at 25. "Here, due to his mere title as an expert witness," the defendants argue, "Clover's obviously biased testimony, given his long relationship with Mr. Bazarian, will be afforded a greater weight, despite the lack of any expert analysis being applied to his opinions." *Id.*

"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues,

---

[8]     The defendants argue that Clover's proposed testimony on these three topics amounts to legal conclusions rather than factual testimony based on expertise. Defs.' Mot. at 23. While "[e]xpert testimony that consists of legal conclusions cannot properly assist the trier of fact" and thus is inadmissible, "the line between an inadmissible legal conclusion and admissible assistance to the trier of fact in understanding the evidence or in determining a fact in issue is not always bright." *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997). Whether expert testimony consists of impermissible legal conclusions turns on "whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular. If they do, exclusion is appropriate." *Id.* (internal quotation marks omitted). "In other words, an expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." *Id.* at 1212–13. Here, Clover's testimony as to whether the Proposal constituted an Information Memorandum, the requirements of financial "structuring," and the meaning of the term "commitments" would, if believed by the trier of fact, "support a conclusion" that the plaintiff is legally entitled to a debt fee, but Clover does not opine directly as to "whether the legal standard has been satisfied," *id.* at 1213—*i.e.*, whether the plaintiff has proven by a preponderance of the evidence its breach of contract claim and is legally due the fee to which the plaintiff claims entitlement. As such, the testimony Clover proposes to offer in paragraphs 4.4, 4.5–4.5.2, and 4.8 of his Report and paragraphs 4.1 through 5.3 of his Rebuttal Report thus does not constitute impermissible legal conclusions, but rather factual testimony based on Clover's expertise.

misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. "[W]eighing any factors counseling against admissibility is a matter first for the district court's sound judgment." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008) (quoting *United States v. Abel*, 469 U.S. 45, 54 (1984)). "This is particularly true with respect to Rule 403." *Id.*

Clover's testimony on the three subjects where he may provide expert testimony—(1) the requirements of an Information Memorandum and whether the plaintiff's Proposal satisfies those requirements, (2) the meaning of financial structuring within the industry and whether the plaintiff satisfied those requirements, and (3) the meaning of a "commitment" within the industry and whether the plaintiff procured one—do not address the character of the plaintiff's business or business practices, but merely explain unfamiliar industry terms of art to a lay audience that cannot be expected to be familiar with such terms. Any statements by Clover that the plaintiff' is a specialized or successful business, has a strong reputation and track record with respect to success in hotel financing placement, or provides skilled brokerage services are, when viewed in the context of the reports or deposition testimony in which Clover uttered them, trivial, passing or incidental comments made in the course of providing background on the nature of the transaction at issue. *See, e.g.*, Clover's Rebuttal Rpt. ¶¶ 1.3, 2.4. Any quantum of "unfair prejudice" such stray remarks may cause do not "substantially outweigh[]" the "probative value" of Clover's testimony. FED. R. EVID. 403.

## III. CONCLUSION

For the reasons explained above, the defendants' motion *in limine* is denied as to the testimony Clover proposes to provide in paragraphs 4.4, 4.5–4.5.2, and 4.8 in his report— specifically, testimony as to (1) the requirements of an industry-standard Information

Memorandum and whether the plaintiff's Proposal satisfies that standard, Clover's Rpt. ¶ 4.4; (2) the meaning of the term "structuring" as used in the industry, *id*. ¶ 4.5; and (3) the meaning of the term "commitments" as used in the industry, *id*. ¶ 4.8—and the related testimony in paragraphs 4.1 through 5.3 of Clover's Rebuttal Report, and granted in all other respects. An appropriate Order accompanies this Memorandum Opinion.

       **Date:** April 25, 2018

_____
BERYL A. HOWELL
Chief Judge