# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BAZARIAN INTERNATIONAL FINANCIAL ASSOCIATES, LLC, | |
| Plaintiff, | Civil Action No. 13-1981 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| DESARROLLOS HOTELCO, C.A., DESARROLLOS HOTELCO CORPORATION CURACAO HOLDING, N.V., DESARROLLOS HOTELCO CORPORATION ARUBA HOLDING CARACAS, S.A., AND DESARROLLOS HOTELCO CORPORATION DHC ARUBA, N.V., | |
| Defendants. | |

## MEMORANDUM OPINION

The plaintiff, Bazarian International Financial Associates, LLC, sued the defendants, Desarrollos Hotelco, C.A. ("Hotelco C.A."), Desarrollos Hotelco Corporation DHC Aruba, N.V. ("DHC"), and Desarrollos Hotelco Corporation Curacao Holding, N.V. ("Hotelco Curacao"), after the defendants refused to pay the plaintiff for investment banking services provided in anticipation of developing Aruba's beachfront Ritz Carlton hotel. Following a five-day trial, a jury found that Hotelco C.A. had breached its written agreement with, and consequently awarded $2,200,000 in damages to, the plaintiff. DHC and Hotelco Curacao also were found liable as alter egos of Hotelco C.A. and as its successors in interest.

The parties have filed several post-trial motions. First, DHC and Hotelco Curacao seek judgment as a matter of law, or alternatively a new trial, repeating arguments made unsuccessfully pre-trial that neither is Hotelco C.A.'s alter ego or its successor in interest. Defs.'

Renewed Mot. JMOL or New Trial ("Defs.' Mot. JMOL"), ECF No. 136. Second, all three

defendants seek remittitur of the jury's damages award. Defs.' Mot. Remittitur or New Trial

("Defs.' Mot. Rem."), ECF No. 137. Finally, the plaintiff seeks prejudgment and post-judgment

interest on the jury's damages award as well as reasonable attorneys' fees, costs, and expenses.

*See* Pl.'s Mot. Interest & Fees ("Pl.'s Mot."), ECF No. 134.

For the reasons explained below, both co-defendants' motions are denied because the

defendants have failed to show that the trial evidence did not permit the jury's verdict as to alter-

ego or successor-in-interest liability or that the jury's damages award is beyond all reason.

Further, the plaintiff's fee motion is granted because the plaintiff is entitled to prejudgment

interest under District of Columbia law, post-judgment interest under federal law, and attorneys'

fees, costs, and expenses under the terms of the parties' contract.

I.      **BACKGROUND**

Set out below is the relevant procedural and factual background.

A.      **Dismissal of Plaintiff's 2009 Complaint**

This litigation dates to 2009, when the plaintiff sought a declaratory judgment to establish

its right to payment under an agreement, dated February 5, 2007 ("the Agreement"), executed

with Desarrollos Aerohotelco, C.A. ("Aerohotelco"). Compl., *Bazarian Int'l Fin. Assocs., LLC*

*v. Desarrollos Aerohotelco, C.A.*, Civ. No. 09-1764 (D.D.C. Sept. 17, 2009), ECF No. 1. Under

the Agreement, the plaintiff was to provide financial services to Aerohotelco, in exchange for a

"debt fee," as Aerohotelco built Aruba's Ritz Carlton hotel. That initial complaint was

dismissed, without prejudice, because no justiciable controversy had yet arisen. *Bazarian Int'l*

*Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.*, 793 F. Supp. 2d 124, 125 (D.D.C. 2011)

("*Bazarian I*").

## B.     Plaintiff's 2013 Complaint

The second iteration of this matter dates to 2013, when the plaintiff again sued Aerohotelco, asserting that Aerohotelco had breached the Agreement and been unjustly enriched by receiving, but failing to pay for, plaintiff's services. Compl. at ¶¶ 30–47. The amended operative version of that complaint added several defendants, all affiliated with Aerohotelco, including DHC and Hotelco Curacao. Am. Compl., ECF No. 13. Following a motion under Rule 12(b)(6), the claim for unjust enrichment was dismissed. Order, ECF No. 36. The breach-of-contract claim, however, survived against not only Aerohotelco but also against its affiliated enterprises, including DHC and Hotelco Curacao, because the Amended Complaint plausibly alleged each was an alter ego of Aerohotelco. *Bazarian Int'l Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.*, 168 F. Supp. 3d 1, 22–24 (D.D.C. 2016) ("*Bazarian II*"). The role of Walter Stipa, Aerohotelco's President and the Agreement's signatory, *id.* at 5, factored heavily in that conclusion, *id.* at 23. Stipa allegedly had a prominent role with each defendant-enterprise, serving as the president of some, a representative of others, and an owner or part-owner of all. *Id.* Moreover, the Amended Complaint alleged that Aerohotelco had freely transferred a valuable asset between defendants. *Id.* at 24. The alter-ego ruling obviated the need to consider the plaintiff's alternative successor-liability argument. *Id.* at 22 n.8. Thus, the breach-of-contract claim continued to trial.

## C.     Pre-Trial Motions

In anticipation of trial, the defendants filed two *motions in limine*. The first sought exclusion of testimony from the plaintiff's expert on hotel financing, William Clover. *See* Defs.' Mot. Lim. Expert, ECF No. 65. The second sought to preclude references to the defendants' foreign status. *See* Defs.' Mot. Lim. Foreign Status, ECF No. 67. The first motion was granted only in part and Clover was allowed to testify about industry standards and understandings

regarding certain documentation used in hotel financing and the meaning of certain terms, including "structuring" and "commitments." *See* Order, ECF No. 104. The second motion also was granted in part, prohibiting unfairly prejudicial references to the defendant-entities' foreign status. *See* Order, ECF No. 96.

### D. Evidence at Trial

At the five-day trial, the plaintiff presented the testimony of seven witnesses: Carl Bazarian, the plaintiff's President and Owner; Stipa; Willem Broekaart, a Vice President of Corporate Finance for the Aruba Investment Bank ("AIB"); Frendsel Giel, the Managing Director of AIB; Pedro Vera, a representative of the various defendant-entities; Gregory Zorella, the plaintiff's employee from 2004–2016; and Clover, the plaintiff's expert. The testimony of Stipa, Broekaart, and Giel was in the form of their pre-trial depositions, with most objections resolved pre-trial. *See* Min. Orders (May 2, 2018) (ruling on the parties' objections to designations in deposition transcripts of Giel, Stipa and Broekaart, respectively). The defendants presented a single witness: William Nicholson, an expert in real estate brokering, financing, and investing. The plaintiff introduced 93 exhibits into evidence, *see* Exhibit Log, ECF No. 121, and the defendants introduced 17, *see* Exhibit Log, ECF No. 122. Relevant to the now-pending motions, the evidence at trial revealed the following facts.

In 2003, the Aruban government inquired of the plaintiff's interest in bringing a Ritz Carlton hotel to the island, based on the plaintiff's specialty in developing resorts in under-developed parts of the world. Day 1 PM at 11:7–12:14.[1] The plaintiff was interested and as a result purchased the exclusive option to develop the hotel. *Id.* at 12:15–25; Day 2 AM at 41:9–

---

[1] The transcript of the jury trial appears on the docket as follows: Day 1 AM, ECF No. 128; Day 1 PM, ECF No. 142; Day 2 AM, ECF No. 129; Day 2 PM, ECF No. 143; Day 3 AM, ECF No. 130; Day 3 PM, ECF No. 144; Day 4 AM, ECF No. 131; Day 4 PM, ECF No. 145; Day 5 AM, ECF No. 132; Day 5 PM, ECF No. 146.

15.  While holding that option, the plaintiff prepared a market study and worked with Scotiabank and the AIB to secure financing.  Day 1 PM at 14:16–15:5.

Toward the end of 2006, Bazarian met Stipa, who was introduced as someone who had experience financing and constructing hotels, for the first time.  *Id.* at 20:17–21, 23:5–24:16.  Barzarian and Stipa, and their respective business partners, Zorella and Vera, emailed about financing the potential hotel as 2006 came to a close.  *Id.* at 25:16–27:16. Ultimately, the plaintiff could not arrange financing needed to begin development and, in 2006, let the exclusive option expire.  *Id.* at 13:1–14:21, 27:11–19; Day 2 AM at 41:18–21.

Notwithstanding the plaintiff's relinquishment of the option, Aruba's government remained interested in opening a Ritz Carlton and to this end, in February 2007, requested proposals for the right to develop the luxury hotel.  Pl.'s Trial Ex. 18; *see also* Day 1 PM at 27:21–28:4.  Stipa, on behalf of Aerohotelco, contacted Bazarian about the request for proposals ("RFP") because Bazarian, on behalf of the plaintiff, already had commissioned studies relevant to building the beachfront hotel.  Day 1 PM at 31:8–19.  Aerohotelco intended to bid, and on February 5, 2007, the plaintiff executed the Agreement with Aerohotelco "and/or its successor companies or any related entities which intend to invest in and/or develop the Project."  Pl. Trial Ex. 17 at preamble.  Under the Agreement, the plaintiff would "perform exclusive investment banking services in connection with [the] RFP process and development of a luxury hotel … on the island of Aruba."  *Id.* § 1.  Among other forms of compensation, the plaintiff was slated to receive a debt fee "[u]pon the settlement of binding loan and/or guarantee commitments for the Project obtained directly or indirectly by Bazarian International," the amount of which would be "a flat two percent (2%) of the gross amount of the debt fee financing provided to the Project, net of VAT and all wiring/bank fees, except for Scotiabank at one percent (1%) of the gross amount

of debt financing." *Id.* § 2.C. The debt fee would be paid "upon the earlier of the first draw-down of funds and/or first infusion of equity capital, provided that financing has been committed to the Project as a result of the efforts of Bazarian International." *Id.* § 2.D.

Bazarian signed the Agreement on behalf of the plaintiff and Stipa signed on behalf of Aerohotelco. *Id.* at 5; *see also* Day 2 AM at 125:14–17. Though Stipa entered the agreement on behalf of Aerohotelco, Aerohotelco was a Venezuelan company and Stipa testified that he was aware that if Aerohotelco's bid succeeded, "it would have to be a company in Aruba" that held the option on the beachfront property. Day 2 AM at 123:25–124:6. Vera, who worked alongside Stipa in negotiating the Agreement on behalf of Aerohotelco, also knew at the time of executing the Agreement that should Aerohotelco's bid prevail Aerohotelco would need to structure an Aruban entity to receive the leasehold. Day 3 PM at 52:19–53:11; Day 4 AM at 25:22–26:4. At his deposition, Stipa was asked, "[D]id you intend for, at the time you signed [the Agreement], if the project were successful, for that Aruban entity to also be bound by this agreement?" Day 2 AM at 124:16–19. Stipa answered: "Of course." *Id.* at 124:20.

Sometime between the formation of the Agreement and the end of March 2007, Aerohotelco merged into Hotelco C.A. *See* Joint Stipulation Regarding Substitution and Voluntary Dismissal of Parties at 1, ECF No. 55. The parties agree that Hotelco C.A. is Aerohotelco's successor in interest and assumed all Aerohotelco's liabilities under the Agreement. *Id.* at 1–2. Stipa and his family were Hotelco C.A.'s largest shareholders. Day 3 PM at 80:10–16.

Meanwhile, Bazarian and Zorella introduced Stipa and Vera to representatives from AIB, including Giel and Broekhart. Day 1 PM at 74:20–78:22; Day 2 PM at 91:5–92:15; Day 3 AM at 93:16–18; Day 3 PM at 18:6–15; Day 4 PM at 15:13–16:3. Bazarian and Broekhart each

recalled that during the initial introduction, Broekhart, representing AIB, expressed interest in serving as a syndicate arranger for Hotelco C.A.'s funders. Day 1 PM at 78:23–79:8; Day 3 AM at 35:12–19. According to Bazarian and Zorella, after the meeting, the plaintiff did all the due diligence for AIB as the bank prepared an indicative term sheet, and the plaintiff ultimately secured an indicative term sheet from AIB for the defendants. Day 1 PM at 48:6–49:14, 69:23–70:2, 71:6–16, 74:4–14, 80:16–81:14; Day 4 AM at 93:16–24; Pl.'s Trial Exs. 25, 26, 27. AIB's indicative term sheet was then included in the proposal that Stipa submitted to the Aruba government, in March 2007, on behalf of Hotelco C.A. for the right to develop the luxury hotel. Day 1 PM at 48:6–21, 85:6–21; *see also* Pl.'s Trial Ex. 35.

While Hotelco C.A's proposal was pending, the plaintiff remained a conduit from AIB to Stipa and Vera, pushing for AIB's inclusion as a financier or syndicate arranger for the hotel. Day 1 PM at 86:10–18, 87:7–88:1, 89:20–90:10; Day 2 AM at 73:22–74:7; Day 4 AM at 95:3–23; Day 4 PM at 69:10–23; *see also* Pl.'s Trial Ex. 34. AIB maintained regular communication with the plaintiff. Day 1 PM at 96:8–15, 103:10–15; Day 3 AM at 18:23–19:11, 24:10–14; Pl.'s Trial Exs. 43, 44, 45, 46.

In June 2008, Aruba issued a letter of intent selecting Hotelco C.A.'s bid for the beachfront hotel and offering Hotel C.A. an exclusive right to the leasehold. Day 3 PM at 49:22–50:24; *see also* Pl.'s Trial Ex. 65. As expected, the letter of intent instructed Hotelco C.A. "to structure and incorporate a local company … to hold the option right and lease hold." Pl.'s Trial Ex 65 at 1; *see also* Day 1 PM at 111:6–21. Within three months, Vera had incorporated DHC in Aruba for purposes of transferring the leasehold. Day 2 AM at 124:3–9; Day 3 PM at 48:19–49:16, 53:12–54:4. Hotel Curacao was incorporated two weeks later. Day 3 PM at 49:11–16. DHC was wholly owned by a non-defendant holding company, which was itself

wholly owned by Hotelco Curacao. *Id.* at 56:16–19, 57:14–20, 58:6–15; *see also* Pl.'s Trial Ex. 121. Vera acknowledged that Stipa and his family were the largest shareholders of DHC and Hotel Curacao, and that Stipa continued to act on behalf of each defendant. Day 3 PM at 80:17–81:12; Day 4 AM at 8:21–10:12; *see also* Pl.'s Trial Ex. 101 at preamble. Hotelco C.A., Vera conceded, then transferred the exclusive right to the leasehold for the beachfront property to DHC at no cost. Day 3 PM at 50:20–52:2.

On July 21, 2008, Hotelco C.A. and AIB entered into a Syndicate Management Agreement, pursuant to which AIB would act as Hotelco C.A.'s syndicate arranger for the hotel's funders. Pl.'s Trial Ex. 78; *see also* Day 1 PM at 132:6–15. In August 2008, the defendants, through Stipa, instructed the plaintiff to cease working on the defendants' behalf. Day 2 AM at 23:4–23, 26:20–27:1; Day 3 PM at 28:20–29:20; Day 4 PM at 44:19–45:17; *see also* Pl.'s Trial Ex. 87. Still, as AIB began its work as the syndicate arranger, the bank continued soliciting and receiving support from the plaintiff. Day 1 PM at 112:7–12, 114:1–9; Day 2 AM at 23:17–23, 82:5–83:18; Day 4 PM at 27:10–25; *see also* Pl.'s Trial Ex. 86.

On October 26, 2009, DHC and Hotelco Curacao, but not Hotelco C.A., entered into a Facility Agreement with a syndicate of seven lenders. Pl.'s Trial Ex. 99; *see also* Day 3 PM at 63:1–11, 72:19–21. The Facility Agreement permitted DHC and Hotel Curacao to borrow up to $110,000,000. Day 3 PM at 60:6–62:15; *see also* Pl.'s Trial Ex. 99 at 1. AIB, according to Broekhart, was instrumental in negotiating that agreement. Day 3 AM at 65:20–66:2. From the money lent through the Facility Agreement, Vera explained, just under $16.5 million went to Hotel Curacao and just over $93.5 million went to DHC. Day 3 PM at 63:12–24, 69:14–72:1; *see also* Pl.'s Trial Exs. 107, 108. The money was disbursed in stages. The first drawdown was

for $78.5 million, and occurred in early 2013, Day 3 PM at 78:25–80:1, while the remainder was disbursed in 2014 after the hotel was in operation, *id.* at 61:5–12

The following year, Stipa entered into a shareholders' agreement that disbursed shares of Hotelco Curacao and listed Stipa as the representative of Hotelco C.A., DHC, and Hotelco Curacao. Pl.'s Trial Ex. 101 at preamble. That agreement also noted that each entity was "directly or indirectly fully owned by or related to Stipa." *Id.*

The Ritz Carlton Aruba opened in 2013. Day 3 PM at 79:9–11. Hotelco C.A. and the affiliated enterprises, however, failed to make any payment owed to the plaintiff. Day 2 AM at 34:6–35:5.

After the plaintiff's presentation of its case, DHC and Hotel Curacao moved for judgment as a matter of law, under Federal Rule of Civil Procedure 50(a), on grounds that neither was liable as an alter-ego of or successor-in-interest to Hotelco C.A. Day 5 AM at 16:24–17:11. That motion was denied. *Id.* at 35:18–37:18. The case then went to the jury, which returned a verdict in the plaintiff's favor. Verdict Form, ECF No. 125. The jury found that Hotelco C.A. breached the Agreement and awarded the plaintiff $2.2 million in damages. *Id.* The jury also found that DHC and Hotelco Curacao were both alter egos of and successors in interest to Hotelco C.A. *Id.* at 2.

### E.    Pending Post-Trial Motions

Now, DHC and Hotelco Curacao again seek judgment as a matter of law, repeating that neither can be found liable as either Hotelco C.A.'s alter ego or as successors in interest. Additionally, all three defendants insist that the jury's damage award is unreasonably high. Separately, the plaintiff, as the prevailing party, seeks prejudgment and post-judgment interest on the jury's award, as well as reimbursements for reasonable fees, costs, and expenses incurred while litigating this matter. Each of these motions is ready for review.

## II. LEGAL STANDARD

### A. Federal Rule of Civil Procedure 50(b)

Federal Rule of Civil Procedure 50(a) authorizes a court, once a party has been fully heard on an issue, to enter judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a). If a Rule 50(a) motion is denied, the moving party may renew the motion within 28 days of the entry of judgment. FED. R. CIV. P. 50(b). A defendant seeking relief from a jury verdict through Rule 50 must satisfy an exceedingly demanding standard. "Judgment as a matter of law is appropriate only if the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in plaintiff's favor." *Campbell v. District of Columbia*, 894 F.3d 281, 286 (D.C. Cir. 2018) (citations omitted). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150–51 (2000) (citations omitted).

### B. Federal Rule of Civil Procedure 59(a)

After a jury trial, a court may, upon the motion of a party, grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A). Other circuits have given meaning to this less than pellucid standard, ruling that a new trial is "warranted when a jury has reached a 'seriously erroneous' result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.*, the

proceedings being influenced by prejudice or bias." *E.E.O.C. v. New Breed Logistics*, 783 F.3d

1057, 1066 (6th Cir. 2015) (citations omitted); *see also Venson v. Altamirano*, 749 F.3d 641, 656

(7th Cir. 2014) ("A new trial is appropriate if the jury's verdict is against the manifest weight of

the evidence or if the trial was in some way unfair to the moving party."). Whether to grant a

motion for a new trial is "entrusted to the sound discretion of the trial court." *Grogan v. Gen.*

*Maint. Serv. Co.*, 763 F.2d 444, 447 (D.C. Cir. 1985).

## III.   DISCUSSION

Defendants DHC and Hotelco Curacao have moved for judgment as a matter of law,

arguing that the trial evidence does not support the jury's verdict that each is an alter ego of, and

successor in interest to, Hotelco C.A. Additionally, all three defendants urge that the jury's

damages award is excessive and ask for remittitur or a new trial. Independently, the plaintiff, as

the prevailing party, seeks prejudgment and post-judgment interest on the jury's damages award,

as well as reimbursement for reasonable fees, costs, and expenses. The respective arguments are

taken in turn.

### A.     Trial Evidence Support Jury Verdict that DHC and Hotelco Curacao are
####       Alter Egos of Hotelco C.A.

As a default principle, "a corporation is regarded as an entity separate and distinct from

its shareholders." *Estate of Raleigh v. Mitchell*, 947 A.2d 464, 469 (D.C. 2008) (citations

omitted). "Courts apply the 'alter ego' theory to cast aside the corporate shield and fasten

liability on the individual shareholder," however, "when substantial ownership of corporate stock

is concentrated in one person or a few persons and other factors support disregarding the

corporate entity in the interest of equity and fairness." *Id.* at 470 (citations and internal quotation

marks omitted). Thus, alter ego analysis looks beyond formalism to a transaction's economic

substance. *See Vuitch v. Furr*, 482 A.2d 811, 816 n.8 (D.C. 1984) ("[T]he essential term is to be

defined in the act of operation." (quoting *Berkey v. Third Ave. R.R.*, 155 N.E. 58, 61 (N.Y. 1926) (Cardozo, J.)). As Justice Cardozo explained, and as the D.C. Court of Appeals has endorsed, an entity may be held liable as another's alter ego "though agency in any proper sense is lacking, where the attempted separation between parent and subsidiary will work a fraud upon the law." *Berkey*, 155 N.E. at 61; *accord Vuitch*, 482 A.2d at 816 n.8. "At such times, unity is ascribed to parts which, at least for many purposes, retain an independent life, for the reason that only thus can we overcome a perversion of the privilege to do business in a corporate form." *Berkey*, 155 N.E. at 61; *accord Vuitch*, 482 A.2d at 816 n.8.

A party may "pierce the corporate veil upon proof that there is (1) unity of ownership and interest, and (2) use of the corporate form to perpetrate fraud or wrong, or other considerations of justice and equity justify it." *Mitchell*, 947 A.2d at 470 (citations internal quotation marks omitted). There is neither a "precise formula by which to predict when courts will pierce the corporate veil since each case is sui generis," nor "a uniform standard to determine whether the evidence has sufficiently demonstrated unity of interest and ownership." *Vuitch*, 482 A.2d at 816 (citations omitted). "[T]he factor which predominates will vary in each case, . . . influenced by considerations of who should bear the risk of loss and what degree of legitimacy exists for those claiming the limited liability protection of a corporation." *Id.*

Before trial, the parties proposed jury instructions as to alter ego liability. The defendants objected generally to the plaintiff's proposal, arguing simply that the proposed instruction was not "tailored to the facts of this case." Joint Pretrial Statement, App. 9, Pl.'s Proposed Jury Instrs. Defs.' Obj. at 20–21, ECF No. 71-13. At the charging conference, the defendants reiterated their objection to the proposed alter ego instruction, Day 5 AM at 87:2–93:12, 110:11–115:2, and this time more specifically asked that this instruction include a reference to whether

corporate formalities have been disregarded, consistent with Standard Instruction 406. Day 5 AM at 93:1–8; 114:14–18. The defendants' request was adopted, Day 5 PM at 2:23–3:2; Jury Instrs. at 5, ECF No. 119. The Court instructed the jury "[t]o decide whether the Defendants DHC and Hotelco Curacao are alter egos of Aerohotelco and Defendant Hotelco C.A., for purposes of liability under the Agreement," by considering "factors such as": (1) "[w]hether corporate formalities have been disregarded;" (2) "whether corporate assets have been transferred from Aerohotelco or Hotelco, C.A. to Defendants DHC and/or Hotelco Curacao without payment of fair market value therefor;" (3) "whether Defendants DHC and/or Hotelco Curacao were started with inadequate capital;" (4) "whether Defendants DHC and/or Hotelco Curacao were used to protect Aerohotelco and/or Hotelco, C.A., from Plaintiff Bazarian International's claim;" (5) "the extent to which Defendants DHC and/or Hotelco Curacao have the same beneficial owners as Aerohotelco and/or Hotelco, C.A.;" and (6) "the extent to which Defendants DHC and/or Hotelco Curacao are controlled by the same dominating beneficial owner as Aerohotelco and/or Hotelco, C.A." Jury Instrs. at 5.

The defendants do not now contend that the instruction on alter ego liability improperly stated the law, and thus have waived that argument. *See* Defs.' Mot. JMOL at 11–16; Defs.' Reply Pl.'s Opp'n Defs.' Mot. JMOL ("Defs.' Reply JMOL") at 8–12, ECF No. 150. Instead, the defendants contend that insufficient evidence supports imputing alter ego liability to DHC and Hotelco Curacao. Defs.' Mot. JMOL at 11. Contrary to the defendants' contention, sufficient evidence supports the jury's finding that DHC and Hotelco Curacao are "legally responsible for the damages suffered by Plaintiff as a result of Defendant Hotelco's breach of contract" because DHC and Hotelco Curacao each is the "alter ego of Defendant Hotelco C.A." *See* Verdict Form at 2.

## 1.    *Disregard of Corporate Formalities*

As to the first factor, "[w]hether corporate formalities have been disregarded," Jury Instrs. at 5, the trial evidence supports that Hotelco C.A. transferred a valuable asset to DHC and Hotelco Curacao without receiving any compensation in return.  The jury heard that the Aruban government issued Hotelco C.A. a letter of intent selecting Hotelco C.A. to develop the hotel but conditioning this valuable exclusive development right on Hotelco C.A. "structur[ing] and incorporat[ing] a local [Aruban] company . . . to hold the option right and lease hold."  Pl.'s Trial Ex. 65 at 1; *see also* Day 1 PM at 111:6–21.  Shortly thereafter, Vera led an effort to structure two new companies, DHC, which was incorporated in Aruba, and Hotelco Curacao, which was incorporated in Curacao.  Day 3 PM at 49:11–16, 53:12–54:4.  DHC is 100% owned by a non-defendant intermediate entity that itself is 100% owned by Hotelco Curacao.  *Id.* at 56:16–19, 57:14–20, 58:6–15; *see also* Pl.'s Trial Ex. 121.  Hotelco Curacao and the intermediate entity are holding companies that can only hold stock and cannot engage in any commercial activity or directly receive any revenue.  Day 3 PM at 56:16–57:7, 59:17–60:5.  As Vera testified, once these wholly-owned subsidiaries were set up, Hotelco C.A. transferred to DHC, for no compensation, the "right to exercise the option and assume the leasehold interest granted by the Government of Aruba."  *Id.* at 51:23–52:2; *see also id.* at 50:20–24, 58:7–8.  This also indirectly was a transfer to Hotelco Curacao, which fully owned the intermediate holding company that fully owned DHC.  *See id.* at 57:8–10.  While the letter of intent granting the exclusive option to Hotelco C.A. had little value until the conditions for exercising the option were met, as the Court explained when denying the defendants' Rule 50(a) motion for judgment as a matter of law as to DHC and Hotelco Curacao, the option's value grew exponentially upon transfer of the option to

an Aruban company and compliance with the conditions for exercise. *See* Day 5 AM at 36:16–25.

Nonetheless, the defendants focus only on the exclusive option granted to Hotelco C.A., contending that "nothing was 'transferred' from Hotelco C.A to DHC or Hotelco Curacao" because "DHC was formed and obtained the lease pursuant to the Aruban government's condition and requirement that a local Aruban corporation hold the lease." Defs.' Reply JMOL at 9. This blinkered argument puts form over substance. *See Vuitch*, 482 A.2d at 816 n.8; *accord Berkey*, 155 N.E. at 61. The trial evidence supports that the Aruban government awarded the leasehold to Hotelco C.A. The requirement that Hotelco C.A. incorporate a local corporation to exercise control over the leasehold is immaterial in evaluating the liability of the local corporation as an alter ego of its ultimate wholly-owned parent. DHC did not acquire the lease through an arms-length transaction. Vera incorporated DHC and Hotelco Curacao to receive the exclusive leasehold interest and then Hotelco C.A. designated DHC as the entity to receive the leasehold from the government of Aruba. Indeed, once DHC came into existence, it received the leasehold in the beachfront property. Any independence DHC and Hotelco Curacao had from Hotelco C.A. was entirely notional.

The defendants press that Hotelco C.A. could not sell, assign, or hold the leasehold itself because the letter of intent required Hotelco C.A. to incorporate a separate Aruban company to hold the leasehold. Defs.' Reply JMOL at 9. These facts, far from aiding the defendants, only emphasize Hotelco C.A.'s, DHC's, and Hotelco Curacao's common identity by underscoring the extent to which all participants in this transaction, including the government of Aruba and Hotelco C.A., understood that Hotelco C.A., DHC, and Hotelco Curacao were in substance entities owned and operated by the same individuals with the single purpose of developing the

beachfront luxury hotel for which the Aruban government had granted Hotelco C.A. the exclusive option. As the plaintiff observes, "Hotelco could have—but did not—require DHC to compensate Hotelco in some way for this transfer, particularly since DHC would go on to use the letter of intent to develop a very valuable asset—the Ritz Carlton Aruba." Pl.'s Opp'n Defs.' Mot. JMOL ("Pl.'s Opp'n JMOL") at 14, ECF No. 147. Hotelco C.A. did not charge DHC a fee for this designation because doing so would have been akin to the right hand charging the left.

For these reasons, the jury reasonably could have found that Aerohotelco transferred a valuable asset to DHC and Hotelco Curacao without any transactional documentation or fee, in disregard of corporate formalities.

### 2.    *Transfer of Corporate Assets Without Payment of Fair Market Value*

As to the second factor, "whether corporate assets have been transferred from Aerohotelco or Hotelco C.A. to Defendants DHC and/or Hotelco Curacao without payment of fair market value therefor," Jury Instrs. at 5, the plaintiff and defendants largely rehash arguments relevant to the first factor. *See* Pl.'s Opp'n JMOL at 19; Defs.' Reply JMOL at 9. For substantially the same reasons given as to the first factor, the jury heard evidence that Hotelco C.A. transferred a valuable corporate asset to DHC and Hotelco Curacao without payment of fair market value.

### 3.    *Inadequate Capitalization*

As to the third factor, "whether Defendants DHC and/or Hotelco Curacao were started with inadequate capital," Jury Instrs. at 5, the plaintiff argues that "[t]he evidence at trial showed that, from the time that [these two] Defendants were incorporated through June 22, 2010, the financial statements for Defendants did not have any activity." Pl.'s Opp'n JMOL at 19 (citing Pl.'s Trial Ex. 101 art. 5.1(e)). The defendants counter that "inactivity is not synonymous with,

or even necessarily indicative of, financial undercapitalization," and that "[d]etermining whether an entity is adequately capitalized does not hinge on the extent of its initial financial activity." Defs.' Reply JMOL at 10. Here, the defendants explain that "[d]efendants' initial period of inactivity is simply a reflection of the fact that DHC and Hotelco Curacao had yet to become operational as the Ritz Carlton, Aruba was still being constructed and developed." *Id.* The defendants argue that "Hotelco C.A., DHC and Hotelco Curacao are all active, solvent, and remain in business to this day," and that "seven independent lenders loaned a total of $78,500,000 to DHC and Hotelco Curacao after extensive and prolonged negotiations," which "would have never happened if one accepts Plaintiff's unsupported theory that DHC and Hotelco Curacao were inadequately capitalized." *Id.*

At most, the defendants show that the jury *could* have found that DHC and Hotelco Curacao were adequately capitalized. Where "the record permits either inference, it is the jury's job," not the Court's, "to choose between them." *Primas v. District of Columbia*, 719 F.3d 693, 698 (D.C. Cir. 2013); *see also Metrocare v. Wash. Metro. Area Transit Auth.*, 679 F.2d 922, 925 (D.C. Cir. 1982) ("It is the essence of the jury's function to select, from among conflicting inferences and conclusions, that which it finds most reasonable."). The Court "cannot substitute its view for that of the jury, and can assess neither the credibility nor weight of the evidence." *Radtke v. Lifecare Mgmt. Partners*, 795 F.3d 159, 163 (D.C. Cir. 2015) (citations omitted). Even if the jury could have found that DHC and Hotelco Curacao were adequately capitalized, the defendants fail to show that this was the only reasonable conclusion.

### 4.    *Shielding Defendants from Legal Claims*

As to the fourth factor, "whether Defendants DHC and/or Hotelco Curacao were used to protect Aerohotelco and/or Hotelco C.A., from Plaintiff Bazarian International's claim," Jury

Instrs. at 5, the defendants argue that no evidence suggested that either DHC or Hotel Curacao were structured to protect Hotelco C.A. from the plaintiff's claim. Defs.' Mot. JMOL at 4. The plaintiff has not responded, although the defendants, over the long course of this litigation, have used the incorporation of these two companies to avoid any liability for the debt fee claimed by the plaintiff, despite the plain, broad language in the Agreement to bind "successor companies or any related entities which intend to invest in and/or develop the Project," Pl.'s Trial Ex. 17 at preamble, and admitted intent of the parties. Even if the fourth factor favors the defendants, however, this would not be dispositive of whether DHC and Hotelco Curacao were Hotelco C.A.'s alter egos. Indeed, alter ego liability is not the product of satisfying a "precise formula," and which factors "predominate[] will vary in each case." *Vuitch*, 482 A.2d at 816. In this case, the jury was entitled to conclude that the strength of plaintiff's showing on the other factors outweighed any lack of evidence on the fourth factor.

### 5. *Common Ownership*

As to the fifth factor, "the extent to which Defendants DHC and/or Hotelco Curacao have the same beneficial owners as Aerohotelco and/or Hotelco, C.A.," Jury Instrs. at 5, the evidence supports that Stipa and his family are the largest shareholders for Hotelco C.A., DHC, and Hotelco Curacao. Vera referred to Stipa as "the majority shareholder" in the development project. Day 3 PM at 20:2–5; *see also id.* at 80:10–21. Moreover, Stipa signed a contract on behalf of all three defendants representing that all three defendants were "directly or indirectly fully owned by or related to Stipa." Pl.'s Trial Ex. 101 at preamble; *see also* Day 4 AM at 8:21–10:12.

The defendants do not dispute the common ownership of Hotelco C.A., DHC, and Hotelco Curacao, but instead argue that "[d]ominant stock ownership *alone* . . . does not create

an identity of interest as an alter ego." Defs.' Mot. JMOL at 13 (citing *Alkanani v. Aegis Def.*

*Servs., LLC*, 976 F. Supp. 2d 1, 9 (D.D.C. 2013)) (emphasis added). This is true, but the plaintiff

does not rely on Hotelco C.A., DHC, and Hotelco Curacao's common ownership alone as

creating an identity of interest. Common ownership is just one of several facts supporting alter

ego liability.

### 6. *Common Control*

Finally, the jury reasonably could have found that "Defendants DHC and/or Hotelco

Curacao are controlled by the same dominating beneficial owner as Aerohotelco and/or Hotelco

C.A." Jury Instrs. at 5. Stipa and Vera, who works for Stipa, were the driving forces behind

each defendant. As discussed, Stipa executed a shareholders' agreement for the sale of Hotelco

Curacao shares on behalf of all three defendants. Pl.'s Trial Ex. 101 at preamble. Vera, for his

part, represented Hotelco C.A. in negotiations for the Agreement, *see* Day 4 AM 25:22–26:4,

was in charge the entire project, Day 3 PM at 19:24–20:8, and was the one who signed the

Facility Agreement on behalf of DHC and Hotelco Curacao, Pl.'s Trial Ex. 99; *see also* Day 3

PM at 62:23–63:11. The jury had ample evidence from which to conclude that all three

defendants were controlled by the same individuals.

\*      \*      \*

Based on consideration of all these factors, the jury reasonably could have found that

DHC and Hotelco Curacao were alter egos of Hotelco C.A.

### B. Trial Evidence Supports Jury Verdict that DHC and Hotelco Curacao are Successors in Interest to Hotelco C.A.

Separately, the defendants argue that the trial evidence does not support the jury's finding

that DHC and Hotelco Curacao are Hotelco C.A.'s successors in interest. Defs.' Mot. JMOL at

7. The plaintiff counters that the trial record supports that DHC and Hotelco Curacao are

Hotelco C.A.'s successors in interest under both District of Columbia common law and the language of the Agreement's preamble. Pl.'s Opp'n JMOL at 10. For the follow reasons, the trial evidence supports the plaintiff's position.

At trial, the Court instructed the jury that:

> If you find that Defendants DHC and Hotelco Curacao continued the business of Aerohotelco and/or Hotelco, C.A., under the Agreement by investing in and developing the Ritz Carlton Hotel in Aruba, you may find that they are successors in interest to Aerohotelco and/or Defendant Hotelco, C.A. and are bound by the Agreement. In other words, Defendants DHC and Hotel Curacao may be found to be successors in interest to Aerohotelco and/or Defendant Hotelco, C.A., where there is an implied or express agreement by Defendants DHC and Hotelco Curacao to assume the liabilities of Aerohotelco and/or Defendant Hotelco, C.A., or are a mere continuation of Aerohotelco and/or Defendant Hotelco, C.A.

Jury Instrs. at 5. The defendants do not argue that the jury instruction misstated the law and, consequently, have waived any such argument.[2] *See* Defs.' Mot. JMOL at 7–11; Defs.' Reply JMOL at 4–8.

From the inception of the plaintiff and defendants' business relationship, as both Bazarian and Stipa testified, the intention was for the eventual Aruban entities to assume Hotelco C.A.'s role. Day 1 PM at 44:17–24; Day 2 AM at 124:16–20. The Agreement's preamble, which includes any "successor companies or any related entities which intend to invest in and/or develop the Project" as a party, memorialized that understanding and intention. Pl.'s Trial Ex. 17 at preamble. Indeed, the parties' intention came to pass. Though Hotelco C.A. bid for and

---

[2]     Before trial, the defendants objected generally to the plaintiff's proposed jury instruction regarding successor-in-interest liability, arguing that it was "improper and lacking any adequate authority." Proposed Jury Instrs. Defs.' Obj. at 19. At the charging conference, the defendants again objected to the proposed successor-interest instruction, Day 5 AM at 87:2–93:12, 110:11–115:2, urging that the proposed language wrongly instructed the jury to determine whether DHC and Hotelco Curacao were bound by the Agreement rather than whether the clause of the Agreement entitling the plaintiff to payment covered DHC and Hotelco Curacao, *id.* at 87:12–23. DHC and Hotelco Curacao also argued that the successor-in-interest instruction mistakenly suggested that continuation of Aerohotelco and/or Hotelco C.A.'s business was the sole basis for finding successor-in-interest liability. *Id.* at 89:1–7; 113:9–22. The objections were addressed by adding language indicating that successor-in-interest liability accounted for whether one enterprise agreed, either explicitly or implicitly, to assume the liabilities of another. Day 5 PM at 2:12–22; *see also* Jury Instrs. at 5.

won the right exclusive right to the leasehold on the property that would house the Ritz Carlson, Pl.'s Trial Exs. 35, 65, the leasehold—a potentially lucrative asset—was transferred to DHC and Hotelco Curacao for no consideration as soon as those entities formed, Day 3 PM at 50:20–52:2. Transitioning assets and liabilities from Hotelco C.A. to DHC and Hotelco Curacao was seamless because Stipa, along with his family, was the principal owner of all three entities. *See* Day 3 PM at 80:10–12; Day 4 AM at 8:21–10:12; Pl.'s Trial Ex. 101.

Following the transfer, Hotelco C.A. bowed out. Vera executed the Facility Agreement not on behalf of Hotelco C.A., but on behalf of DHC and Hotelco Curacao. Pl.'s Trial Ex. 99; Day 3 PM at 63:1–11, 72:19–21. Disbursements through the Facility Agreement went to DHC and Hotelco Curacao, not Hotelco C.A. Day 3 PM at 63:12–24, 69:24–72:23; Pl.'s Trial Exs. 107, 108. DHC and Hotelco Curacao invested those disbursements when development of the Ritz Carlton got underway. Day 3 PM at 72:2–8. DHC owns the hotel, its assets, and its bank accounts, receives all revenue from of hotel operations, and employs all hotel employees. Day 2 AM at 33:19–21; Day 2 PM at 69:3–5; Day 3 PM at 54:14–16, 56:13–15, 59:3–12.

The defendants argue that this evidence does not suffice "to show that Hotelco C.A. was stripped of its assets and is, therefore, unable to pay a Debt Fee to Plaintiff," Defs.' Mot. JMOL at 8, but this argument fights a strawman. The defendants cite no authority that stripping one entity's assets is a predicate for finding another to be a successor in interest. The defendants further argue that successor-in-interest liability applies only in "a situation whereby the specific purpose of acquiring assets is to place those assets out of reach of the predecessor's creditor." *Id.* (quoting *Jackson v. George*, 146 A.3d 405, 414 (D.C. 2016)). *Jackson*, however, listed the fraudulent transfers to escape liability as just one of "several recognized exceptions" to the rule that "a business entity which acquires the assets of another business is not liable for its

predecessor's liabilities and debts." *Jackson*, 146 A.3d at 413.  Other exceptions included "where (1) there is an implied or express agreement to assume liabilities, (2) the transaction amounts to a 'de facto merger,' [or] (3) the successor corporation is a 'mere continuation' of its predecessor … ."  *Id.*

For the foregoing reasons, the trial record amply supports the that DHC and Hotelco Curacao are Hotelco C.A.'s successors in interest, either under District of Columbia common law or the terms of the Agreement.

### C.    Trial Evidence Supports the Jury's Damages Award

The defendants next challenge the jury's award of $2.2 million as unreasonably high, requiring either remittitur to $150,000, or a new trial on damages.  Defs.' Mot. Rem. at 1–2.  In the defendants' view, the plaintiff's recovery should be limited to two percent of either (1) $7,500,000, the amount AIB itself loaned to the project, rather than the sum of all seven lenders' loans to the project, or else (2) $78,500,000, the amount loaned during the first draw down of funds.  *Id.* at 1–2, 8.  Neither argument has merit.

A defendant seeking either remittitur of a jury's damages award or a new trial on damages must show that the jury's verdict was excessive.  *Langevine v. District of Columbia*, 106 F.3d 1018, 1024 (D.C. Cir. 1997).  Verdicts are excessive only if they are "beyond all reason" or are "so great as to shock the conscience."  *Id.* (quoting *Williams v. Steuart Motor Co.,* 494 F.2d 1074, 1085 (D.C.Cir.1974)).  By that standard, remittitur must be limited to instances in which the verdict is "so unreasonably high as to result in a miscarriage of justice" or "is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate."  *Id.* (quoting *Jeffries v. Potomac Dev. Corp.,* 822 F.2d 87, 96 (D.C.Cir.1987)); *accord Daskalea v. District of Columbia*, 227 F.3d 433, 443 (D.C. Cir. 2000).

In this case the damages flow from the breach of contract. As explained in partially denying the defendants' motion to dismiss, "[t]he proper interpretation of a contract" under DC law, "including whether a contract is ambiguous, is a legal question." *Bazarian II*, 168 F. Supp. 3d at 20 (quoting *Abdelrhman v. Ackerman*, 76 A.3d 883, 887 (D.C.2013)). "A contract is not ambiguous if the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends." *Id.* (quoting *Sahrapour v. LesRon, L.L.C.*, 119 A.3d 704, 708 (D.C. 2015)).

The defendants argue that "the highest amount of damages that the Jury in this case could reasonably have awarded Plaintiff . . . was $150,000—or, 2% of AIB's loan participation in the amount of $7,500,000." Defs.' Mot. Rem. at 1–2. The defendants, however, identify no legal basis to limit the plaintiff's recovery to only two percent of the amount of AIB's individual loan to the development project. To the contrary, the Agreement expressly provided that "[u]pon settlement of binding loan and/or guarantee commitments for the Project obtained *directly or indirectly* by Bazarian International, Bazarian International will be entitled to receive investment banking fees from the Company based on the amount of financing *arranged* for the Project . . . ." Pl. Trial Ex. 17 § 2.C (emphasis added). This language instructs that the plaintiff was entitled to a fee based on the amount of financing the plaintiff "arranged" for the project either "directly or indirectly," *id.*, belying the defendants' arguments that the plaintiff was due a fee based only on the amount of AIB's loan contribution.

Here, the jury heard evidence that the plaintiff arranged at least indirectly the entire amount of financing that the project received by facilitating AIB's efforts to bring other lenders into the Facility Agreement. The plaintiff introduced AIB to the project, Day 1 PM at 60:13–61:20, 74:4–14, 74:20–25, 76:2–5, 77:24–78:1, 79:4–8; Day 2 PM at 92:11–15; Day 3 AM at

35:12–19, 93:16–18; Day 3 PM at 18:6–15; Day 4 PM at 15:19–16:3; Pl.'s Trial Ex. 25, gave

AIB the information needed to prepare an indicative terms sheet, Day 1 PM at 49:13–14, 71:9–

16, 80:16–81:14; Day 4 AM at 93:16–24; Pl.'s Trial Ex. 26, pushed for AIB to be included in the

project as either a participant or syndicate arranger, Day 1 PM at 86:10–18, 87:7–88:1, 89:20–

90:10; Day 2 AM at 74:1–7; Day 4 AM at 95:3–17; Day 4 PM at 69:10–23; Pl.'s Trial Ex. 34,

and communicated regularly with AIB about the project for over a year, Day 1 PM at 96:8–15,

103:10–15, 112:7–12, 114:1–9; Day 3 AM at 18:23–19:11; Day 4 PM at 27:10–14, 69:19–23;

Pl.'s Trial Exs. 43, 44, 45, 46, 70, 86.  The jury heard testimony that AIB was "in regular

contact" with the plaintiff during this time, Day 3 AM at 24:10–14, and the plaintiff had

"discussions with AIB about . . . the possibility of [AIB] syndicating this loan with other partner

banks and affiliates of AIB locally," Day 4 PM at 69:19–23.  Finally, the plaintiff gave AIB

information relating to the project as AIB began arranging a lending syndicate in the summer and

fall of 2008.  Day 2 AM at 23:17–23, 83:12–23.  The jury thus had a basis to find that the

plaintiff, by facilitating AIB's efforts to recruit other lenders for the lending syndicate, arranged

indirectly the entire amount of financing the project received.  That the plaintiff "*never* had any

dealings, communications or negotiations with any of [the other] lenders in an effort to secure

financing commitments, binding or otherwise, for the Project," Defs.' Mot. Rem. at 6, is

irrelevant.

The defendants point to language in the Agreement stating that the plaintiff shall receive

a debt fee "provided that financing has been committed to the Project as a result of the efforts of

Bazarian International."  Pl.'s Trial Ex. 17 § 2.D; *see* Defs.' Mot. Rem. at 4.  This provision only

underscores the plaintiff's entitlement to a debt fee based on the full amount of loans committed

to the project due to the plaintiff's efforts, even if such efforts only indirectly secured the loans.

As explained, the trial record supports that the plaintiff's efforts indirectly secured the full amount of the financing the project received. The defendants seem to treat the Agreement as limiting the plaintiff's recovery to the amount of loans secured by entities with which the plaintiff directly interacted. That simply is not what the Agreement says, and the jury, relying on the plain language, reasonably found that the plaintiff was entitled to a larger fee than the defendants acknowledge.

The defendants raise two arguments to dispute that the plaintiff arranged the full amount loaned to the project, but neither is persuasive. First, the defendants argue that "the majority of Plaintiff's work, efforts and negotiations in attempting to obtain the requisite binding loan and/or guarantee commitments for the Project . . . centered around the large international financial institution, Scotiabank." Defs.' Mot. Rem. at 5 (citing Pl.'s Trial Ex. 17 § 2.C). This is beside the point. Even if the plaintiff expended time, effort, and resources on lenders that turned out to be dead-ends, the relevant question is whether the plaintiff directly or indirectly arranged the project's financing by facilitating AIB's efforts to secure loans. The trial record supports an affirmative answer. The jury heard ample testimony that the plaintiff did not focus its work, efforts, and negotiations solely on Scotiabank. Day 2 AM at 73:22–74:7, 85:15–25; Day 4 PM at 5:25–6:25, 35:11–15.

Second, the defendants assert that Zorella, the plaintiff's own officer, previously had acknowledged that the debt fee should reflect only the amount of AIB's own contribution to the lending syndicate. The defendants identify an email Zorella sent Stipa, which said "[T]here are three things we need to discuss: . . . Fees of the amount of AIB's participation . . . . [A]ccording to your last e-mail to us, you said you did not believe we would not be entitled to a fee for the amount of AIB's financing. It is important to clarify that, according to our contract, we would

earn a fee for the amount of AIB's loan." Defs.' Trial Ex. 62. Zorella, who by the time of trial

was no longer employed by the plaintiff, *see* Day 4 AM at 78:2–7, testified that the term "fees

for the amount of AIB's participation," as used in the email, meant "[t]he AIB loan amount, as in

the amount of the loan we were discussing with AIB at the time. The full amount, excluding

whatever amounts they may not end up taking to their own balance sheets because of

syndication." Day 4 PM at 74:18–25. This email shows that Zorella believed the plaintiff to be

due at least a fee based on the amount AIB lent the project; it does not follow that Zorella

believed the plaintiff to be due a fee based only on the amount AIB lent the project.

Moreover, Zorella explained at trial that in writing his email, he intended to claim

entitlement to a fee based on the entire amount of the syndicated loan, not just AIB's

contribution to the loan, stating:

> Our agreement is very clear that our fee is predicated on the gross amount
> of financing provided by the institution . . . . [A]t every instance where we've had
> banks that have subsequently syndicated the loan, the fee paid to us has been the
> total amount of funding provided. And [the] same thing when I was on the banking
> side. Whenever there was a syndicated loan, the intermediary received a fee based
> on the total amount of the financing provided.

Day 4 PM at 72:12–20. Likewise, Bazarian testified that he understood the plaintiff to be

entitled to "2 percent of the gross amount of the AIB arrangement," Day 2 AM at 34:21– 23, *i.e.*,

the entire amount of the syndicated loan. The jury, as trier of fact, was entitled to credit

Zorella's and Bazarian's explanatory testimony over the defendants' understanding of statements

Zorella made in his email.

Finally, the defendants argue that the jury's verdict was excessive because the syndicate

had leant only $78,500,000 to finance the project by the first drawdown of funds, and that the

amount loaned would not rise to $110,000,000 for several years. Defs.' Mot. Rem. at 8. The

Agreement provided that the debt fee shall be "based upon the amount of financing arranged for

the Project" and "based on a flat two percent (2%) of the gross amount of the debt financing provided to the Project." Pl.'s Trial Ex. 17 § 2.C. The Facility Agreement, meanwhile, provides that the amount to be loaned to the project is $78,500,000, "conditionally to be increased to USD $110,000,000." Pl.'s Trial Ex. 99 at 1. While the lending syndicate had provided only $78,500,000 at the time of the first draw down of funds, the Facility Agreement clearly contemplated, albeit conditionally, that this amount would be increased to $110,000,000 in the future. The defendants fail to explain why these terms do not suffice to show that "the amount of financing arranged for the Project," Pl.'s Trial Ex. 17 § 2.C, was $110,000,000, and the jury thus was entitled to find that the plaintiff "arranged," $110,000,000 in financing for the project.

For these reasons, the jury's verdict warrants neither remittitur nor a new trial on damages.

### D. The Plaintiff is Entitled to Prejudgment Interest

The plaintiff argues that prejudgment interest on the jury's verdict is warranted under section 15-108 of the District of Columbia Code. Pl.'s Mem. Supp. Mot. Interest & Fees ("Pl.'s Mem.") at 3–5, ECF No. 134-1.[3] The Court agrees.

"Prejudgment interest is an element of complete compensation" under District of Columbia law. *Bragdon v. Twenty-Five Twelve Assocs. Ltd. P'ship*, 856 A.2d 1165, 1172 (D.C. 2004) (citations omitted). "[T]he court has ample discretion to include prejudgment interest if necessary to fully compensate the plaintiff and the court usually should award prejudgment interest in such cases absent some justification for withholding such an award." *Wash. Inv.*

---

[3] The plaintiff also seeks prejudgment interest under D.C. Code § 15-109, which allows "the jury, or the court, if the trial be by the court," to include[e] interest as an element in the damages awarded" in an action for breach of contract, "if necessary to fully compensate the plaintiff." D.C. Code § 15-109. The parties dispute whether the statute's plain language precludes an award of prejudgment interest by the Court in a jury trial action. This issue need not be resolved, however, as prejudgment interest is available under section 15-108.

*Ptnrs. of Delaware v. Secs. House, K.S.C.C.*, 28 A.3d 566, 581 (D.C. 2011) (citations omitted).

"Statutes providing for prejudgment interest are [] remedial and should be generously construed so that the wronged party can be made whole." *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 732 (D.C. 2003) (citations omitted).

Section 15-108 provides that:

> In an action in the United States District Court for the District of Columbia . . . to recover a liquidated debt on which interest is payable by contract or by law or usage the judgment for the plaintiff shall include interest on the principal debt from the time when it was due and payable, at the rate fixed by the contract, if any, until paid.

D.C. Code § 15-108. This section requires prejudgment interest "if (1) the action is one to recover a liquidated debt, and (2) the interest is payable on that debt by contract or by law or usage." *Steuart Inv. Co. v. The Meyer Group, Ltd.*, 61 A.3d 1227, 1239 (D.C. 2013). "The rate of interest in the District upon the loan or forbearance of money, goods, or things in action in the absence of expressed contract, is 6% per annum." D.C. Code § 28-3302(a). "[T]he statutory limit on prejudgment interest expressed in D.C. Code § 28–3302 applies" to "sums under [Section] 15–108." *District of Columbia v. Pierce Assocs., Inc.*, 527 A.2d 306, 310 (D.C. 1987). For liquidated debts, section 15-108 mandates "prejudgment interest … from the date the debt is due until the date it is paid." *Id.* at 310.

### 1. *The Debt Fee Was a Liquidated Debt*

"Debt," as used in section 15-108, "is given a broad reading, and describes an amount of money the use of which a prevailing plaintiff has been deprived by the defendant's conduct." *Wash. Inv. Ptnrs. of Delaware*, 28 A.3d at 581 (citations omitted). "A debt is 'liquidated' if it is an easily ascertainable, certain sum of money." *Id.* Here, the jury's $2.2 million verdict compensates the plaintiff for an unpaid liquidated debt due under the Agreement. The debt fee due to the plaintiff is a "debt" within section 15-108's meaning because it is the "amount of

money the use of which [the] plaintiff has been deprived by the defendant[s'] conduct." *Id.* The plaintiff was deprived of money because the defendants refused to pay. The debt fee likewise is "liquidated" within section 15-108's meaning because "it is an easily ascertainable, certain sum of money." *Id.* The Agreement provided that the debt fee would be "a flat two percent (2%) of the gross amount of the debt financing provided to the Project," Pl.'s Trial Ex. 17 § 2.C, and the trial evidence supports that the gross amount of debt financing provided to the project was $110,000,000. The jury thus was entitled to find that the total debt fee due to the plaintiff was $2.2 million. *See Giant Food, Inc. v. Jack I. Bender & Sons*, 399 A.2d 1293, 1302 (D.C. 1979) ("[I]t would be somewhat artificial to find the debt unliquidated where . . . the defaulting party[] knew the exact amount and terms of the contractual debt.").

The defendants raise several arguments as to why the debt fee was not a liquidated debt, none of which is persuasive. First, the defendants argue that "[t]he amount of the Debt Fee, if any, has always been in dispute and is not specifically set forth in the Agreement." Defs.' Opp'n Pl.'s Mot. Interest & Fees ("Defs.' Opp'n") at 9, ECF No. 138. To the contrary, the Agreement specifically provides that the debt fee shall be "a flat two percent (2%) of the gross amount of the debt financing provided to the Project." Pl.'s Trial Ex. 17 § 2.C. The Agreement could not provide a more specific figure because the parties could not know in advance the amount of debt financing that would be provided to the project. The Agreement provides a simple multiplicative function to determine the amount of the debt fee based on the amount of debt financing provided to the project. That the defendants have disputed the debt fee is irrelevant, as a defendant's recalcitrance in paying a debt owed by disputing the debt obligation or amount, cannot render unliquidated an otherwise liquidated debt, and thereby foreclose prejudgment interest's availability.

Second, the defendants point out that "the total amount of credit facilities or financing available was unknown at the time the Agreement was executed, was never definitively capped, and was always subject to change, and did in fact fluctuate throughout the course of this litigation." Defs.' Opp'n at 9. According to the defendants, "[t]he exact dates, amounts and the participating lender(s) of the increase in financing from $78,500,000 to $110,000,000 was … never established by the evidence presented at trial," *id.* at 10, thereby undercutting characterization of the debt as liquidated, which requires that the debt be an easily ascertainable sum certain "at the time it arose." *District of Columbia v. Campbell*, 580 A.2d 1295, 1300 (D.C. 1990) (citations omitted). Contrary to the defendants' strained reasoning, the Agreement specified exactly when the debt fee would be due—"upon the earlier of the first draw-down of funds and/or first infusion of equity capital, provided that financing has been committed to the Project as a result of the [plaintiff's] efforts." Pl.'s Trial Ex. 17 § 2.D. At trial, Vera testified that the first draw down of funds occurred sometime in 2013 before the hotel opened in November of that year. *See* Day 3 PM at 78:25– 80:1. The plaintiff points to this testimony to contend that "the latest the debt fee became due was November 1, 2013." Pl.'s Reply Supp. Mot. Interest & Fees ("Pl.'s Reply") at 11, ECF No. 141. If the debt fee became due before November 2013, it seems the latest the debt fee became due was October 31, 2013, but the plaintiff does not make this argument, waiving any claim to one additional day of prejudgment interest. In any event, the trial record, coupled with the plaintiff's waiver of one day of prejudgment interest, supports that the latest the debt fee could have become due was November 1, 2013, and, as explained above, by this date, the $110,000,000 in "debt financing" already had been "provided

to the Project." Pl.'s Trial Ex. 17 § 2.C.[4]  The debt thus was an easily ascertainable sum certain at the time it became due.

The defendants argue that the jury, not the Court, was required to make a finding as to the date the debt fee became due.  Defs.' Opp'n at 12.  As an initial matter, the defendants have "waive[d] the right to a jury trial on [this] issue of fact" by not "demand[ing] its submission to the jury," allowing "the court [to] make a finding on this issue."  FED. R. CIV. P. 49(a)(3).  If the date the debt fee came due must be found as a matter of fact, the job is left to the Court, which is persuaded, for the reasons given above, that November 1, 2013 is the latest the debt fee could have become due, and would so find if necessary.  Regardless, the defendants cite no authority suggesting that the date a debt fee comes due must be found as a matter of fact.  At this stage, the question instead is whether "a reasonable jury [had] a legally sufficient evidentiary basis to find for the party on that issue."  FED. R. CIV. P. 50(a)(1).  Here, the jury certainly did.

The defendants also argue that "the Debt Fee became due and payable in stages over time" rather than all at once.  Defs.' Opp'n at 10.  This argument cannot square with Section 2.D of the Agreement, which made the entire debt fee due "upon the earlier of the first draw-down of funds and/or first infusion of equity capital, provided that financing has been committed to the Project as a result of the [plaintiff's] efforts."  Pl.'s Trial Ex. 17 § 2.D.  The Agreement concretizes when the debt fee became due.

For the reasons given, the trial record provides a sufficient evidentiary basis that the plaintiff was deprived of an ascertainable sum of money no later than November 1, 2013.

---

[4]    For this reason, the defendants' accusation that "[p]laintiff has arbitrarily selected a date upon which the Debt Fee became due and payable without explanation or any evidence to support it," Defs.' Opp'n at 10, is unsupported.

## 2. *The Debt is Payable By Usage*

Next, the plaintiff argues that interest on the debt fee is payable by usage. Usage, as used in section 15-108, "refers to what is customary or usual under similar of comparable circumstances." *Aspire Channel, L.L.C. v. Penngood, LLC*, 139 F. Supp. 3d 382, 387, 389 (D.D.C. 2015) (quoting *Riggs Nat'l Bank of Wash. v. District of Columbia*, 581 A.2d 1129, 1255 (D.C. 1990). Under District of Columbia law, "it is indeed customary to pay interest on funds that are withheld and not paid when due." *Bragdon*, 856 A.2d at 1172; *accord Bassin,* 828 A.2d at 731; *see also Nolen v. District of Columbia*, 726 A.2d 182, 185 (D.C. 1999) ("If a debt ought to be paid at a particular time, and is not, owing to the default of the debtor, the creditor is entitled to interest from that time by way of compensation for the delay in payment." (quoting *Young v. Godbe,* 82 U.S. (15 Wall.) 562, 565–566 (1872)).

The defendants rely on *Steuart Investment Co.* to argue that *Bragdon*'s "general dicta standing alone is insufficient to establish that prejudgment interest is payable by usage in this scenario." Defs.' Opp'n at 12. Indeed, *Steuart Investment Co.*, a case about non-payment of a commercial real estate commission, regarded *Bragdon,* a case about overpayments, as insufficient authority for prejudgment interest to be owed as a matter of custom on funds not paid when due. *Steuart Inv. Co.*, 61 A.3d at 1241. Yet, *Steuart Investment Co.* is not as compelling as the defendants would like. First, the District of Columbia Court of Appeals affirmed the denial of prejudgment interest because the contested debt was not liquidated. *Steuart Inv. Co*., 61 A.3d at 1240. That is not true here. Second, in dicta, the appellate court wrote that the plaintiff had "presented no evidence demonstrating that in the [commercial] relate estate industry, interest would customarily be paid on a brokerage commission." *Id.* at 1241. Thus, the problem was a mere failure of proof.

Here, the plaintiff does not suffer from the same failure of proof. Custom may be established by showing a prior award of "pre-judgment interest on the specific type of claim at issue" or by showing that such "such interest [has] been held to be recoverable in a case which [is] viewed as analogous in principle." *Nolen*, 726 A.2d at 185. The plaintiff cites several cases beyond *Bragdon*. *See* Pl.'s Mem. at 4–5; Pl.'s Reply at 9–10. In *Aspire Channel*, for example, prejudgment interest was found payable by usage where the defendant had "failed to pay plaintiff the total amount due for the advertising placements" under the parties' agreement. 139 F. Supp. 3d at 387, 390. *Aspire Channel* is analogous in principle to the matter at hand, as both involve nonpayment under a contract for services. Though the defendants characterize *Aspire Channel* as "an action for breach of a broadcast agreement which defendant conceded it breached by failing to pay the liquidated amount owed," Defs.' Opp'n at 11, the defendant's concession of liability did not factor into the prejudgment interest award, *see generally Aspire Channel*, 139 F. Supp. 3d at 389–90. Similarly, in *District of Columbia v. Potomac Electric Power Co.*, prejudgment interest was awarded under section 15-108 when the District failed to pay in full for electric service provided by PEPCO. 402 A.2d 430, 433, 441 (D.C. 1979). Withholding funds left PEPCO "without the use of the sums here from the days on which they fell due, with the [defendant] correspondingly having the use of such funds." *Id.* at 441. Making the creditor whole in such a situation is the purpose of section 15-108. *Id.* These examples are sufficiently analogous to establish the plaintiff's entitlement to prejudgment interest, under section 15-108, to provide full compensation for the plaintiff's loss of the use of the debt fee payment.

For these reasons, the plaintiff is entitled to prejudgment interest under section 15-108. The plaintiff asserts that the amount of prejudgment interest due on the debt fee from November 1, 2013 through May 14, 2018 is $599,016. The defendants do not dispute this figure's

accuracy, and thus have waived any objection that the plaintiff miscalculated the amount of prejudgment interest.

### E. The Plaintiff is Entitled to Post-Judgment Interest

The plaintiff also seeks "an award of post-judgment interest at the statutory rate established by 28 U.S.C. § 1961(a)." Pl.'s Mem. at 7. Under that provision, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." *Id.* "[T]he federal post-judgment interest rate provided for in 28 U.S.C. § 1961 applies in diversity cases." *Cappiello v. ICD Publications, Inc.*, 720 F.3d 109, 112 (2d Cir. 2013) (quoting *FCS Advisors, Inc. v. Fair Fin. Co.*, 605 F.3d 144, 147 (2d Cir. 2010)); *accord Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 165 (D.D.C. 2013) ("Post-judgment interest is governed by federal law, even in a case in which a federal court hears only state-law claims."). Awarding post-judgment interest under Section 1961(a) "is mandatory, not discretionary." *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1102 (9th Cir. 2011); *accord Lanny J. Davis & Assocs. LLC*, 962 F. Supp. 2d at 165. The plaintiff asserts that "[t]he Court's judgment should thus allow for post-judgment interest at the statutory rate established by 28 U.S.C. § 1961(a)." Pl.'s Mot. at 7. The defendants are silent regarding the plaintiff's request for post-judgment interest, and no reason to deny the plaintiff post-judgment interest is evident. The plaintiff thus is entitled to post-judgment interest in the amount that Section 1961(a) allows.

## F.     The Plaintiff is Entitled to Attorney's Fees

The plaintiff also seeks "an award of its reasonable attorneys' fees through the end of trial in the amount of $493,328.50." Pl.'s Mem. at 8. As support, the plaintiff has submitted detailed affidavits and records showing hours worked and rates charged for each attorney and non-attorney staff member who worked on this matter and has demonstrated the reasonableness of these figures. As such, the plaintiff is entitled to the full amount of attorney's fees sought.

Under District of Columbia law, "where a contractual agreement expressly provides for the payment of attorney's fees, the trial court's discretion is limited to ascertaining what amount constitutes a 'reasonable' fee award." *Concord Enterprises, Inc. v. Binder*, 710 A.2d 219, 225 (D.C. 1998) (quoting *Cent. Fid. Bank v. McLellan*, 563 A.2d 358, 360 (D.C. 1989)). "Otherwise put, absent public policy considerations or other unusual circumstances, the duty of the trial court is to give meaning to the full agreement of the parties, as interpreted by controlling case law." *Id.* (quoting *McLellan*, 563 A.2d at 360). Section 6 of the Agreement entitles a "prevailing party" in any "action to enforce this Agreement or to interpret any of its terms . . . to full reimbursement of its costs and expenses in connection therewith from the non-prevailing party, including attorney's fees." Pl.'s Trial Ex. 17 § 6. "Such a provision will generally be enforced so long as it does not reimburse a party for greater than reasonably incurred expenses." *Concord Enterprises, Inc.*, 710 A.2d at 225.[5]

---

[5] The plaintiff urges the Court to use the lodestar methodology to calculate reasonable attorneys' fees. Pl.'s Mem. at 8. "The usual method of calculating reasonable attorney's fees" under a federal fee-shifting statute "is to multiply the hours reasonably expended in the litigation by a reasonable hourly fee, producing the 'lodestar' amount." *Bd. of Trs. of Hotel & Rest. Employees Local 25 v. JPR, Inc.*, 136 F.3d 794, 801 (D.C. Cir. 1998). No federal fee-shifting statute is involved in this case, so "the duty of the trial court is to give meaning to the full agreement of the parties." *Concord Enterprises, Inc.*, 710 A.2d at 225 (quoting *McLellan*, 563 A.2d at 360). Yet, the plaintiff seeks only a lodestar amount of attorney's fees, *see* Decl. of Eric N. Heyer, Partner, Thompson Hine LLP ("Hine Decl.") ¶ 16, ECF No. 134-2, and the defendants do not contest that aptness of that methodology, *see* Defs.' Opp'n at 17–20. As such, no occasion is presented to decide whether District of Columbia law requires a court to apply the lodestar method to determine whether the amount of attorney's fees sought under a contractual fee-shifting provision is reasonable.

The plaintiff has shown that the hourly rate each timekeeper charged is reasonable by submitting a detailed declaration identifying each timekeeper who worked on this matter, as well as each timekeeper's title, the hourly rates each timekeeper charged, and the years such rates were charged. *See* Decl. of Eric N. Heyer, Partner, Thompson Hine LLP ("Heyer Decl.") ¶¶ 3–16, ECF No. 134-2. The rates that each timekeeper charged are the same, or less than, the rates each timekeeper charged other clients. *See id.* ¶ 16. The voluminous invoices attached to the Heyer Declaration document and substantiate the declaration's assertions as to the rate each timekeeper charged. *See generally* Heyer Decl., Attach., Invoices, ECF No. 134-2.

Moreover, with one exception, the rates each timekeeper charged fall within the range for the corresponding years of experience found in the Attorney's Fees Matrix prepared and regularly updated by the Civil Division of the U.S. Attorney's Office for the District of Columbia ("USAO"). *See* U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA, USAO ATTORNEY'S FEES MATRIX—2015–2019, at 1, https://www.justice.gov/usao-dc/file/796471/download (last visited Oct. 24, 2018).[6] Although the USAO Attorney's Fees Matrix is used to determine prevailing market rates in attorney's fee disputes under federal fee-shifting statutes rather than under contracts governed by District of Columbia law, that plaintiff's attorneys' rates fall within the Matrix's ranges supports that such rates comport with the wider

---

[6] This USAO Attorney's Fees Matrix is often referred to as the "*Laffey* Matrix," but this is a misnomer. While "originally compiled to reflect the prevailing market rate for 'complex federal litigation,'" *Reed*, 843 F.3d at 519 (citing *Laffey v. Nw. Airlines, Inc. (Laffey I)*, 572 F. Supp. 354, 372 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds, Laffey v. Nw. Airlines, Inc. (Laffey II)*, 746 F.2d 4 (D.C. Cir. 1984), *overruled in part on other grounds, Save Our Cumberland Mountains, Inc. v. Hodel (SOCM)*, 857 F.2d 1516, 1517 (D.C. Cir. 1988) *(en banc)),* the methodology used to prepare the current USAO Attorney's Fees Matrix is entirely divorced from the original *Laffey* case rates. *See* USAO Attorney's Fees Matrix – 2015-2019, Explanatory Note 4 (highlighting that current methodology "replaces that used prior to 2015, which started with the matrix of hourly rates developed in *Laffey*…"). Instead, the USAO derived the hourly rates for attorneys in this area based on "average hourly rates reported in 2011 survey data for the D.C. Metropolitan area, which rates were adjusted for inflation with the Producer Price Index-Office of Lawyers (PPI-OL) index," with "[t]he survey data com[ing] from ALM Legal Intelligence's 2010 & 2011 Survey of Law Firm Economics." USAO Attorney's Fees Matrix – 2015-2019, Explanatory Note 2.

market.  The only timekeeper whose rates charged fall outside the Matrix's ranges is David A. Wilson, a senior partner at Thompson Hine LLP, who billed 54.5 hours over five years.  *See* Heyer Decl. ¶¶ 16–17.  That Wilson's rates fall outside the Matrix's ranges does not by itself render such rates unreasonable, especially given the limited hours Wilson billed.  Having thoroughly reviewed the plaintiff's declaration and invoices, the nothing unreasonable may be perceived about the rates each timekeeper charged.

The plaintiff also has established that the number of hours each timekeeper charged is reasonable.  The plaintiff's invoices provide extensive, contemporaneous records of the hours each timekeeper billed for this matter.  *See generally* Invoices, ECF No. 134-2.  The invoices' descriptions of each timekeeper's activities and the number of hours worked demonstrate that the plaintiff's attorneys billed a reasonable number of hours.  This is especially so given this matter's factual complexity and long duration.

The defendants make a conclusory assertion that the amount of attorney's fees the plaintiff seeks "includes many charges that are not reasonable or recoverable," Defs.' Opp'n at 17, but offer no substantive analysis in support.  The defendants do not contest, however, any of the hourly rates that the plaintiff's timekeepers charged.  Though the defendants have contested six charges, there is no accompanying explanation, legal authority, or evidence to show why or how these charges are unreasonable.  *See id* at 17–18.[7]  Such a meager showing fails to

---

[7]     Specifically, the defendants characterize as "[u]nreasonable charges that should not be awarded" the following charges:

- "12.5 hours billed by Mr. Roberto R. Guzman at a rate of $375/hr between May 1, 2018-May 14, 2018 for preparing and attending trial to read Walter Stipa's deposition testimony (Doc. 134-2 at 186-193) (Plaintiff already had 3 attorneys representing it at trial);"
- "11.2 hours billed by Mr. David Wilson at a rate of $675/hr between April 27, 2018-May 14, 2018 for preparing and attending trial to read the deposition of Willem Broekaart and Frendsel Giel (*Id.* 182-193);"
- "Several time entries that lump together multiple tasks into large blocks of time making it impossible to evaluate their reasonableness. See e.g. 14 hour block of time billed by Mr. Eric Heyer

37

demonstrate that the identified time charges are unreasonable under the circumstances. Merely listing charges and asserting that they are unreasonable does not suffice.

Apart from the six charges, the defendants identify no particular time charges that are unreasonable as to rates or hours worked. While the defendants assert that the six abovementioned time charges are "just a sampling of Defendants' objections to Plaintiff's fee petition based on a preliminary review of the nearly 350 pages of submissions which purport to substantiate Plaintiff's request for an award of $493,328.50 in attorneys fees," *id.* at 18, the defendants have not specifically identified any other portion of the plaintiff's fee request alleged to be unreasonable. The defendants' utter failure to offer any substantive argument as to why the plaintiff's attorney's fee request is unreasonable amounts to waiver as to the full amount of attorney's fees the plaintiff seeks.

Procedurally, the defendants assert that they "require additional time to review Plaintiff's voluminous documentary submissions and consider them on an item by item basis." Defs.' Opp'n at 19. This Court's Local Rules, however, make clear that "[w]ithin 14 days of the date of service or at such other time as the Court may direct, an opposing party shall serve and file a memorandum of points and authorities in opposition to the motion," and that "[i]f such a memorandum is not filed within the prescribed time, the Court may treat the motion as

on April 18, 2018 (*Id.* 179); 9.5 hour block of time billed by Ms. Karyna Valdes on April 20, 2018 (*Id.* 181), 8.6 hour block of time billed by Ms. Karyna Valdes on May 4, 2018 (*Id.* 188);"
- "Multiple entries that include insufficiently vague descriptions such as "other trial preparation" by "Ms. Karyna Valdes on May 1, 2018- May 2, 2018 (*Id.* 187);"
- Charges for the attendance of four attorneys, including two partners, and a law clerk at trial (*Id.* 186-193); and"
- "Time entries for travel time that do not indicate that work was performed during travel such as the entry "[t]raveled from Washington, D.C., to Cincinnati, Ohio following trial" by Ms. Jesse Jenike-Godshalk on May 12, 2018 (*Id.* 191) and "Return air travel from Aruba to Washington, D.C." by Mr. Eric Heyer on May 5, 2017 (*Id.* 136)."

Defs.' Opp'n at 18. These paltry, conclusory descriptions do not suffice to explain why the time charges at issue were unreasonable under the circumstances.

conceded." LCvR 7(b). The plaintiff filed its motion for attorney's fees on May 29, 2018. *See* Pl.'s Mot. at 2–3. The defendants thus had until June 12, 2018 to "serve and file a memorandum of points and authorities in opposition to the motion." LCvR 7(b). Indeed, the defendants filed timely opposition to the plaintiff's motion. *See* Defs.' Opp'n at 24. The defendants' failure to submit any substantive argument in opposition to the plaintiff's motion for attorney's fees amounts to concession on this issue.

The defendants argue that "[s]ince the Court issued judgment in this matter, Defendants' counsel has been occupied with preparing other time sensitive pleadings in this case alone which are subject to strict deadlines under the applicable rules." *Id.* at 19. A "court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect." FED. R. CIV. P. 6(b)(1)(B). Here, however, the defendants have filed no motion for extension of time. Such a motion would be futile in any event, as it is well-established that other matters on counsel's plate do not amount to excusable neglect. *See, e.g.*, *Citizens' Protective League v. Clark*, 178 F.2d 703, 704 (D.C. Cir. 1949) ("That an attorney has other matters in his office which require his attention does not constitute excuse for neglect of attention to any one matter."); *Maghan v. Young*, 154 F.2d 13, 13 (D.C. Cir. 1946) (finding no excusable neglect where counsel who was "professionally engaged in attending to other matters" untimely filed an opposition); *McLaughlin v. City of LaGrange*, 662 F.2d 1385, 1387 (11th Cir. 1981) ("The fact that counsel has a busy practice does not establish 'excusable neglect' under Rule 6(b)(2)."); *Gadsden v. Jones Lang Lasalle Ams., Inc.*, 210 F.Supp.2d 430, 436 (S.D.N.Y. 2002) ("Preoccupation with another trial and mere oversight are not reasons for delay that are sufficient to satisfy the standard for excusable neglect." (citations omitted)).

Moreover, the matters preoccupying the defendants' counsel are unremarkable aspects of post-trial motions practice. The defendants assert that they could not respond substantively to the plaintiff's motion for attorney's fees by the Court-imposed deadline because they were otherwise committed to (1) "[p]reparing a Renewed Motion For Entry Of Judgment As A Matter Of Law Or, In The Alternative, For New Trial (Doc. 136)," (2) "[p]reparing Defendants' Post-Trial Motion For Remittitur Or, In The Alternative, For A New Trial On Damages (Doc. 137)," (3) "[r]esponding *infra* to Plaintiff's Motion," (4) "[c]onsidering whether to object to the items included in Plaintiff's Bill of Costs (Doc. 133)," and (5) "[r]eviewing the extensive trial record and voluminous transcripts for use with Defendants' post-trial efforts." Defs.' Opp'n at 19. The defendants could have filed a motion seeking additional time to file either their two post-trial motions or their opposition to the plaintiff's motion, if the defendants felt they had insufficient time to prepare all three filings. *See* FED. R. CIV. P. 6(b)(1)(A) ("When an act may or must be done within a specified time, the court may, for good cause, extend the time . . . with . . . motion … or if a request is made, before the original time or its extension expires."). Likewise, merely considering whether to object to items in the plaintiff's Bill of Costs and reviewing the trial record do not constitute good cause to fail to respond timely to the plaintiff's motion.

The defendants note as another excuse that "Defendants' undersigned counsel have had several other time sensitive commitments and deadlines in other cases in the last three (3) weeks," Defs.' Opp'n at 19 n.14, without identifying these commitments and deadlines so as to enable the Court to evaluate whether they could constitute excusable neglect. In any event, counsel, not this Court, is responsible for balancing counsel's competing client obligations and seeking additional time, with an appropriate motion, as needed. Finally, the defendants note that "one of two of Defendants' counsel . . . has been out of the country on a pre-planned and paid

family vacation from May 31, 2018 and is not due back in the office until June 14, 2018." *Id.* The defendants' prior notice of this "pre-planned," *id.*, vacation prevents the defendants from relying in any way on the vacation as excusable neglect.

The defendants invoke Rule 54(d)(2)(C), which provides that "the court must, on a party's request, give an opportunity for adversary submissions on the motion" for attorney's fees. FED. R. CIV. P. 54(d)(2)(C). This Rule merely entitles the defendants to an opportunity to contest the attorney's fee award the plaintiff seeks. The defendants' opportunity to file a brief in opposition to the plaintiff's motion satisfied Rule 54(d)(2)(C). *See, e.g., Killer Joe Nevada, LLC v. Does 1-20*, 807 F.3d 908, 913 (8th Cir. 2015) ("The district court considered the parties' submissions on the attorney's fee issue. Nothing more was required by Rule 54." (citations omitted)); *Barrientos v. 1801-1825 Morton, LLC*, No. CV066437 ABC FMOX, 2007 WL 7213524, at *6 (C.D. Cal. Dec. 10, 2007) ("Defendant had the opportunity in its opposing briefing to refute the reasonableness of Plaintiffs' fees and offer evidence to at least contradict Plaintiffs' evidence. Defendant, however, acted at its own peril in . . . asking for further briefing on reasonableness, rather than also offering evidence in opposition to the reasonableness of the fees sought. Plaintiffs' motion gave Defendant the 'opportunity' contemplated by Rule 54(d)(2)(C), and Defendant has cited no case to suggest that any further opportunity . . . is now required. The Court need not—and will not—allow Defendant to submit evidence and argument it already had the opportunity to present."). The defendants' failure to take advantage of this opportunity by substantively opposing the plaintiff's request for attorney's fees does not meet Rule 54(d)(2)(C)'s standard.

In a last gasp effort to put off a reckoning of attorney's fees due, the defendants "request that the Court set the matter for hearing or refer issues regarding the reasonableness of the

amount of fees to a special master or magistrate." Defs.' Opp'n at 20. "[T]he court may refer issues concerning the value of services to a special master . . . and may refer a motion for attorney's fees to a magistrate judge." FED. R. CIV. P. 6(d)(2)(D); *see also GAF Corp. v. Transamerica Ins. Co.*, 665 F.2d 364, 370 (D.C. Cir. 1981) (remanding "for a hearing on the amount of attorneys' fees and costs that should properly be awarded"). No need to set this matter for hearing or refer the matter to a magistrate judge or special master exists, however, as the defendants' failure to respond substantively to the plaintiff's motion for attorney's fees means no factual dispute as to the amount of attorney's fees to which the plaintiff is entitled sufficiently has been presented to the Court. Indeed, the defendants articulate no reason at all why either a hearing or reference to a magistrate judge or special master is appropriate here.

Had the defendants required an extension of time to file a substantive response to the plaintiff's motion for attorney's fees, the proper course of action would have been to confer with the plaintiff and file a motion for extension of time. *See* FED. R. CIV. P. 6(b)(1)(A) (allowing a court "for good cause" to "extend the time . . . if a request is made, before the original time . . . extension expires."); Standing Order ¶ 6, ECF No. 5 (allowing a party to move for extension of time so long as the party's motion contains, among other things, "the good cause supporting the motion" and "the opposing party's position on the motion"). Indeed, the docket shows that the plaintiff previously consented to the defendants' motion for extension of time, *see* Joint Status Report at 1, ECF No. 61; Min. Order (dated Oct. 2, 2017), and the plaintiff represents that it would have consented to a motion for extension of time here, *see* Pl.'s Reply at 15. Having failed to seek an extension of time before their opposition was due, the defendants cannot now demand additional time. Strikingly, the defendants nowhere acknowledge the failure to abide by

this Court's Local Rules or the inconvenience prolonging litigation would impose on the plaintiff or this Court's interest in resolving litigation expeditiously.

For these reasons, the plaintiff is entitled to $493,328.50 in attorney's fees.

### G.    The Plaintiff is Entitled to Other Costs and Expenses

The plaintiff argues that it "is also entitled to an award of its other costs and expenses incurred in pursuing this action beyond those sought in its bill of costs filed in conjunction herewith." Pl.'s Mem. at 13. As noted, Section 6 of the Agreement entitles a "prevailing party" in any "action to enforce this Agreement or to interpret any of its terms . . . to full reimbursement of its costs and expenses in connection therewith from the non-prevailing party, including attorney's fees." Pl.'s Trial Ex. 17 § 6. The plaintiff has submitted detailed declarations, as well as supporting receipts, identifying with particularity the costs and expenses, above and beyond those included in the plaintiff's bill of costs, that the plaintiff incurred in litigating this matter. *See* Heyer Decl. ¶¶ 18–20; Invoices, ECF No 134-2; Decl. of Carl J. Bazarian ("Bazarian Decl.") ¶¶ 4–11, ECF No. 134-3; Bazarian Decl., Attachs., Supporting Documents, ECF No. 134-3. These include court reporter and trial transcript fees, interpreter fees, translation fees, airfare, lodging, meals, ground transportation, parking, postage and FedEx expenses, photocopier charges, legal research charges, PACER access charges, offsite telephone charges, e-discovery vendor charges, courier charges, trial supply costs, and the expert witness fees of Williston H. Clover. *See* Heyer Decl. ¶¶ 18–20; Invoices, ECF No 134-2; Bazarian Decl ¶¶ 4–11; Bazarian Decl., Attachs., Supporting Documents, ECF No. 134-3. Review of these affidavits and receipts reveals that the costs and expenses the plaintiff seeks to recover are of the sort that ordinarily arise in the course of a complex, long-running commercial dispute, and therefore are reasonable.

The defendants argue that plaintiff's requested costs and expenses are not recoverable under Federal Rules of Civil Procedure Rule 54(d)(1) and Local Civil Rule 54.1. *See* Defs.'

Opp'n at 20–22. The plaintiff, however, does not invoke either rule for its entitlement to recover these costs and expenses. Instead, the plaintiff argues that Section 6 of the Agreement provides an independent, freestanding basis to recover costs and expenses. *See* Pl.'s Mem. at 13; Pl.'s Reply at 16–19. By allowing a prevailing party to recover "costs *and* expenses," Pl.'s Trial Ex. 17 § 6 (emphasis added), the Agreement entitles a prevailing party to recover those limited costs recoverable under its bill of costs, while the term "including attorney's fees" signals that these additional expenses are not limited to attorney's fees. Indeed, the defendants do not contest this construction of the Agreement, and thus waive any argument that the Agreement limits recovery to costs recoverable under Rule 54(d)(1) or Local Rule 54.1.[8]

## IV. CONCLUSION

For the foregoing reasons, the Court denies the defendants' motions for judgment as a matter of law, a new trial, and remittitur, and grants the plaintiff's motion for pre-judgment interest, post-judgment interest, and attorneys' fees, costs, and expenses. In addition to the jury's $2,200,000 damages award, the defendants shall pay the plaintiff as follows: pre-judgment interest in the amount of $599,016; post-judgment interest on the jury's $2,200,000 damages

---

[8] The defendants also argue that the plaintiffs are not entitled to prejudgment interest, attorney's fees, or other costs and expenses as to DHC and Hotelco Curacao because "[i]t would be inequitable to require the non-signatory Defendants, DHC and Hotelco Curacao, to pay prejudgment interest on the debt arising from a contract that they were not parties to, or contractually obligated to pay based on the specific language and exact terms of that contract," and because "as a matter of fundamental due process and notice, . . . the earliest they could have been made contractually liable for the Debt Fee by operation of law (and the Jury's finding of successor and alter ego liability) was on the date of the Judgment in this case." Defs.' Opp'n at 15–16. This argument reflects a fundamental misunderstanding of successor in interest and alter ego liability. Under these theories, DHC and Hotelco Curacao did not suddenly become liable to the plaintiff on the day the jury rendered its verdict. Rather, the crux of the successor in interest and alter ego theories is that DHC and Hotelco Curacao have stood in Hotelco C.A.'s shoes dating back to the time of the actions that form the basis of such liability. As such, to hold DHC and Hotelco Curacao liable as Hotelco C.A.'s alter egos or successors in interest is neither inequitable nor inconsistent with due process norms. The defendants' reliance on *Athridge v. Iglesias*, 382 F. Supp. 2d 42, 51 (D.D.C. 2005), *see* Defs.' Opp'n at 15–16, is misplaced. The *Athridge* Court declined to impose liability on defendants for injuries the plaintiff sustained when the defendants' nephew, an unlicensed driver, struck the plaintiff with the defendants' car, which the nephew had borrowed. *Athridge* did not involve alter ego or successor in interest liability, however, under which theories DHC and Hotelco Curacao stand in Hotelco C.A.'s shoes. As such, any inequity that may have resulted from imposing damages on the *Athridge* defendants would not occur here.

award at the rate set in 28 U.S.C. § 1961(a) from May 14, 2018 until the date of payment; $493,328.50 in reasonable attorneys' fees; and $86,328.77 in costs and expenses.

An order consistent with the conclusions in this Memorandum Opinion will be entered contemporaneously.

Date: October 24, 2018

_____

BERYL A. HOWELL

Chief Judge